## UNITED STATES FEDERAL DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| WEST VIRGINIA STATE UNIVERSITY BOARD OF GOVERNORS for and on behalf of West Virginia State University, <br><br> *Plaintiff,* <br><br> v. <br><br> THE DOW CHEMICAL COMPANY; UNION CARBIDE CORPORATION; BAYER CORPORATION; BAYER CROPSCIENCE LP; BAYER CROPSCIENCE HOLDING INC.; RHONE-POULENC INC.; RHONE-POULENC AG COMPANY; RHONE-POULENC AG COMPANY, INC.; and AVENTIS CROPSCIENCE USA LP, <br><br> *Defendants.* | Case. No.   2:17-cv-03558 |

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1332, 1441, 1442, and 1446, defendants give notice that the above captioned case (Case No. 17-C-599 in the Circuit Court of Kanawha County, West Virginia) is hereby removed to this United States District Court.

### INTRODUCTION

This case is a quintessential federal dispute that can and should be heard in federal court. Plaintiff West Virginia State University ("WVSU") brings claims that directly challenge ongoing investigative and remedial activities by the United States Environmental Protection Agency ("EPA"). Based upon voluminous scientific reports compiled over a period of years, the EPA has determined that any contamination beneath the WVSU campus poses no threat to health or

safety and can be effectively addressed without remediation.  Rather than accept the EPA's expert judgment, however, plaintiff seeks to compel defendants to undertake a host of remedial actions that the EPA has rejected.  In effect, plaintiff is attempting to hijack the EPA's statutory and regulatory mandate by collaterally attacking the EPA's judgment in state court.  Because the dispute is federal in character, it firmly belongs in federal court.

This dispute concerns contamination from a chemical plant in Institute, West Virginia that plaintiff alleges has seeped into groundwater underneath adjoining property purportedly owned by the university.  Yet, this contamination has been the subject of EPA investigation and remediation activities for decades — investigation and remediation activities that are still ongoing.

As a result of information collected through this investigation, and as plaintiff concedes in public statements made in conjunction with this lawsuit, the EPA has determined that there is no risk to human health from any contamination purportedly contained in groundwater underneath the WVSU campus:

- "Outside experts have concluded that the available evidence does not indicate a threat to human health from these contaminants, and the United States Environmental Protection Agency and the West Virginia Department of Environmental Protection agree." (4/27/17 WVSU press release at 1, Ex. 1.)

- "The federal Environmental Protection Agency (EPA) and the West Virginia Department of Environmental Protection (DEP) have been apprised of the results of campus environmental testing throughout our assessment.  Outside experts have concluded that the available evidence does not indicate a threat to human health from these contaminants, and EPA and DEP agree." (4/27/17 A. Jenkins, letter to parents and students at 1, Ex. 2; WVSU Fact Sheet at 1-2, Ex. 3.)

- "Multiple environmental experts have reviewed testing results from various sites on campus and in the ground beneath it.  They all agree, based on all known information, that no one in the campus community is being exposed to the Dow contamination." (4/27/17 A. Jenkins, letter to campus at 1, Ex. 4.)

WVSU does not use the groundwater as a source of drinking water for the campus, and the EPA has determined that there is no danger of exposure to any contaminants, and no risk to human health.  Accordingly, the EPA has indicated that it agrees that no remediation is necessary and that the appropriate approach is to have the university execute an environmental covenant providing that it will continue to refrain from accessing groundwater at the site.  (CH2M Meeting Summary re UCC Institute Facility - Agency/UCC Collaboration Meeting, Ex. 6.)

Despite the fact that it has cooperated with the EPA investigation for years, WVSU has not executed the covenant and has instead filed this lawsuit requesting injunctive relief flatly inconsistent with the EPA's regulatory determinations.  WVSU would have the state court order defendants to take actions that are directly at odds with what the EPA has required — including potentially directing the Institute plant to cease operations entirely.

Plaintiff's lawsuit would significantly interfere with the EPA's ongoing activities and represents a direct challenge to the EPA's expert conclusions, warranting exercise of this Court's jurisdiction.  Indeed, there are multiple reasons the Court may exercise jurisdiction over these claims, including the following: (1) plaintiff's claims challenge the EPA's ongoing clean-up activities, and thus this Court has exclusive jurisdiction under federal law; (2) plaintiff's claims involve actions taken by defendants acting under the direction of a federal officer (the EPA); and (3) the parties are citizens of different states, conferring diversity jurisdiction upon this Court. Removal is therefore proper.

## BACKGROUND

I.    **Federal Law Establishes A Comprehensive Statutory And Regulatory Framework That Governs The Contamination At Issue Here.**

1.  Under federal law, the EPA is charged with "develop[ing] regulations, guidance and policies that ensure the safe management and cleanup of solid and hazardous waste." (*See* EPA

Resource Conservation and Recovery Overview (hereinafter "EPA Overview"), Ex. 7.)  Pursuant to the statutory directive, the EPA has developed a "comprehensive" program for the safe management of solid and hazardous wastes.  (*Id.*)  The program's objective is to ensure that such wastes are handled in a way that protects the environment and human health.  (*See* EPA's RCRA Orientation Manual 2014 (hereinafter "EPA Orientation Manual" at I-4, Ex. 8[1]).)  The EPA's waste management program and regulatory scheme is comprehensive and is commonly described as "cradle-to-grave."  (*See, e.g.*, EPA Overview, Ex. 7.)  Indeed, it "has resulted in perhaps the most comprehensive regulations EPA has ever developed."  (*See EPA Orientation Manual* at I-4, Ex. 8.)

2.  The EPA's cradle-to-grave waste management program regulates the generation, transportation, treatment, storage and disposal of potentially hazardous waste.  (EPA Orientation Manual at I-4, Ex.8; *see* 40 C.F.R. §§ 261-262.)  The EPA's regulation of waste generators includes, among other things, the identification of such waste, compliance with accumulation and storage requirements, tracking the shipment and receipt of waste, and recordkeeping and reporting requirements.  (EPA Orientation Manual at III-46, Ex. 8.)

3.  The EPA's management and regulation also includes, where necessary, corrective action.  (*See generally id.* at III-119 to III-124.)  The EPA's corrective action program addresses the cleanup of existing contamination at operating industrial facilities, which the EPA has described as one of its "highest priorities."  (*See, e.g.*, EPA fact sheet, Treatment Experiences at RCRA Corrective Actions, Ex. 9.)  In addition to remediation of contamination at the site itself,

---

[1] Exhibits 8, 13, 15-17, 27, and 31 contain excerpts from documents too voluminous to attach in their entirety.  The full versions of these documents are available upon request.

federal law permits the EPA to impose corrective action requirements for releases that have migrated beyond the facility boundary. *See, e.g.*, 42 U.S.C. § 6924(v).

4.   As part of a federal cleanup, the EPA may require, among other things, a variety of measures to monitor and remediate contamination, such as protective systems, barriers, removal of hazardous waste, groundwater monitoring, and vapor mitigation. (*See, e.g.*, EPA's Vapor Intrusion Guide (Oct. 2015), Ex. 10 (EPA has "statutory authority and responsibility to assess and, if warranted, mitigate vapor intrusion."); RCRA Corrective Action Environmental Indicator (EI) RCRIS code (CA750) at 1, 15-16 (Sept. 22, 2015), Ex. 11.)

5.   In conducting such environmental cleanups, the EPA draws on its extensive experience to craft appropriate remedies. (*See, e.g.*, A Toolbox for Corrective Action, Ex. 12.) The EPA maintains a reference guide that provides a "yellow pages" of remediation technologies, including "[p]resumptive remedies" that are "based on historical patterns of remedy selection and EPA's scientific and engineering evaluation of performance data on technology implementation." (*See* Remediation Technologies Screening Matrix and Reference Guide, Version 4.0, at 1.1, Ex. 13.) With respect to groundwater contamination in particular, the EPA has identified a number of different potential treatment technologies and has assessed the costs and benefits of each. (*See id.* at Table of Contents.) In addition, as part of its corrective action program, the EPA maintains information about treatment experiences at corrective action sites to help it and others "better understand the types of cleanup technologies" available. (*See, e.g.*, EPA fact sheet, Treatment Experiences at RCRA Corrective Actions, Ex. 9.)

6.   Before implementing a final remedy, the EPA commonly analyzes a range of alternatives, considering the advantages or disadvantages of each. (EPA Orientation Manual at III-119 to III-124, Ex. 8.) Implementation of the final remedy typically involves a number of

components, including "detailed remedy design, remedy construction, remedy operation and maintenance, and remedy completion." (*Id.* at III-124.)  The EPA employs a variety of "balancing/evaluation" criteria in assessing final remedies. (*See* EPA Fact Sheet, Final Remedy Selection for Results-Based RCRA Corrective Action, at 3-4 (March 2000), Ex. 14.)

## II.   The EPA Has Been Conducting Ongoing Investigation And Remediation Activities At The Institute Facility For Decades.

7.   Defendants in this action have been working with the EPA for decades pursuant to this comprehensive regulatory framework.  The facility at issue here is a 433-acre industrial park located in Institute, West Virginia between the Kanawha River to the south, State Route 25 to the north, and WVSU to the east (hereinafter the "Institute Facility").

8.   The Institute Facility consists of two distinct areas, the main chemical plant and a wastewater treatment unit.  These areas are separated by approximately one half mile, with intervening properties that include a transformer substation, an aggregate dock, and a former construction debris landfill (the solid waste management unit).  The chemical plant contains multiple process, chemical storage and handling units, laboratories, warehouses, and offices.

9.   The Institute Facility began operation in 1943 as a synthetic rubber production plant during World War II and was originally owned by the federal government.  (CH2M, Corrective Measures Proposal 1-1 (Dec. 2016) (hereinafter "Corrective Measures Proposal"), Ex. 15.)  In 1947, Union Carbide Corporation ("UCC") purchased and began operating the facility, producing various hydrocarbons and agricultural products.  (*Id.*; First Am. Compl. ¶ 15, Ex. A.)  Since UCC sold the facility in 1986, it has been owned and operated by multiple parties (whom plaintiff has also named as defendants).  UCC reacquired the facility in 2015 and owns it today.

10. In the mid-1980s, the EPA initiated efforts to address contamination at the Institute Facility pursuant to the EPA's comprehensive waste management program and regulatory

scheme.  (*See* Corrective Measures Proposal at ES-1, Ex. 15.)  In August 1984, the EPA published a report documenting environmental pollution from multiple sources located within the Kanawha Valley.  (*See Overview of Environmental Pollution in the Kanawha Valley* (Aug. 1984), Ex. 16.)  That EPA report described, among other things, groundwater contamination at the Institute Facility.  (*Id.* at VII-19 to VII-29.)

11. As part of its efforts to address environmental contamination within the Kanawha Valley, in approximately November 1984, the EPA initiated a corrective permitting action in order to identify and remediate solid waste management units (SWMUs) at the facility. (Corrective Measures Proposal at 1-1, Ex. 15.)  As part of the permitting process, UCC submitted to the EPA an initial list of SWMUs, which was modified and resubmitted in September 1986.  (Verification Investigation Report at 1-4 (July 9, 1992), Ex. 17.)  The EPA issued a preliminary corrective action permit to Rhone-Poulenc (which was operating the facility at the time) in July 1988, and in November 1988 it issued a final permit requiring investigation for potential migration of hazardous wastes from certain SMWUs at the facility.  (*Id.*)

12. In December 1990, the EPA issued a revised final permit, effective January 1991, to govern investigation and remediation activities relating to contamination emanating from the facility.  (*Id.*; USEPA Permit for Corrective Action (Dec. 18, 1990), Ex. 18.)  The EPA's Corrective Action Permit for the Institute Facility made clear that "[t]he Permittee must comply with all terms and conditions of this permit."  (*Id.*)  Indeed, "permit noncompliance … is grounds for enforcement action" against the owner of the facility.  (*Id.* at 4.)  Under federal law, if a facility violates the requirements in its permit, the EPA may initiate an enforcement action against the facility to compel compliance and to collect penalties.  (*See* RCRA Corrective Action Enforcing Permits, Ex. 19; 42 U.S.C. § 6928 ("Federal enforcement").)

13. Pursuant to this permit, the EPA requires, among other things, submission "to EPA, for approval, documentation that the subsurface conditions and contaminant plume have been adequately characterized and the proposed corrective measures will adequately remove, contain or treat the released hazardous wastes or hazardous constituents." (USEPA Permit for Corrective Action at 11, Ex. 18.)  The EPA specifies numerous detailed requirements for the work to be performed pursuant to the permit, including that "[a]ll plans, reports, schedules, and other submissions required by" the permit are, "upon approval by the [EPA] Regional administrator, incorporated in this permit" and that "[a]ny noncompliance with such approved studies, schedules, plans, reports, or other submissions shall be deemed noncompliance with this permit." (*Id.* at 27.)

14. Since the EPA issued its Corrective Action Permit, dozens of investigation, permitting and remedial activities have occurred under the EPA's supervision, many of which are catalogued in the attached exhibits. (*See* Corrective Measures Proposal at 1-1 & Table, Ex. 15 ("Numerous environmental investigations and reports have been completed at the facility . . .")..); Institute Facility - USEPA and WVDEP Partnering Meeting (May 2017), Ex. 20.)

15. As part of these activities, beginning in 1996, groundwater delineation and remediation work were performed at multiple areas at the facility.  (Key Environment, Summary of Site Remediation (2006), Ex. 21; Corrective Measures Proposal, Ex. 15.)  As a result, "there are several measures already employed at the facility on a sitewide basis to address potential risk from dissolved groundwater contaminants.  In addition to utilizing remedial objectives, site-specific performance standards were established to specifically address groundwater." (Corrective Measures Proposal at ES-2, Ex. 15.)

16. Remediation efforts at the facility have included, among other things, implementation of air sparging and soil vapor extraction systems and ground water extraction wells.[2] Contaminated material from the solid waste management units was also excavated and disposed of off-site. A "USEPA-sitewide groundwater monitoring program has been in place since 2011." (*Id.*) It has been "updated with a revised program in 2014 to 1) determine if concentrations in impacted areas are stable or decreasing; 2) monitor the site perimeter; 3) document water quality improvement; 4) detect and respond to changes in site conditions; and 5) identify areas where additional active remediation may be necessary." (*Id.*)

17. Currently, the EPA is involved in the final stages of remediation and is considering proposed final corrective measures at the facility and adjoining properties. (*Id.*)

18. All of the ongoing activities at the facility and adjoining properties have been conducted under the direction and supervision of the EPA. (*See* Corrective Measures Proposal at 1-1 (EPA is the "lead agency for implementing the RCRA CA permit."), Ex. 15.)

III.    **Plaintiff West Virginia State University And Owners Of Property Adjacent To The Institute Facility Have Cooperated With the EPA Investigation For Years.**

19. For years, WVSU and owners of property adjacent to the facility cooperated with the EPA's ongoing investigation and remedial efforts. Among other things, WVSU and prior owners of the property executed access agreements that allowed EPA-ordered "sampling, monitoring, and investigative activities" to be conducted on the property. (9/30/14 WVSU Access Agreement at 1, Ex. 22; 1/22/13 Department of Administration Access Agreement at 1, Ex. 23.)

---

[2] Air sparging involves the injection of pressurized air into contaminated groundwater enabling the hydrocarbons to change to a vapor state. The vapor is then sent to vacuum extraction systems, which remove the contaminants.

20. Moreover, for years, WVSU and the prior owners have been regularly informed regarding the investigation and remedial efforts through a series of presentations. (*See, e.g.,* J. Cibrik, email to K. McCord (Aug. 11, 2014), Ex. 24; Institute Facility - West Virginia State University Groundwater Monitoring (May 2015), Ex. 25; Institute Facility - West Virginia State University Groundwater Investigation Update (Nov. 2015), Ex. 26.)

21. To this day, owners of property adjacent to the Institute Facility, including Appalachian Power Company and Norfolk Southern, continue to cooperate with the EPA's ongoing investigation. WVSU is the sole exception. (*See* Corrective Measures Proposal at ES-3 Figure 1-1, ES-2 to ES-3, 3-29 to 3-30, Ex. 15.)

## IV.   After A Thorough And Comprehensive Investigation, The EPA And Other Experts Concluded There Is No Risk To Human Health.

22. As part of its investigation and remediation activities, the EPA presided over a series of studies of contamination related to the Institute Facility, including studies conducted on the WVSU campus. Data was collected on the WVSU campus in a phased approach. In total, five phases of testing spanning four years were overseen by the EPA and conducted by experts who evaluated whether there was any potential risk and whether remedial measures were necessary.

23. Phase I of the investigation concerned property that was immediately adjacent to the Institute Facility. The property was not being utilized but contained buildings that had housed a rehabilitation center formerly operated by the West Virginia Department of Education.

24. In May 2010, the West Virginia Department of Education transferred the rehabilitation center property to the West Virginia Department of Administration ("WVDA").

25. From December 2012 to January 2013, UCC negotiated an agreement with the WVDA for access to the property. The parties signed the access agreement on January 22, 2013,

after which experts at CH2M Hill began their investigation activities as part of the EPA cleanup. (1/22/13 Department of Administration Access Agreement at 1, Ex. 23.)

26. In March 2013, CH2M Hill reported the results of its investigation of contamination at the former rehabilitation center property (the Phase I study) and provided the results of this study to the WVDA. (*See* J. Cibrik letter to G. Melton (May 30, 2013), Ex. 27.) The study reported low levels of various organic compounds in the groundwater that runs beneath the former rehabilitation center property and under portions of the remainder of WVSU property.

27. In May 2013, according to WVSU, WVDA transferred the former rehabilitation center property to WVSU. As WVSU has acknowledged, and as the record reflects, WVSU was aware of the contamination before it allegedly took possession of the property: "University officials say they learned of the contamination about four years ago, when they took ownership from the state of the former West Virginia Rehabilitation Center, located between the campus and the chemical plant." (WVSU Sues Dow Over Water Pollution at Institute Campus, Charleston Gazette-Mail (Apr. 27, 2017), Ex. 28.)

28. On August 5, 2013 CH2M Hill reported to the EPA, WVDEP and WVSU the results of its investigation in a technical memorandum. (East Property Boundary Investigation at West Virginia State University (Aug. 5, 2013), Ex. 29.) The memorandum concluded that there was no risk to human health from any contamination beneath the WVSU campus. (*Id.* at 7.) It further noted that "current and potential future use of the property is not expected to be residential, based on discussions with WVSU on July 11, 2013." (*Id.* at 2.) "Based on commercial/industrial land use, no constituents were detected above applicable VISLs at the midpoint of USEPA's risk management range …." (*Id.*) The memorandum recommended only

11

that an environmental covenant be executed that would "prohibit[] the use of groundwater and requir[e] a vapor barrier for new buildings constructed on the property." (*Id.* at 8.)

29. On April 2014, the EPA approved the technical memorandum, including the memorandum's finding that there was no risk to human health and the memorandum's proposal for an environmental covenant. (W. Wentworth, email to J. Cibrik (April 29, 2014), Ex.30.) As a result of the EPA's review and approval, and as CH2M Hill later observed, "the U.S. Environmental Protection Agency (USEPA) approved the recommendation in April 2014 (CH2M 2013; USEPA 2014)." (Eastern Property Boundary RCRA Corrective Action Investigation - Phase II through Phase V, at 1 (Apr. 15, 2016), Ex. 31.)

30. On September 30, 2014, WVSU executed an access agreement to conduct additional investigation activities. (9/30/14 WVSU Access Agreement at 1, Ex. 22.) Under the agreement, among other things, WVSU approved the locations for boring to collect samples on property used by the university. (*Id.*)

31. From October 2014 through January 2016, as part of Phases II-IV of the EPA investigation, CH2M Hill collected additional data relating to the university campus, university football complex and faculty residences, and the university football practice field and agricultural facility.

32. On April 18, 2016, CH2M Hill submitted a report containing the results of the Phase II-V studies to the EPA for the EPA's approval. (J. Cibrik, letter to W. Wentworth (April 18, 2016), attaching Eastern Property Boundary RCRA Corrective Action Investigation - Phase II through Phase V (Apr. 15, 2016), Ex. 31.) Among other things, the report concluded that "there is no risk currently associated with the drinking water use pathway" since "the WVSU property

is supplied by municipal water and no drinking water wells are present on the property."  (*Id.* at 1.)

33. On July 18, 2016, the EPA approved CH2M Hill's report on the Phase II-V studies and stated that "EPA agrees with the conclusions presented in that report."  (W. Wentworth, letter to J. Cibrik (July 18, 2016), Ex. 32.)

34. The EPA is presently, and has been for seven months, actively reviewing a corrective measures proposal.  (J. Cibrik, letter to W. Wentworth (Jan. 6, 2017), attaching Corrective Measures Proposal, Ex. 15.)  The corrective measures proposal summarizes the evidence collected during the EPA investigation, which demonstrates the lack of any human health risk: "[T]here are no drinking water wells on or near the facility and annual evaluation of groundwater data (in accordance with the USEPA-approved sitewide groundwater monitoring program) indicates the VI pathway is insignificant for currently occupied site buildings."  (*Id.* at ES-2.)

35. On May 30 and 31, 2017, representatives from the EPA convened a collaboration meeting with WVDEP, UCC and CH2M Hill to discuss the proposed corrective measures.  (*See* CH2M Meeting Summary re *UCC Institute Facility - Agency/UCC Collaboration Meeting*, Ex. 6.)  At the meeting, the EPA reiterated that the submissions regarding WVSU were "approved and endorsed by the USEPA," and the EPA "confirmed [its] agreement with this approval."  (*Id.* at 2 (noting that Luis Pizarro of the EPA had approved and endorsed the submissions, and Erich Weissbart of the EPA had confirmed his agreement).)  Accordingly, the EPA reiterated that with respect to property used by the university, "[n]o further work is necessary to address RCRA corrective action related to the Institute site."  (*Id.*)

36. The EPA continues to oversee work performed under the Corrective Action permit and will continue to do so after final corrective measures are approved. Likewise, the EPA will retain jurisdiction over any environmental covenants executed as part of the Corrective Action.

## V.    Plaintiff WVSU Agrees With The EPA's Conclusions That There Is No Risk To Human Health.

37. WVSU agrees with the conclusions of the EPA investigation and has repeatedly acknowledged what the EPA and other independent experts have found — that there is no risk to human health from contamination beneath the WVSU campus. Indeed, in conjunction with this lawsuit, the university has issued a series of statements (available on the website of the law firm representing the university in this case) acknowledging that there is no risk to human health:

- In an April 27, 2017 press release announcing this lawsuit, for example, the university stated: "The contamination does not pose a current health risk to anyone on campus. Extensive testing has shown that the Dow contaminants have been introduced through groundwater, which is not used on campus, and pose no health risk in any area where people would be exposed to them." (4/27/17 press release at 1, Ex. 1.)

- In an accompanying "fact sheet", the university stated: "Outside experts have concluded that the available evidence indicates there is no threat to human health from the Dow groundwater contaminants. The United States Environmental Protection Agency and the West Virginia Department of Environmental Protection have indicated their agreement with this conclusion." (WVSU Fact Sheet at 1-2, Ex. 3.)

- In an April 27, 2017 letter to students and parents announcing the lawsuit, WVSU's President Anthony Jenkins stated: "The federal Environmental Protection Agency (EPA) and the West Virginia Department of Environmental Protection (DEP) have been apprised of the results of campus environmental testing throughout our assessment. Outside experts have concluded that the available evidence does not indicate a threat to human health from these contaminants, and EPA and DEP agree." (4/27/17 A. Jenkins, letter to parents and students at 1, Ex. 2.)

- In a letter to students, faculty and staff that same day, President Jenkins reiterated: "Please know there is no current risk to the health of anyone on campus." (4/27/17 A. Jenkins, letter to students and faculty at 1, Ex. 4.) As President Jenkins explained: "Multiple environmental experts have reviewed testing results from various sites on campus and in the ground beneath it. They all agree, based on all known information, that no one in the campus community is being exposed to the Dow contamination. The federal Environmental Protection Agency and the state Department of

Environmental Protection also have reviewed the test data and agree that the evidence does not indicate a risk to human health." (*Id.*)

**VI.** **Despite Acknowledging That There Is No Risk, WVSU Filed This Lawsuit Asking The State Court To Usurp the Function of the EPA During an Ongoing Cleanup and Impose Remedial Measures That The EPA Has Concluded Are Unwarranted.**

38. Even though it has cooperated with the EPA's investigation for years and it explicitly agrees with the EPA's conclusion that there is no risk to human health, plaintiff nonetheless has now retained a private law firm and filed the present action seeking an order from a West Virginia state court imposing a variety of remedial measures that the EPA has concluded are unwarranted — including asking the court to consider shutting down the Institute Facility, a vital contributor to the local economy.

39. In conjunction with the corrective action plan and with the EPA's supervision, UCC attempted to obtain an environmental covenant from WVSU that embodied the recommendations described in the Phase II-V report that was approved by the EPA. (Corrective Measures Proposal at ES-3, Ex. 15.) However, in response to the request for an environmental covenant, WVSU sought to extract a series of financial concessions from UCC. It did not execute the covenant and instead filed the present lawsuit.

40. Plaintiff's complaint seeks a number of different types of relief, including but not limited to requests for injunctive relief directing defendants to: (1) "Remove the Institute Plant Contaminants from the University's property"; (2) "Install barriers to protect University facilities, including but not limited to buildings and athletic fields, from possible intrusions of the Institute Plant Contaminants"; (3) "Install protective systems in all University buildings sufficient to ensure that, in the event the Institute Plant Contaminants enter the indoor environment in any building, they are removed or rendered harmless"; (4) "Monitor the Institute Plant Contaminants on the University's property to ensure that no person is exposed to the

15

Institute Plant Contaminants"; and (5) "Take all other steps necessary to eliminate any effects of the Institute Plant Contaminants on the University; its students, faculty, and staff; and other persons present on the University's property; and to restore the University and its property to the condition it would have been in absent the Institute Plant Contaminants." (First Am. Compl. ¶ 27, ¶ 45, Ex. A.)

41. In addition, plaintiff asks the West Virginia court to impose declaratory relief directing defendants to undertake additional measures not required by the EPA. Such requested relief includes a declaration "*[o]rdering that Defendants must cease and desist from operating their facility* unless and until they can operate it in a responsible and prudent manner that prevents further contamination of the University's property." (*Id.* ¶ 36 (emphasis added).) It also seeks a declaration "[o]rdering Defendants, at their expense, to implement effective plans to remove and remediate the contamination and fully restore the University's property to the condition it would have been in absent the contamination" and "[o]rdering Defendants to conduct periodic post-remediation studies and monitoring to assure the effectiveness of the remedial measures." (*Id.*)

42. Plaintiff requests that the state court step into the shoes of the EPA and oversee — for multiple years, if not decades — these remedial activities and enter an order "[m]aintaining jurisdiction over this matter to ensure that remediation and restoration efforts are performed according to such plans, and are timely and properly executed." (*Id.*) According to plaintiff, "[t]he public interest would be well served by enjoining further contamination by Defendants and ordering them to immediately remediate and restore the University's property to the condition it would have been in absent the contamination." (*Id.* ¶ 44.)

43. Plaintiff's complaint thus makes clear that it is directly challenging the remedial activities that have been, and are currently being conducted by, the EPA and under the EPA's direction and supervision and that the EPA is expected to continue into the future. Not only does the complaint seek injunctive relief that is at odds with the EPA's directives and asks the state court to oversee those remediation activities, but the complaint's own summary introduction makes clear that WVSU is bringing this action specifically because "Dow refuses to clean up the pollution" (First Am. Compl. ¶ 1) and "refuses to perform any removal or remediation of the pollution" (*id.* ¶ 32).[3]

## GROUNDS FOR REMOVAL

### I.     This Court Has Jurisdiction Because WVSU's Complaint Challenges An EPA Cleanup.

44. Under 28 U.S.C. § 1441(a), civil actions brought in state court may be removed to federal court where the U.S. district court has "original jurisdiction," including federal question jurisdiction pursuant to 28 U.S.C. § 1331.[4]

45. Removal is appropriate where, as here, a complaint is artfully pleaded to avoid acknowledging a federal question central to the plaintiff's claims. *See, e.g.*, *Davis v. Bell Atlantic-West Virginia, Inc.*, 110 F.3d 245, 247 (4th Cir. 1997); *Sable v. General Motors Corp.*, 90 F.3d 171, 174 (6th Cir. 1996) ("an action may be removed 'where the real nature of the claim

---

[3] Plaintiff has named The Dow Chemical Company and Bayer Corporation as defendants in the instant lawsuit. Neither The Dow Chemical Company nor Bayer Corporation ever owned or operated the Institute Facility and, thus, there is no basis for any claim against these entities.

[4] Since original federal jurisdiction exists here, the Court acquires supplemental jurisdiction over any claims the Court determines raise purely state-law issues. *See* 28 U.S.C. § 1367(a) (noting that, apart from certain exceptions not applicable here, "in any civil action in which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution").

asserted in the complaint is federal irrespective of whether it is so characterized'"); *Phipps v. FDIC*, 417 F.3d 1006, 1011 (8th Cir. 2005) ("[W]e are required to look beyond the plaintiffs' artful attempts to characterize their claims to avoid federal jurisdiction."); *Burda v. M. Ecker Co.*, 954 F.2d 434, 438 (7th Cir. 1992) ("A plaintiff may not frame his action under state law and omit federal questions that are essential to recovery.") (internal citations omitted); *Sherr v. South Carolina Elec. & Gas Co.*, 180 F. Supp. 3d 407, 417 (D.S.C. 2016) ("Under the artful pleading doctrine, a plaintiff may not defeat removal by omitting necessary federal questions.").

46. "Courts 'will not permit plaintiff to use artful pleading to close off defendant's right to a federal forum . . . [and] occasionally the removal court will seek to determine whether the real nature of the claim is federal, regardless of plaintiff's characterization." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 397 n.2 (1981). In assessing whether a plaintiff has "artfully pleaded" its claims, the court may examine the entire record to determine the true nature of the claims, regardless of plaintiff's characterization. *Id.*

47. Federal jurisdiction exists and removal is warranted where a plaintiff seeks to "challenge" an environmental cleanup being supervised by the EPA by requesting judicial orders that would dictate remedial actions or interfere with an ongoing cleanup. *See, e.g., Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469 (9th Cir. 1995) (request for injunctive relief was "challenge" to government's continuing environmental cleanup); *North Penn Water Authority v. BAE Sys.*, No. 04-5030, 2005 WL 1279091, at *7 (E.D. Pa. May 25, 2005); *Lehman Bros. Inv. Inc. v. City of Lodi*, 333 F. Supp. 2d 900, 901 (E.D. Cal. 2004). As the Fourth Circuit has recognized more generally, "[w]here the resolution of a federal issue in a state-law cause of action could, because of different approaches and inconsistency, undermine the stability and efficiency of a federal statutory regime, the need for uniformity becomes a substantial federal

interest, justifying the exercise of jurisdiction by federal courts." *See Ormet Corp. v. Ohio Power Co.* 98 F.3d 799, 807 (4th Cir. 1996) (citing *Martin v. Hunter's Lessee*, 14 U.S. (1 Wheat) 304, 347-48) (1816) (Story, J.)).

48. An action constitutes a "challenge" to an EPA-supervised cleanup "if it is related to the goals of the cleanup." *Hanford Downwinders Coalition*, 71 F.3d at 1482; *North Penn*, 2005 WL 1279091, at *8; *see also McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 330 (9th Cir. 1995). Thus, for example, federal courts have found that actions "challenge" EPA-supervised cleanups where, among other things, "the plaintiff seeks to dictate specific remedial actions, to postpone the cleanup, to impose additional requirements on the cleanup, or to terminate the RI/FS [Remedial Investigation/Feasibility Study] and alter the method and order of cleanup." *North Penn*, 2005 WL 1279091, at *8, *11; *Lehman Bros.*, 333 F. Supp. 2d at 902 (courts have found challenges to EPA cleanups where plaintiffs seek to "alter" cleanup requirements or environmental standards or the action would "postpone" or "delay" a cleanup).

49. In *North Penn*, for example, the court affirmed federal jurisdiction and rejected plaintiff's motion to remand a case involving alleged TCE contamination because plaintiff's claims conflicted with ongoing EPA remediation activities. The EPA initiated an investigation of the contamination leading to the development of a proposed plan for remediation. Plaintiff filed a complaint asserting state statutory and common law claims and seeking declaratory relief and future costs. The court held that, while plaintiff did not expressly plead a federal cause of action, its requested declaratory relief sought to dictate remedial actions and thus represented an implicit "challenge" to EPA's ongoing investigation and remedial actions.

50. Among other things, the court found that plaintiff's claims could be construed as "criticiz[ing] the EPA's proposed remediation plan," accusing defendants of "failing to take

appropriate and timely action to address the contamination," and asserting that plaintiff had "incurred costs as a result." *North Penn*, 2005 WL 1279091, at *9. In addition, plaintiff sought "a judgment directing Defendants 'to abate the contamination and provide an appropriate and acceptable treatment system." *Id.* The court held that claims seeking an order directing "Defendants to establish and maintain 'an appropriate and acceptable treatment system" were "claims which clearly involve the federal interests in clean-up that Congress intended to address in CERCLA and RCRA" and therefore were claims over which the federal courts could assert jurisdiction. *Id.* at *10. As a result, the court denied plaintiff's remand motion.[5]

51. Similarly, in *Lehman Brothers*, the federal district court held that federal jurisdiction existed over plaintiff's claims because they were "necessarily federal in character." *See* 333 F. Supp. 2d at 900. Specifically, the court found that plaintiff's state-law claims presented a challenge to an ongoing EPA cleanup action. *Id.* at 905-07. The court determined that the investment contract at issue in the dispute was part of an "ill-fated strategy to reorder" priorities in an ongoing federal cleanup that had "caused significant delay in remediation as well as a diversion of substantial resources from cleanup." *Id.* at 906. These circumstances, the court held, "compel [the] court to exercise jurisdiction." *Id.* Accordingly, the court denied plaintiff's motion for remand.[6]

---

[5] Having found that federal jurisdiction existed over certain of the claims representing a challenge to a federal cleanup, the court then held that it could "properly exercise[] supplemental jurisdiction over [plaintiff's] other state law claims" under 28 U.S.C. § 1367. *North Penn*, 2005 WL 1279091, at *11.

[6] Having found that federal jurisdiction existed over the contract-based claims because they "challenged" an EPA cleanup, as in *North Penn*, the court concluded that it "may properly exercise supplemental jurisdiction over [plaintiff's] tort claims," which included claims for fraud and negligent misrepresentation. *Lehman Bros.*, 333 F. Supp. 2d at 904 n.16.

52. Here, for a variety of reasons, plaintiff's claims represent a direct challenge to an ongoing EPA cleanup.

53. *First*, plaintiff's lawsuit is "related to the goals of the cleanup." *North Penn*, 2005 WL 1279091, at *8; *McClellan*, 47 F.3d at 330. Indeed, it largely seeks to supplant the ongoing EPA cleanup, requesting the implementation of a variety of remedial measures to be supervised by the state court. Thus, for example, plaintiff says that it brought this lawsuit because "Dow refuses to clean up the pollution" (First Am. Compl. ¶ 1) and "refuses to perform any removal or remediation of the pollution" (*id.* ¶ 32).

54. *Second*, as noted above, plaintiff's complaint seeks to impose a variety of measures through requests for injunctive and declaratory relief that seek to "dictate specific remedial actions." *See North Penn*, 2005 WL 1279091, at *11 (federal jurisdiction existed and "removal of this action was therefore proper" where action sought "to dictate remedial actions and to alter the method of cleanup"); *Lehman Bros.*, 333 F. Supp. 3d at 901 (breach of contract suit against city raised substantial federal question impacting EPA cleanup).

55. Thus, for example, plaintiff asks for an order directing defendants to engage in a variety of remedial activities that the EPA could have ordered but as of this date has not. Accordingly, among other things, plaintiff would have the state court order defendants to: "Remove the Institute Plant Contaminants from the University's property"; "Install barriers to protect University facilities, including but not limited to buildings and athletic fields, from possible intrusions of the Institute Plant Contaminants"; "Install protective systems in all University buildings sufficient to ensure that, in the event the Institute Plant Contaminants enter the indoor environment in any building, they are removed or rendered harmless"; and "Monitor the Institute Plant Contaminants on the University's property to ensure that no person is exposed

to the Institute Plant Contaminants." (First Am. Compl. ¶ 45, Ex. A.) Plaintiff asks that the state court order defendants "to implement effective plans to remove and remediate the contamination and fully restore the University's property to the condition it would have been in absent the contamination" and "conduct periodic post-remediation studies and monitoring to assure the effectiveness of the remedial measures." (*Id.* ¶ 36.) Indeed, plaintiff seeks an order directing "that Defendants must cease and desist from operating their facility unless and until they can operate it in a responsible and prudent manner that prevents further contamination of the University's property." (*Id.*)

56. *Third*, plaintiff's lawsuit would "impose additional requirements on the cleanup" and "alter the method and order of cleanup" both at the Institute Facility and at the WVSU campus. *North Penn*, 2005 WL 1279091, at *11. As noted above, the EPA has indicated that "no remediation" is necessary at any WVSU property and that an environmental covenant should suffice to address any issues. Nonetheless, plaintiff asks the state court to impose a variety of additional measures that EPA has not found necessary or appropriate, including removing all contamination from the property to "fully restore the University's property to the condition it would have been in absent the contamination" and construct physical "barriers" and protective systems on the property. (First Am. Compl. ¶ 36, 45, Ex. A.) Similarly, while the EPA has approved certain interim remedial measures at the Institute Facility, plaintiff's requested relief would go far beyond what the EPA has deemed appropriate, going so far as asking the courts to order that the facility be shut down if defendants cannot implement procedures that would completely block *all* contamination from entering WVSU property. (*Id.*) *See also Hanford Downwinders Coalition, Inc.*, 71 F.3d at 1482 ("[I]njunctive relief that 'for all practical purposes,

22

seeks to improve on the CERCLA cleanup … qualifies as a 'challenge' to the cleanup,'" quoting *McClellan*, 47 F.3d at 330).

57. *Finally*, plaintiff's action would significantly "postpone" and "delay" the ongoing EPA cleanup efforts. Plaintiff's refusal to continue its cooperation with the EPA cleanup in favor of prosecuting this lawsuit will only interfere with EPA cleanup activities. Moreover, plaintiff's request for remedial actions that are in direct conflict with those the EPA believes are appropriate will only interfere with defendants' efforts to comply with EPA directives. Indeed, implementing the litany of remedial measures that plaintiff requests in its complaint would take years.

## II.   This Court Has Jurisdiction Because Defendants Are Acting Under The Direction Of Officials At The EPA Who Are Federal Officers.

58. Defendants further remove this action pursuant to 28 U.S.C. § 1442(a)(1), the federal officer removal statute. Cases are removable under § 1442(a)(1) where (1) the removing party is a federal officer or "person acting under that officer"; (2) with a "colorable federal defense"; and (3) the suit is "for an act under color of office, which requires a causal nexus between the charged conduct and asserted official capacity." *Ripley v. Foster Wheeler LLC*, 841 F.3d 207, 209-10 (4th Cir. 2016) (internal quotations omitted). The right of removal under § 1442 is based on the "supremacy" of the federal government, *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 397-400 (5th Cir. 1998), and "is made absolute whenever a suit in state court is for any act 'under color' of federal office, regardless of whether the suit could originally have been brought in federal court," *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1427 (11th Cir. 1996) (internal quotations omitted).

59. Courts applying these standards have repeatedly held that federal jurisdiction exists in cases, like this one, involving federally supervised environmental remedial activities. In *Greene*

*v. Citigroup, Inc.*, for example, the court held that federal jurisdiction existed over claims seeking "injunctive and declarative relief regarding a low-level radioactive waste site." 215 F.3d 1336 (table), 2000 WL 647190, at *1 (10th Cir. May 19, 2000).  Specifically, plaintiff alleged that the actions by a private corporation implementing remedial measures approved by the EPA as part of an EPA cleanup violated the Rocky Mountain Low Level Radioactive Waste Compact. *Id.*  The court held that the requirements for removal were "clearly met" where the defendant implemented "a remedy selected by the EPA, a federal agency," the removing defendant had "raised colorable defenses, including the interpretation of the Compact, and the interplay between [federal environmental law] and the Compact," and there was a "clear nexus between [plaintiff's] claims and [defendant's] remedial actions taken pursuant to the EPA's orders." *Id.* at *2.

60. Similarly, in *California v. H&H Ship Service Co.*, the court held that federal jurisdiction existed over a case in which a private corporation was convicted based on the release of substances deleterious to fish, plants or birds under the California Fish and Game Code.  68 F.3d 481 (table), 1995 WL 619293 (9th Cir. Oct. 17, 1995).  The court concluded that because the defendant corporation took its actions as part of a federal cleanup, it qualified as a "federal officer," thereby conferring federal jurisdiction.  *Id.*  In fact, the court held that jurisdiction existed even though the defendant had apparently acted "contrary to the removal plan." *Id.* at *2. It was enough that its actions were "taken during the course of a removal action that was under the direction and control of the Coast Guard," which was acting pursuant to its authority under federal environmental law. *Id.*

61. The requirements for federal officer removal are similarly satisfied here.  *First*, defendants are "persons" as envisioned by the federal officer removal statute because

corporations are considered "persons" for purposes of § 1442(a)(1). *See, e.g., Winters*, 149 F.3d at 398 (federal officer jurisdiction existed over chemical manufacturers because "corporate entities qualify as 'persons' under § 1442(a)(1)"). Moreover, defendants' investigation and remediation activities are being conducted under the ongoing direction and supervision of federal officers at the EPA. *See Greene*, 2000 WL 647190, at *2; *H& H Ship Serv. Co.*, 1995 WL 619293, at *2.

62. *Second*, because plaintiff alleges that the defendants have not properly cleaned up contamination allegedly emanating from the Institute Facility, its claims have a causal nexus to the remediation work that defendants have performed and are continuing to perform under the ongoing and continuing supervision of the EPA. *See Greene*, 2000 WL 647190, at *2.

63. *Finally*, defendants' compliance with EPA directives and the detailed program of federal oversight is a colorable federal defense to plaintiff's allegations that the investigation and remediation activities to date are insufficient, as is the preemption of plaintiff's state-law claims by federal law. *See, e.g., Greene*, 2000 WL 647190, at *2; *Magnin*, 91 F.3d at 1428-29 (inquiry is only whether federal defense is colorable and "not whether his defense will be successful"); *H&H Ship Serv. Co.*, 1995 WL 619293, at *2 *Cobb v. GC Servs, LP*, 2016 WL 7155765, at *3 (S.D.W.V. Dec. 7, 2016) ("Preemption is a colorable federal defense on which GC may premise its removal."); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 364 F. Supp. 2d 329, 336 (S.D.N.Y. 2004); *Feikema v. Texaco, Inc.*, 16 F.3d 1408 (4th Cir. 1994) (claims for injunctive relief preempted by EPA-supervised remediation activities). Accordingly, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1442(a)(1).

III.     **The Court Has Diversity Jurisdiction Because The Parties Are Citizens Of Different States.**

64. This case is also removable pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a).

65. **Complete Diversity.**   As plaintiff acknowledges in its complaint, none of the corporate defendants is incorporated or has its principal place of business in West Virginia.  (*See* First Am. Compl. ¶¶ 3-11.)[7]  Accordingly, none are citizens of West Virginia, unlike plaintiff WVSU, and complete diversity exists among the parties.

66. While plaintiff suggests that it is an "agency of the State of West Virginia" (*id.* ¶ 2), presumably to defeat diversity jurisdiction by claiming that it is not a "citizen" of the state,[8] its complaint contains numerous allegations that are inconsistent with this assertion.

67. As the Fourth Circuit has recognized, "the question of whether an entity is an alter ego of the state is a highly fact-intensive undertaking."  *Maryland Stadium Authority v. Ellerbe Becket Inc.*, 407 F.3d 255, 257 (4th Cir. 2005).  Indeed, courts have held that several "state" universities are nonetheless sufficiently independent that they do not constitute an "alter ego" of the state for jurisdictional purposes.  *See, e.g., Kovats v. Rutgers*, 822 F.2d 1303, 1312 (3d Cir. 1987) (Rutgers University not alter ego of State of New Jersey); *Univ. of R.I. v. A.W. Chesterton*

---

[7] The First Amended Complaint is silent with respect to the residence of defendants Bayer CropScience Holding Inc. and Defendant Aventis CropScience USA LP.  However, Bayer CropScience Holding Inc. is incorporated in Delaware  and its principal place of business is in North Carolina (https://www.sosnc.gov/Search/profcorp/8206108, Ex. 33), and as the complaint acknowledges Aventis CropScience USA LP was simply the "predecessor to Bayer CropScience LP," and no longer exists.  (First Am. Compl. ¶ 11, Ex. A.)  Bayer CropScience LP, in turn, is a Delaware limited partnership whose principal place of business is in North Carolina (*id.* ¶ 6) and whose partners are citizens of states other than West Virginia.  (Affidavit of Keith Abrams, Ex. 5.)

[8] Courts have held that diversity jurisdiction is lacking where a party is an "arm or alter ego" of the state (and so not a "citizen" of the state).  For example, one court has held that West Virginia University — not WVSU — is an "alter ego" of the state; however, as noted herein, the facts regarding that institution are much different than those here. *See, e.g., W. Va. Univ. Bd. of Governors ex rel. W. Va. Univ. v. Rodriguez*, 543 F. Supp. 2d 526 (N.D. W. Va. 2008).

*Co.*, 721 F. Supp. 400 (D.R.I. 1989) (University of Rhode Island not alter ego of Rhode Island and thus was subject to diversity jurisdiction); *Gordenstein v. Univ. of Del.*, 381 F. Supp. 718 (D. Del. 1974) (University of Delaware is not an arm or alter ego of State of Delaware and thus not immune from suit under Eleventh Amendment).

68. Here, plaintiff WVSU has pleaded allegations directly contrary to any suggestion that it is an "arm or alter ego" of the state.

69. *First*, as plaintiff notes in its complaint, WVSU is a historically African-American university established by the federal government.  (First Am. Compl. ¶ 2, Ex. A.)  As the Fourth Circuit has recognized, courts have held that universities are not "alter egos" of the state where they were independently established.  In *Maryland Stadium Authority*, for example, the Fourth Circuit recognized the Third Circuit's holding that Rutgers University was not an alter ego of the State of New Jersey because it "was originally a private university that was converted to a state university in 1956."  407 F.3d at 263 n.12 (citing *Kovats*, 822 F.2d 1303).  While the Third Circuit noted that Rutgers was "a state created entity which serves a state purpose with a large degree of state financing," it was not an "alter ego of the state" and thus was subject to federal jurisdiction because the university was originally an "independent entity."  *Kovats*, 822 F.2d at 1312.

70. A similar situation exists here, where plaintiff pleads that WVSU was originally established by the federal government as a historically African-American institution.  As plaintiff acknowledges in its complaint, WVSU "began in 1890 as the West Virginia Colored Institute, one of 19 land-grant institutions that Congress authorized that year to educate African Americans in agriculture and the mechanical arts."  (First Am. Compl. ¶ 2, Ex. A.)  As a result of these historical origins and this historical status, WVSU continues to receive significant federal funds.

(*See, e.g.*, WVSU Press Release, *$1.6 Million in Federal Research Grants Awarded to W. Va. State University* (Sept. 27, 2012), Ex. 35 (noting that "WVSU is one of 18 land-grant institutions in the nation eligible to compete in the program").) Thus, as in *Kovats*, WVSU's allegations indicate that it is not an "alter ego" of the state and is thus subject to federal diversity jurisdiction.

71. *Second*, WVSU does not purport in its complaint to bring this action on behalf of the state. Neither the State Attorney General nor any other government lawyer has filed the present action (nor have the university's lawyers signed the complaint as "special assistant attorneys general" or some similar designation). Indeed, the West Virginia Supreme Court has indicated that "in all instances when an executive branch or related State entity is represented by counsel before a tribunal, the Attorney General shall appear upon the pleadings as an attorney of record." *State ex rel. McGraw v. Burton*, 569 S.E.2d 99, 117 (W. Va. 2002). *See also id.* (noting that the requirement that the AG appear "does not bar other counsel from also appearing and acting in a legal capacity for the State entity").

72. Here, however, WVSU is represented solely by private counsel.[9] To the extent that WVSU maintains that it has the power to "sue and be sued in its own name," that is a significant indication of its autonomy under state law. *See, e.g.*, *Univ. of R.I.*, 721 F. Supp. at 403; *Kovats*, 822 F.2d at 1310 ("Rutgers remains able to sue and be sued in state court.").

73. *Third*, the claims plaintiff brings are claims that cannot be brought by the state. The law is clear, for example, that the state is not entitled to bring claims for declaratory relief. *See, e.g., McGraw v. Caperton*, 446 S.E.2d 921, 925 (W. Va. 1994) (Attorney General "has no right

---

[9] The Bylaws for WVSU's Board of Governors purport to give it discretion to "acquire legal services as are considered necessary." (WVSU Board of Governors Bylaws Art. III.17, Ex. 36.)

to bring a declaratory judgment action in his official capacity" because he is not included in, and is expressly excluded from, the "persons" entitled to seek declaratory relief under state statute). However, plaintiff's complaint contains lengthy requests for such relief, which it could not bring were it purporting to be acting as an "alter ego" of the state. (*See* First Am. Compl. ¶¶ 34-36, Ex. A.)

74. Finally, many of the other factors courts have identified in assessing whether a university is an "alter ego" of the state weigh against such a finding with respect to WVSU based on WVSU's representations.  In assessing whether an entity is an "alter ego" of the state, courts within the Fourth Circuit have considered, among other things, the following so-called *Ram Ditta* factors:  (1) whether the judgment will have an effect on the state treasury; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether the entity is involved in local versus statewide concerns; and (4) how the entity is treated as a matter of state law.  *See Rodriguez*, 543 F. Supp. 2d at 530 (citing *Ram Ditta v. Md. Natl. Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987)).

75. Here, based on WVSU's representations in its own financial statements, nothing about this litigation will have any impact on the state treasury.  According to WVSU's financial statements, its funds are not included in the State's general fund.  (*See* 2016 WVSU Financial Statements at 20, Ex. 37.)  Rather, WVSU is a "separate entity which, along with [other entities,] form the Higher Education Fund of the State."  *Id.*  Moreover, the relief WVSU seeks is largely injunctive, not monetary, in nature.  And the injunctive relief it seeks is designed to remedy contamination allegedly present beneath property purportedly owned by the university.  (*See, e.g.*, First Am. Compl. at ¶¶ 37-46, Ex. A.)

29

76. WVSU also "exercises a significant degree of autonomy from the state." *Ram Ditta*, 822 F.2d at 457-58. In addition to its historical origins as an entity wholly independent of the state, WVSU receives a significant portion of its funding from the federal government. (*See* 2016 WVSU Financial Statements at 11, Ex. 37.) Moreover, while it does receive some state funding, that funding is declining. (*See, e.g.*, *WVSU president says college is 'strong' despite budget cuts*, The Charleston Gazette-Mail (Oct. 9, 2015), Ex. 34.)

77. **Amount in controversy.** As alleged by plaintiff, the amount of damages WVSU seeks exceeds the $75,000 jurisdictional amount. *See* 28 U.S.C. § 1332(a) ("matter in controversy" must "exceed[] the sum or value of $75,000, exclusive of interest and costs"). When the amount in controversy is not apparent from the face of the complaint, courts "must attempt to ascertain the amount in controversy by considering the plaintiff's cause of action as alleged, the notice of removal, and any other relevant materials in the record at the time of removal." *Caprita v. Frances Zilko*, 2017 WL 1407646, at *2 (N.D. W. Va. Apr. 19, 2017). In so doing, courts are "not required to leave common sense behind." *Mullins v. Harry's Mobile Homes, Inc.*, 861 F. Supp. 22, 24-25 (S.D.W.V. 1994) (holding that "any realistic assessment of the record establishes the jurisdictional amount"). The value of the injunctive relief plaintiff seeks must be considered in determining whether the amount-in-controversy requirement has been satisfied. *See JTH Tax, Inc. v. Frashier*, 624 F.3d 635, 639 (4th Cir. 2010) (reversing district court for failure to consider injunctive relief sought).

78. Here, it is evident from the face of the complaint that the alleged amount in controversy well exceeds $75,000. WVSU seeks wide-ranging injunctive relief, including an order shutting down the Institute Facility if contamination is not immediately eliminated. The economic cost of such an order alone would dwarf the jurisdictional amount. In addition,

plaintiff seeks both preliminary and permanent injunctions ordering defendants to, *inter alia*, "[r]emove the Institute Plant Contaminants from the University's property," "install barriers to protect University buildings," "install protective systems in all University buildings," "[m]onitor the Institute Plant Contaminants," and "[i]mplement a national public relations program funded at a level sufficient to completely interact the damage that the Institute Plant Contaminants will do to the University's reputation, business, customer base, and goodwill." (First Am. Compl. ¶ 45, Ex. A.)   The cost of WVSU's requested injunctive relief alone exceeds the $75,000 amount-in-controversy requirement.

79. In addition, plaintiff seeks a variety of categories of alleged damages that would by themselves exceed $75,000.  Plaintiff seeks, among other things, "any reasonable cost incurred to date for environmental investigation," "the cost of any future environmental investigation and health assessment that the University can reasonably expect to incur," "all costs which are reasonably necessary to restore the University properties to the condition it would have been in absent the Defendant's contamination," "compensation for the loss of enjoyment of the University's property, both past and future," "compensation for the diminution in value of the University's groundwater," "compensation for the loss of business interest, enterprise and enrollment, and all income generated therefrom, as well as damage to reputation and brand and loss of goodwill, both past and future, occasioned by Defendants' acts and omissions," "aggravation, annoyance, and inconvenience, past and future," "past and future loss and diminution of the value of the University's real property and rights incidental thereto," and "consequential damages." (First Am. Compl. ¶ 110, Ex. A.)  Finally, plaintiff asks the court to impose punitive damages. (*Id.*) *See Bell v. Preferred Life Assurance Soc'y*, 320 U.S. 238, 240 (1943) (both compensatory and punitive damages "must be considered to the extent claimed in

31

determining jurisdictional amount"). Plaintiff's complaint and the record demonstrate that the amount-in-controversy requirement is satisfied.

80. Defendants submit this Notice of Removal without waiving any defenses to the claims asserted by Plaintiff.

## REMOVAL IS TIMELY

81. This Notice of Removal is timely filed under 28 U.S.C. § 1446(b) in that it is being filed within thirty days after service of the summons and complaint on June 8, 2017.

## VENUE

82. The United States District Court for the Southern District of West Virginia, Charleston Division, is the United States district and division embracing the Circuit Court of Kanawha County, West Virginia, where this action was filed and is pending. *See* 28 U.S.C. § 1441(a). Therefore, venue of this removed action is proper in this Court.

## CONSENT

83. All defendants that have been served consent to the removal of this action and join in this removal. *See* 28 U.S.C. § 1446(b).

## NOTICE TO THE STATE COURT

84. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served on all adverse parties and filed with the Circuit Court of Kanawha County, West Virginia, where this case was originally filed and is pending.

## STATE COURT FILINGS

85. Defendants file herewith as Exhibit A to this Notice copies of all process, pleadings, and orders served upon them, as well as a copy of the state court docket.

WHEREFORE, defendants respectfully request that this action be removed to this Court.

Dated:  July 7, 2017

Respectfully submitted,


/s/ Patricia M. Bello
R. Scott Masterson (WV Bar #10730)
Matthew A. Nelson (WV Bar #9421)
Patricia M. Bello (WV Bar #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLC
222 Capitol Street, Fifth Floor
Charleston, West Virginia 25301
(304) 553-0166
Scott.masterson@lewisbrisbois.com
Matt.nelson@lewisbrisbois.com
Patricia.bello@lewisbrisbois.com
*Counsel for Union Carbide Corporation*


/s/  Floyd E. Boone, Jr.
Floyd E. Boone Jr. (WV Bar #8784)
Thomas A. Heywood (WV Bar #1703)
Roger G. Hanshaw (WV Bar #11968)
Bowles Rice, LLP
600 Quarrier Street
Charleston, WV 25301
(304)347-1733
fboone@bowlesrice.com
theywood@bowlesrice.com
rhanshaw@bowlesrice.com
*Counsel for Union Carbide Corporation*

/s/ David R. Pogue
Michael W. Carey (WV Bar #635)
David R. Pogue (WV Bar #10806)
Carey, Scott, Douglas & Kessler, PLLC
901 Chase Tower
707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
(304) 345-1234
mwcarey@csdlawfirm.com
drpogue@csdlawfirm.com
*Counsel for The Dow Chemical Company*


/s/ Joseph M. Price
Joseph M. Price,  (WV Bar #2981)
Stephen F. Gandee(WV Bar #5204)
Robinson & McElwee PLLC
700 Virginia Street, East, Suite 400
Charleston, West Virginia 25301
(304)344-5800
jmp@ramlaw.com
sfg@ramlaw.com
*Counsel for Bayer Corporation, Bayer*
*CropScience LP, BayerCropScience Holding,*
*Inc., Rhone-Poulenc, Inc., Rhone-Poulenc AG*
*Company, Rhone-Poulenc AG Company, Inc.*
*and Aventis Corporation USA, LP*

## UNITED STATES FEDERAL DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

|  |  |
|---|---|
| WEST VIRGINIA STATE UNIVERSITY BOARD OF GOVERNORS for and on behalf of West Virginia State University, <br><br> *Plaintiff*, <br><br> v. <br><br> THE DOW CHEMICAL COMPANY; UNION CARBIDE CORPORATION; BAYER CORPORATION; BAYER CROPSCIENCE LP; BAYER CROPSCIENCE HOLDING INC.; RHONE-POULENC INC.; RHONE-POULENC AG COMPANY; RHONE-POULENC AG COMPANY, INC.; and AVENTIS CROPSCIENCE USA LP, <br><br> *Defendants*. | Case No. 2:17-cv-03558 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 7th day of July, 2017, the foregoing "Notice of Removal" was electronically filed with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to, and constitutes service on:

> Brian A. Glasser, Esquire
> Samuel A. Hrko, Esquire
> Steven R. Ruby, Esquire
> Sharon F. Iskra, Esquire
> Bailey & Glasser LLP
> 209 Capitol Street
> Charleston, WV  25301
> *Counsel for Plaintiff*

34

/s/ Patricia M. Bello
Patricia M. Bello (WV Bar #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLC
222 Capitol Street, Fifth Floor
Charleston, West Virginia 25301
(304) 553-0166
Patricia.bello@lewisbrisbois.com