WEST VIRGINIA STATE
UNIVERSITY BOARD OF GOVERNORS
for and on behalf of West Virginia State
University,

      Plaintiff,

v.                                           Case No: 2:17-cv-03558
                                            Judge: John T. Copenhaver, Jr.

THE DOW CHEMICAL COMPANY;
UNION CARBIDE CORPORATION;
BAYER CORPORATION;
BAYER CROPSCIENCE LP;
BAYER CROPSCIENCE HOLDING INC;
RHONE-POULENC INC.;
RHONE-POULENC AG COMPANY;
RHONE-POULENC AG COMPANY, INC.; and
AVENTIS CROPSCIENCE USA LP,

      Defendants.

## MEMORANDUM IN SUPPORT OF MOTION TO REMAND

### I.    Introduction

The complaint in this case pleads only state law causes of action. The defendants are all private corporations. And the plaintiff is a state university with no citizenship for diversity purposes, precluding federal diversity jurisdiction. This is, in other words, a straightforwardly appropriate case to be handled in West Virginia circuit court.

Defendants nonetheless have removed it to federal court on three grounds. *First*, they assert federal question jurisdiction. But the Supreme Court has made clear that only a "slim," "small," "special" class of cases qualify for federal question jurisdiction absent a federally created cause of action, and no such cause of action exists here. *See Gunn v. Minton*, 133 S. Ct.

1059, 1065 (2013). Although recent Supreme Court authority has overhauled this area of the law, emphasizing the high bar to obtain federal question removal, defendants' notice of removal disregards those precedents. Instead it relies on earlier, out-of-circuit district court decisions that have lost whatever vitality they once had.

Analyzed under current Supreme Court precedents, the University's complaint supports no federal question jurisdiction because it does not "necessarily raise" any federal issue. That is, there is no federal issue that must be resolved for the University to establish any element of its state law claims. And the relief that the University seeks conflicts neither with a federally approved environmental cleanup plan nor with a federal agency's application of federal law. Any federal issue that may be raised, moreover, is not sufficiently substantial to warrant federal jurisdiction: The cleanup plan for the Institute plant focuses on the plant itself and only tangentially addresses surrounding properties, for which the federal government cannot mandate cleanup actions without consent from their owners. The University, in addition, is a state agency, and depriving the state of a state forum in which to vindicate its state law claims would seriously disturb the balance of authority between the federal and state governments.

*Second*, defendants claim they are acting under the direction of the federal Environmental Protection Agency (EPA). But the EPA did not direct them to contaminate the University's groundwater. It did not direct them to leave the contaminants in the ground or compensate the University for polluting its campus. In fact, although Dow has proposed a cleanup plan that addresses (briefly) the University's property, the EPA has not yet acted on it.

*Third*, defendants contend that the University is not an arm of the State of West Virginia. If it were not an arm of the state, it would be a citizen of West Virginia, creating complete diversity that would permit removal to federal court. But the overwhelming weight of authority,

particularly in this circuit, holds that state universities are, in fact, arms of the state. All of the West Virginia-specific authority that the University can identify holds that West Virginia state universities are arms of the state, including a recent case from the Northern District of West Virginia. Defendants offer no persuasive reasons that those precedents should not guide this case.

## II.    Factual and procedural background

### A.    Factual background

West Virginia State University (the University) is an agency of the State of West Virginia, defined by state statute as a state university. W. Va. Code s. 18B-1-2 (26) ("'State college and university' means . . . West Virginia State University."). The state created it in 1891 as the West Virginia Colored Institute, and the University has been part of state government since its inception.

Beginning in approximately 1947, defendant Union Carbide Corporation (Carbide) operated a chemical plant located near the University, in Institute, West Virginia. Over time, the plant was the subject of several purchases and sales, and each of the defendants has at some point owned or operated it, either directly or through subsidiaries. Defendant The Dow Chemical Company (Dow) now owns the plant through its wholly owned Carbide subsidiary. In the defendants' Notice of Removal, Dow disclaims ownership of the Institute plant. To the public, however, Dow touts the Institute plant as a significant part of its West Virginia operations. *See* Exhibit A (Dow website page representing that Institute plant is part of Dow's West Virginia operations). Accordingly, this motion refers to the plant as the Dow plant, and references to Dow in this motion also encompass Dow's Carbide subsidiary.

Because it treats, stores, and disposes of hazardous wastes, the Dow plant is subject to the federal Resource Conservation and Recovery Act (RCRA), 42 U.S.C. s. 6901 *et seq.* The plant operates under a RCRA permit issued by the West Virginia Department of Environmental Protection (DEP), the state agency to which the EPA has delegated RCRA permit authority. *See* Exhibit B (DEP-issued RCRA permit for the Dow plant). The current permit was renewed in 2014, when the plant was owned by defendant Bayer CropScience, but it remains effective today.

As a RCRA permit holder, the Dow plant must correct any release of hazardous waste at its site. 42 U.S.C. s. 6924(u). The DEP-issued permit for the Dow plant includes a formal corrective action plan for hazardous waste releases. *See* Ex. B at 36-50. This 15-page plan makes no mention of any corrective action pertaining to the University's campus.

In March 2013, Ch2M Hill, an environmental consultant hired by Dow, took groundwater samples on the University's property to determine whether hazardous waste contaminants had spread from the Dow plant to the University. *See* Exhibit C (Aug. 5, 2013 Ch2M Technical Memorandum). These samples were taken on the former site of the West Virginia Rehabilitation Center (Rehab Center). For many years, the Rehab Center property separated the University's campus from the Dow plant, but the state closed the Rehab Center around 2007, and in 2013, the University assumed ownership of the property. The samples taken in March 2013 revealed that hazardous waste had potentially migrated to the Rehab Center property from the Dow plant. Ex. C at 8. The specific hazardous contaminants included 1,4 dioxane; 1,1 dichloroethane; and chloroform (the "Dow contaminants"), *id.*, each of which EPA regards as a probable carcinogen.

On August 5, 2013, Ch2M Hill completed a report on the sampling project. Ex. C. The report admitted that the Dow contaminants—previously found in groundwater under the Dow

property—were now also found in groundwater under the University's property. *Id.* at 8. It concluded that the Dow contaminants are not a current threat to human health on University property. *Id.* at 8-9. Because the Dow contaminants could threaten human health in future scenarios, however, the August 2013 report recommended that an environmental covenant be placed on the southern quarter, approximately, of the Rehab Center property, which it called the Phase I area. *Id.* at 9. The proposed covenant would bar residential construction and the use of groundwater, and would impose costly conditions on nonresidential construction. *Id.* The Ch2M Hill report said nothing about compensation for the University or whether the University would accept this recommendation concerning its property. *Id.* Neither Dow nor the EPA possesses authority under RCRA to impose a covenant on the University's property unless the University consents to it. 42 U.S.C. s. 6924(v); 40 C.F.R. § 264.101(c) (RCRA corrective action outside the RCRA facility boundaries requires permission from the owner of the outside property).

Over the ensuing years, Ch2M Hill, continuing to act as Dow's consultant, took additional environmental samples on University property, including samples on the University's active campus, that is, beyond the newly acquired but vacant Rehab Center property. *See* Exhibit D (Apr. 15, 2016 Ch2M Hill Technical Memorandum) (tables and figures omitted because of size). This sampling disclosed that the same Dow contaminants that existed in the plant's groundwater had been identified in groundwater under the University's active campus. *Id.* at 13-14. In April 2016, Ch2M Hill completed a report on this additional sampling. *See* Ex. D. The April 2016 report noted Ch2M Hill's previous recommendation for an environmental covenant in the so-called Phase I area of the Rehab Center property. *Id.* at 13-14. Like the August 2013 report, it was silent as to any compensation for this proposed restriction on the University's land use or whether the University would agree to it. *Id.* In July 2016, the EPA issued a two-sentence

letter stating generally that it agreed with the conclusions of the April 2016 report. *See* Exhibit E. The letter made no mention of any environmental covenant on the University's property or any modification to the plant's RCRA corrective action plan. *Id.*

In January 2017, Dow submitted a Corrective Measures Proposal to the EPA. *See* Exhibits F, G (Jan. 6, 2017 Corrective Measures Proposal Amendment) (divided into two exhibit files to accommodate CM/ECF upload limit). The Corrective Measures Proposal, if accepted, would amend the Dow plant's RCRA corrective action plan. The Corrective Measures Proposal again recommended an environmental covenant for part of the University's property. Ex. G at 12-13. Like the previous recommendations, it did not mention compensation for the University or whether the University would agree to such restrictions. *Id.* The EPA has not yet acted on the Corrective Measures Proposal. *See* Not. of Removal ¶ 34 (ECF 3).

### B. Procedural background

On April 26, 2017, the University filed a complaint in the Circuit Court of Kanawha County, alleging state law causes of action against the defendants and certain other chemical companies that had operations at the Dow plant at various times. ECF 3-1 at 1. The Dow contaminants are volatile and semivolatile organic compounds, meaning they can take the form of a gas and migrate upward through soil to reach surface air, including air inside campus buildings. The complaint sought, among other things, a cleanup of the pollutants, protective measures for campus facilities, and damages arising from the pollution. It did so through ten state law causes of action: declaratory judgment, injunctive relief, negligence, interference with business expectancy and loss of goodwill, public nuisance, private nuisance, trespass, strict liability, unjust enrichment, and punitive damages. The complaint neither alleged nor mentioned

any federal law cause of action, nor did it mention the federal Resource Conservation and Recovery Act (RCRA).

On June 6, 2017, the University filed an amended complaint in Kanawha County Circuit Court. ECF 3-1 at 24. The amended complaint dropped some parties who were only tenants at the plant and made minor adjustments to the University's factual allegations. It alleged the same causes of action as the original complaint, minus the cause of action for interference with business expectancy and loss of goodwill. Like the original complaint, the amended complaint made no reference to federal law causes of action or to RCRA.

On July 7, 2017, defendants filed their notice of removal of the case to the United States District Court for the Southern District of West Virginia. ECF 3. The notice asserted three bases for removal. *First*, defendants contend that the case presents a federal question under 28 U.S.C. s. 1331 and falls within the original jurisdiction of this court, which would render it subject to removal under 28 U.S.C. s. 1441(a). *Second*, defendants contend that because EPA has approved corrective action plans for the Dow plant, this action may be removed under the provision that permits removal of actions against federal officers—even though this action is not, in fact, against any federal officer. *Third*, defendants claim that the University is not an arm of the State of West Virginia and therefore is a citizen of the state for removal purposes, rendering the case removable on diversity grounds.

### III.    Legal standards

### A.  Removal based on federal question jurisdiction

This court recently explained the standards governing federal-question-based removal in *State of West Virginia ex rel. Morrisey, et al. v. McKesson Corp.*, No. 2:16-cv-1772, 2017 WL

357307, at \*4-\*5 (S.D. W. Va. Jan. 24, 2017) (mem. op. and order). The same standards apply here and thus are recited nearly verbatim below:

The first issue before the court is whether the University's complaint states a claim sufficiently federal in nature to justify the exercise of federal question removal jurisdiction by this court. Federal courts are not courts of general jurisdiction: they "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). Jurisdiction is "determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration." *Taylor v. Anderson*, 234 U.S. 74, 75 (1914). The most obvious manner of establishing jurisdiction is by pleading a federal cause of action. *See, e.g.*, *Empire Healthchoice Assurance, Inc. v. McVeigh*, 547 U.S. 677, 690 (2006). Additionally, the "plaintiff is the 'master of the claim.'" *Pinney v. Nokia, Inc.*, 402 F.3d 430, 442 (4th Cir. 2005) (quoting *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987)).

In the event a case is not properly removed to federal court, the court must remand the case to state court. 28 U.S.C. § 1447 ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."). For the purpose of removal jurisdiction, defendant bears the burden of "demonstrating the court's jurisdiction over the matter." *Strawn v. AT & T Mobility LLC*, 530 F.3d 293, 296 (4th Cir. 2008). The Supreme Court has stated that "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983). Indeed, a state court is often "competent to apply federal law, to the extent it is relevant." *Empire*

*Healthchoice*, 547 U.S. at 701. Courts disfavor removal jurisdiction particularly when a case involves substantial questions of state law. *See Bender v. Jordan*, 623 F.3d 1128, 1130 (D.C. Cir. 2010) ("[F]ederal jurisdiction is disfavored for cases that are 'fact-bound and situation-specific' or which involve substantial questions of state as well as federal law."); *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005) ("[S]tate law complaints usually must stay in state court when they assert what appear to be state law claims.").

Federal jurisdiction may arise under the "well-pleaded complaint rule" even when the complaint does not explicitly plead a federal cause of action. A suit arises under this rule "if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax*, 463 U.S. at 13. The leading case in such a situation is *Grable & Sons Metal Prods., Inc v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005) (finding removal jurisdiction where plaintiff brought an action in state court to quiet title on deed for property that had been confiscated by IRS under federal tax law, concerning which plaintiff alleged IRS had failed to notify him in accordance with federal law). *Id.* at 310-11.

Where a complaint implicates federal law, "the question is, does a state law claim necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id.* at 314. "That is, federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 133 S. Ct. 1059, 1065 (2013). *Grable* jurisdiction, however, exemplifies a "slim category" of cases. *Empire Healthchoice*, 547 U.S. at 701; *W. Va. ex rel. McGraw v. Rite Aid of*

*W. Va., Inc.*, No. 2:09-cv-0956, 2010 WL 454488, at *2 (S.D. W. Va. Feb. 1, 2010)

("'Obviously, not every state law claim raising a federal issue can invoke federal question

jurisdiction. Indeed, such cases will be exceptional.'" (quoting Wright & Miller, Fed. Prac. and

Proc. § 3562 (3d ed. 1998))). Alleging there is a "federal issue" is not a "password opening

federal courts to any state action embracing a point of federal law." *Grable*, 545 U.S. at 314.

Furthermore, "any doubts concerning the propriety of removal should be resolved *against*

removal." *Barbour v. Int'l Union*, 640 F.3d 599, 617 (4th Cir. 2011) (emphasis original).

## B. Removal based on federal officer statute

A case may be removed from state to federal court if it is "against or directed to" the

"United States or any agency thereof or any officer (or any person acting under that officer) of

the United States," if the action is "for or relating to any act under color of such office." 28

U.S.C. § 1442(a). This court addressed the legal standards for federal-officer removal in

*Knuckles v. RBMG, Inc.*, 481 F. Supp. 2d 559, 565-66 (S.D. W. Va. 2007). To qualify under

section 1442(a)(1), a defendant must: (1) be a "person" within the meaning of the statute; (2) act

under the direction of a federal officer; (3) show a nexus or "causal connection" between the

alleged conduct and the official authority; and (4) have a colorable federal defense. *Watson v.*

*Philip Morris Companies, Inc.*, 420 F.3d 852, 855 (8th Cir. 2005); *Virden v. Altria Group, Inc.*,

304 F.Supp.2d 832, 843 (N.D. W. Va. 2004). It is the removing defendant's burden to establish

federal jurisdiction under the federal officer removal statute. *Winters v. Diamond Shamrock*

*Chemical Co.*, 149 F.3d 387, 397 (5th Cir.1998). And in this removal context, as well, "courts

should resolve all doubts about the propriety of removal in favor of retained state court

jurisdiction." *Knuckles*, 481 F. Supp. 2d at 566.

Crucially, the action taken under the direction of a federal officer must be the same action that gives rise to the suit being removed. *Virden*, 304 F.Supp.2d at 844. In other words, it is not enough that a defendant has at some point acted under the direction of a federal officer; the specific action or actions that prompted the litigation must have been performed under that officer's direction. Similarly, the "causal connection" element requires that the action directed by the federal officer be the same action that caused the plaintiff's alleged harm. *Knuckles*, 481 F. Supp. 2d at 566.

## C.        Removal based on diversity jurisdiction

A defendant may remove a case to federal court based on diversity jurisdiction if the action is between citizens of different states. 28 U.S.C. §§ 1441(b), 1332(a). States are not "citizens of a state" for purposes of § 1332(a). *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260 (4th Cir. 2005) (citing *Moor v. Alameda County,* 411 U.S. 693, 717, 93 S. Ct. 1785, 36 L.Ed.2d 596 (1973)). And public entities and political subdivisions, such as municipalities, are also not "citizens of a state" if they are an "arm or alter ego of the State." *Md. Stadium Auth.*, 407 F.3d at 260. A case thus cannot be removed based on diversity jurisdiction if its parties include a public entity that is an arm or alter ego of the state.

As with other bases for removal, in an attempt to remove a case based on diversity "[t]he burden of demonstrating jurisdiction resides with the party seeking removal." *Id.* (*citing Mulcahey v. Columbia Organic Chems. Co.,* 29 F.3d 148, 151 (4th Cir.1994) (internal quotation marks omitted)). And in diversity-based removal, just as with removal on other grounds, doubts about the propriety of removal must be resolved in favor of retained state court jurisdiction. *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d at 260.

## IV.    Analysis

### A.    Federal question jurisdiction

The Supreme Court's relatively recent decisions in *Grable* and *Gunn* bring welcome

clarity to an area of law—federal-question jurisdiction—whose contours previously resembled,

in Chief Justice Roberts' memorable formulation, a Jackson Pollock painting. *Gunn v. Minton*,

568 U.S. 251, 258 (2013). The standards announced in those decisions control this case.

Somewhat surprisingly, Defendants' removal notice fails to address the *Grable/Gunn* standards

at all, instead relying mainly on two district court opinions issued before the Supreme Court

decided *Grable*. These are *Lehman Brothers, Inc. v. City of Lodi*, 333 F. Supp. 2d 895 (E.D. Cal.

2004), and *North Penn Water Authority v. BAE Systems*, No. Civ. A. 04-5030, 2005 WL

1279091 (E.D. Pa. May 25, 2005). Neither sheds light on how to apply the controlling Supreme

Court precedents to this case.

*Grable* and *Gunn* simplify federal question jurisdiction into two categories. The first

encompasses cases in which federal law creates the cause of action; the vast majority of federal

question cases fall into this category. *Gunn*, 568 U.S. at 257 ("[T]his 'creation' test . . . accounts

for the vast bulk of suits that arise under federal law . . . ."). The second class—a "slim" one—is

"a special and small class of cases in which arising under jurisdiction still lies" even though the

claim finds its origins in state rather than federal law. *Gunn*, 568 U.S. at 258 (internal quotation

marks and citation omitted).

In this case, the University's claims—negligence, trespass, nuisance, and the like—

undisputedly originate from state law. If federal question jurisdiction exists here, therefore, this

case must fall within *Gunn* and *Grable*'s "slim," "small," "special" second category. These

exceptional cases are characterized by a federal question that satisfies four elements: "It must be

(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

**1. The University's state law claims do not necessarily raise any federal issue.**

*Grable*'s first prong asks whether a claim that originates in state law nonetheless necessarily raise some federal issue. A federal issue is necessarily raised if there is no scenario in which the claim can be decided without resolving that issue—where some element of the claim can only be proven by proving a conclusion of federal law. As *Gunn* recognized, such circumstances are rare. *Gunn* itself provides an instructive example. There the plaintiff sued his attorney for malpractice in a patent case. 568 U.S. at 259. To prevail, the plaintiff had to prove that the attorney's alleged errors were the proximate cause of his damages—that is, that he would have prevailed in the underlying patent case but for the alleged errors. *Id.* Because the underlying case turned on federal patent law, there was no way to prove causation without resolving federal patent-law questions. *Id.* The federal questions therefore were necessarily raised by the plaintiff's state law legal malpractice claim; without resolving the federal questions, there was no way to establish an essential element of the state law claim. (*Gunn* still found no federal question jurisdiction because other elements of the *Grable* standard were not met.)

Here, by contrast, none of the University's claims includes any element or item of proof that turns on a question of federal law. The University's claims, rather, are purely state law claims, with no embedded federal issues, but any federal issues involved with those defenses are not "necessarily raised" by the University's claims.

**2. Defendants' RCRA cleanup defense does not "necessarily raise" federal issues.**

Defendants may, of course, raise federal law defenses, and indeed seem likely to raise defenses that relate to the plant's RCRA cleanup plan. But a federal issue is not "necessarily raised" merely because it could arise in a defense. The "necessarily raised" test focuses on whether the resolution of a federal issue is inevitable. With any possible defense, the defendant may choose to assert it or not assert it, so the existence of a possible federal defense does not mean that a federal issue is "necessarily raised" within the meaning of *Grable* and *Gunn.*

In other words, because the University can establish all its claims without having to address any question of federal law, the court need not consider the RCRA-related defenses discussed in defendants' notice of removal. Defendants contend, for example, that the University's complaint would interfere with the Dow plant's RCRA cleanup and challenge EPA's application of RCRA. None of those defenses is necessarily raised by the University's claims, so none of them provides a basis for removal. For thoroughness' sake, however, the University will explain why even these defenses do not necessarily inject a federal issue into the case.

      **a.**       **The University's claims do not interfere with Dow's RCRA cleanup plan.**

Defendants' first RCRA-related defense is that the University's claims would interfere with Dow's RCRA cleanup plan. This contention fails for at least three reasons.

*First*, and most important, no aspect of the University's requested relief would block any aspect of Dow's RCRA cleanup plan. Dow's plan focuses primarily on the cleanup of Dow's own property, whereas the University seeks cleanup of the *University's* property, along with damages. Dow's plan thus overlaps little with the University's complaint. Where the Dow plan does mention the University's property, it proposes an environmental covenant that would, in certain areas of campus, prohibit groundwater use, prohibit residential construction, and require

environmental protections for nonresidential buildings. Ex. E at 12-13. The University's complaint presumes that it must observe these restrictions because of the damage defendants' pollution has done; it thus seeks damages for the resulting loss of property value. It also seeks cleanup of the University's property so the restrictions could someday be lifted or modified. And it seeks monitoring of contamination levels to determine whether the restrictions can be lifted or, on the other hand, need to be strengthened to deal with worsening pollution. Rather than conflicting with the restrictions that Dow proposes, the University's complaint therefore complements them.

This contrasts sharply with the situation in defendants' key precedents. In *Lehman Brothers, Inc. v. City of Lodi*, 333 F. Supp. 2d 895 (E.D. Cal. 2004), the plaintiff sought to enforce a contract provision that conflicted directly with the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). 333 F. Supp. 2d at 903, 905-06 ("Lehman's claims are, primarily, based upon the failure to perform the terms of the Investment Contract, which require a specific priority of payments disallowed by CERCLA . . . ." (footnote omitted)). And in *North Penn Water Authority v. BAE Systems*, No. Civ. A. 04-5030, 2005 WL 1279091, *3 (E.D. Pa. May 25, 2005), the plaintiff, a local water utility, sued in state court to begin immediate use of a water well that the EPA had declared, as part of a Superfund plan, could not be safely used for at least 10 years—in other words, to have the state court overturn an EPA Superfund plan.

*Second*, the University must consent to any provision of the Dow RCRA cleanup plan that requires action by the University. 42 U.S.C. § 6924(v); 40 C.F.R. § 264.101(c). Without the University's consent, in other words, Dow's proposal for an environmental covenant has no legal effect; Dow cannot tell the University what to do with its land. The University has not consented

to the environmental covenant that Dow proposed. So even if the University's complaint did conflict with the covenant, it would raise no federal question, because a proposed covenant without the covenantor's consent lacks any force of law under RCRA.

*Third*, to the University's knowledge, the EPA has not approved any corrective actions for the Dow plant that address the University's property. Dow proposed such actions in January 2017. Exs. F, G But the EPA has not acted on them. The cursory EPA letter indicating general agreement with the investigative conclusions of Dow's contractors does not establish an EPA-approved corrective action plan. Ex. E.

This point admittedly is subsidiary, because even if EPA had approved Dow's proposed covenant, it would not raise a federal question in this case. But the lack of an approved plan at the time of removal dooms defendants' argument even on its own terms.

### b. The University's claims do not challenge the EPA's application of RCRA.

Defendants also assert that the University is challenging the EPA's application of RCRA at the Dow plant and thereby raises a federal question. Put differently, defendants contend that Dow's RCRA plan (again, not yet approved by the EPA) reflects the EPA's judgment about exactly what should be done about the contamination of the University's property, so the University's assertion of more extensive state law rights represents an attack on the EPA's conclusions that must be heard in federal court.

But even if the EPA approves Dow's RCRA cleanup plan, it would represent only a conclusion that the plan meets the requirements of RCRA. The University does not contend that Dow's proposed plan falls short of RCRA requirements. On the contrary, the University's complaint raises no RCRA-related claims at all. It raises entirely separate claims based on state law, which may require more relief, less relief, or different relief. As long as they do not interfere

with the particular relief approved by the EPA—and as explained above, they do not—they do not even arguably create a federal question under *Grable* and *Gunn*.

c. **The EPA's mere involvement in the Dow RCRA cleanup plan does not create a federal issue.**

Defendants emphasize that the EPA has been involved in RCRA cleanup plans at the Dow plant for many years and suggest that the agency's mere presence for those plans transforms the University's own claims into federal questions. As an initial matter, however, defendants exaggerate the EPA's role in these plans. Dow hires private consultants to conduct environmental investigations and prepare cleanup plans. *See* Exs. C, D. Although defendants portray the process as one in which the EPA is intimately involved, documents reveal that the agency's role often is limited to reviewing privately prepared reports and responding with a terse letter. *See* Ex. E. In this regard, Dow's RCRA site is not at all like the better-known Superfund sites, many of which the EPA finds abandoned and must clean up on its own. Here, the EPA is mainly an approver.

And in any event, the EPA's presence, even if pervasive, does not "necessarily raise" a federal question. To paraphrase Justice Cardozo's famous line from *Palzgraf*, there is no such thing as federal question jurisdiction in the air. *Cf. Palzgraf v. Long Is. R.R. Co.*, 248 N.Y. 339, 341 ("Proof of negligence in the air, so to speak, will not do." (internal quotation marks omitted)). A case may not be removed merely because a federal agency or legal regime forms part of its backdrop. This court's recent *McKesson* decision furnishes a prime example. That action arose in an industry pervasively regulated by the federal Drug Enforcement Administration (DEA). The complaint repeatedly cited violations of "United States laws and regulations" regarding controlled substances. *State of West Virginia ex rel. Morrisey, et al. v. McKesson Corp.*, No. 2:16-cv-1772, 2017 WL 357307, at *2 (S.D. W. Va. Jan. 24, 2017) (mem.

17

op. and order). And the DEA had issued letters to the defendant regarding the specific acts alleged in the complaint. *Id.* at *4. Yet even on those facts, the DEA's deep involvement raised no federal question within the meaning of *Grable* and *Gunn*. *Id.* at *8.

       **d.**       **Defendant's assertions regarding health risks do not raise a federal issue.**

As a final note on *Grable*'s "necessarily raises" prong, defendants' assertions regarding health risks raise no federal issue. Defendants repeatedly say that the contamination of the University's property poses no health concerns. Defendants no doubt believe this to be an appealing defense, even if it substantially overstates the evidence. But whether or not it is true, it has nothing to do with the federal question analysis.

### 3. Any federal issue raised is not substantial.

Even if a federal issue were necessarily raised, that alone does would not qualify this case for federal question jurisdiction. Rather, the federal question must also be substantial. *Gunn*, 568 U.S. at 260. Here, any arguable federal question is insubstantial both to the present case and to the federal system as a whole. *See id.* (substantiality inquiry looks to the importance of the issue to the federal system as a whole). It is insubstantial to the present case because Dow's corrective action plan addresses the University's property only in passing. The RCRA cleanup of the Dow site focuses on the plant itself, not the surrounding property. Any proposals for surrounding property are effectively recommendations only, since they require the consent of the properties' owners. One could hardly call a nonbinding recommendation regarding property at the edge of a RCRA site a substantial question in litigation over that property. And an issue peripheral to a single RCRA cleanup plan cannot possibly be substantial to the federal system as a whole.

Returning to the polestar of *Gunn*, the Court there held that a state court could interpret federal patent law—an area where federal interests are usually thought exclusive—without

creating any substantial effect on the federal system. 568 U.S. at 260, 261. If the federal question in *Gunn* was insubstantial, any arguable federal question here would be more so.

### 4. Resolving this case in federal court would disrupt the federal-state balance.

This case features a fact absent from both *Grable* and *Gunn* that weighs strongly in favor of a state rather than federal forum: The plaintiff is an agency of the state. As this court noted in its *McKesson* decision, the Supreme Court states that "considerations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it." *State of West Virginia ex rel. Morrisey, et al. v. McKesson Corp.*, No. 2:16-cv-1772, 2017 WL 357307, at *4-*5 (S.D. W. Va. Jan. 24, 2017) (mem. op. and order) (citing *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 21 n.22 (1983)). If defendants were to deprive the state itself—in the form of the University— from having its state law claims heard in state court, it would seriously disrupt the balance that underlies *Grable*'s final prong.

### B. Federal officer removal

Defendants next contend that this case is subject to federal-officer removal pursuant to 28 U.S.C. § 1442(a). As with their federal question claim, defendants premise this contention on the EPA's role at the Dow plant and in its RCRA cleanup process. The EPA is a federal agency. Because the EPA possesses approval authority over the plant's RCRA cleanup plan, the argument goes, and has expressed vague agreement with the conclusions of two investigation reports prepared by Dow's consultants, Dow is acting under the direction of a federal officer.

The problem with this argument is that while the EPA may have a role in the plant's RCRA cleanup, it did not, of course, direct defendants to release the Dow contaminants into the University's groundwater. Defendants do not contend otherwise. It was the release of the

contaminants that gives rise to this civil action. Defendants thus cannot establish that they were acting under the direction of a federal officer with respect to the actions that triggered this case, nor can they establish the requisite causal nexus between a federally directed action and the harms suffered by the University. *Virden v. Altria Group, Inc.*, 304 F. Supp. 2d 832, 844 (N.D. W. Va. 2004); *Knuckles v. RBMG, Inc.*, 481 F. Supp. 2d 559, 566 (S.D. W. Va. 2007).

Defendants nonetheless seek to slip through the door of federal officer removal, asserting that the complaint alleges not only their release of the Dow contaminants but also their failure to remediate them or provide protection against them. They claim that their failure to remediate and protect against the contaminants came at the EPA's direction. The EPA direction that defendants seem to have in mind is the letter expressing general agreement with Ch2M Hill's investigative reports, which proposed an environmental covenant for the University's property. In other words, defendants claim that Dow's proposal to comply with RCRA by placing an environmental covenant on University property is the same thing as an EPA order to leave the Dow contaminants in the ground. That contention fails for several reasons.

*First*, EPA approval of a RCRA cleanup plan represents a conclusion that the plan meets minimum RCRA standards. It is not an order that would prohibit Dow or the other defendants from taking other action required by state law, such as compensating the University, remediating the University's property, providing protective measures for University buildings, or requiring monitoring of contamination on campus. Nor does RCRA or its implementing regulations prohibit defendants from taking these steps. Yet for a private party to obtain federal officer removal, it must show that its acts were the result of a direct order from the federal officer or comprehensive and detailed regulations. *Knuckles v. RPMG, Inc.*, 481 F. Supp. 2d 559, 566 (S.D. W. Va. 2007). Defendants cannot meet that standard.

*Second*, neither Dow nor the EPA can dictate an environmental covenant on University property without the University's permission. 42 U.S.C. § 6924(v); 40 C.F.R. § 264.101(c). The most the EPA could do is approve Dow's proposed environmental covenant on the condition that the University consent to it. Since the University does not consent, the condition cannot be met, and defendants could not rely on an EPA-approved environmental covenant as a basis for removal.

*Third*, the EPA has not yet acted on the pending Dow Corrective Measures Proposal that addresses the University property. Not. of Removal ¶34 (ECF 3). In other words, even if the EPA's approval of an environmental covenant proposed by Dow could somehow be viewed as a direct order to pursue the covenant and do absolutely nothing else, there is no EPA approval in the first place. At most, defendants can cite a brief EPA letter expressing general agreement with Ch2M Hill's investigation reports. Ex. E. Those cannot seriously be viewed as direct orders from a federal officer not to clean up the mess on the University's property. *See Knuckles v. RPMG, Inc.*, 481 F. Supp. 2d 559, 566 (S.D. W. Va. 2007). And "courts should resolve all doubts about the propriety of removal in favor of retained state court jurisdiction." *Id.*

### C. Diversity jurisdiction

Finally, defendants seek to remove on grounds of diversity of citizenship. They contend that the University is not an arm or alter ego of the state and therefore is a citizen of West Virginia for purposes of diversity analysis. The great weight of authority, however, including in this circuit, holds the opposite: Public universities are arms of the state. A recent decision from the Northern District of West Virginia reached that conclusion specifically as to public universities in West Virginia. Defendants offer no basis to distinguish this case from those

precedents, instead relying on a handful of dated decisions from other circuits about universities in other states operating under different state laws.

### 1.     The *Ram Ditta* factors

In the Fourth Circuit, four factors are used to determine whether an entity is an arm or alter ego of the state for purposes of diversity jurisdiction: (1) whether the judgment will have an effect on the state treasury; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether the entity is involved in local versus statewide concerns; and (4) how the entity is treated as a matter of state law. *Ram Ditta v. Md. National Capital Park & Planning Comm'n*, 822 F.2d 456, 457-58 (4th Cir. 1987).

### 2.     Public universities are almost universally held to be arms of the state.

In a decision cited by defendants, the Fourth Circuit examined at length the overwhelming authority favoring the view that public universities are arms of the state. *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 262-63 (4th Cir. 2005). "Numerous courts have decided whether public state universities are 'arms of the state,'" the Fourth Circuit wrote in that case. *Id.* "Almost universally, the answer has been in the affirmative." *Id.* The Fourth Circuit went on to provide a long list of examples from around the country: *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768 (7th Cir. 2005); *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 412 (11th Cir. 1999); *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 494 (10th Cir. 1998); *Laxey v. La. Bd. of Tr.*, 22 F.3d 621, 622 (5th Cir. 1994); *Hutsell v. Sayre*, 5 F.3d 996, 999 (6th Cir. 1993); *Kashani v. Purdue Univ.*, 813 F.2d 843, 848 (7th Cir. 1987*)*; and *Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 307 (6th Cir. 1984).

In some circuits, the Fourth Circuit observed, the issue is so clear that it is not even disputed. For instance, in *University of South Alabama*, the Eleventh Circuit succinctly noted,

"[i]n the context of Eleventh Amendment immunity, we have held that state universities are 'agencies or instrumentalities' of the state, and thus are immune from suit in federal court." *Univ. of S. Ala.*, 168 F.3d at 412. *See also Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 575 (10th Cir.1996) ("Our cases have consistently found state universities are arms of the state."). In fact, at the time the Fourth Circuit decided *Maryland Stadium Authority*, only two circuit court opinions had concluded that a particular state university was not an arm of the state. *See Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1211 (1st Cir. 1993); *Kovats v. Rutgers*, 822 F.2d 1303, 1312 (3d Cir. 1987). Defendants have identified no other circuit court decisions that have reached this conclusion in the nearly 25 years since *A.W. Chesterton*. And the Fourth Circuit noted that the *Rutgers* case was "a somewhat unique situation because Rutgers University was originally a private university that was converted to a state university in 1956." *Md. Stadium Authority*, 407 F.3d at 263 n.12 (citing *Rutgers*, 822 F.2d at 1310).

In *Maryland Stadium Authority*, the Fourth Circuit also pointed to several of its own previous cases that concluded public universities were arms of the state: *Litman v. George Mason Univ.*, 186 F.3d 544, 550 (4th Cir. 1999); *Huang v. Bd. of Governors of the Univ. of N.C.*, 902 F.2d 1134, 1139 (4th Cir. 1990); *Richard Anderson Photography v. Brown*, 852 F.2d 114, 122 (4th Cir. 1988). Perhaps not surprisingly after surveying this nearly unanimous body of law, the *Maryland Stadium Authority* itself decided that the University of Maryland was an arm of that state for diversity purposes, and ordered that case remanded to Maryland state court. *Md. Stadium Authority*, 407 F.3d at 265.

3.      **Precedent holds that West Virginia public universities are arms of the state.**

The diversity issue raised here was considered relatively recently in the Northern District of West Virginia, which sided with the weight of precedent and concluded that West Virginia

University (WVU) was an arm and alter ego of the state. The case was one of local infamy, involving the departure of former WVU football coach Rich Rodriguez to the University of Michigan. *See W. Va. Univ. Bd. of Governors ex rel. W. Va. Univ. v. Rodriguez*, 543 F. Supp. 2d 526 (N.D. W. Va. 2008). The *Rodriguez* case is particularly instructive because WVU is similarly situated to the University, and although defendants claim that "the facts regarding [WVU] are much different than those here," they make no meaningful effort to distinguish it. Not. of Removal at 26 n.8.

*Rodriguez* also highlighted earlier precedents that found West Virginia's public universities to be arms of the state. One was *Hughes-Bechtol, Inc. v. W. Va. Bd. of Regents*, 737 F.2d 540, 543-45 (6th Cir. 1984), in which the Sixth Circuit held that the West Virginia Board of Regents—at the time, the governing body for the state's universities—was an arm of the state. In another, the Fourth Circuit reached a similar holding in *Kondos v. West Virginia Board of Regents*, 318 F. Supp. 394 (S.D. W. Va. 1970), *aff'd*, 441 F.2d 1172 (4th Cir. 1971). And decisions of the Supreme Court of Appeals of West Virginia have held similarly. *See State ex rel. Bd. of Governors of W. Va. Univ. v. Sims*, 134 W.Va. 428, 59 S.E. 2d 705 (1950); *Glover v. Sims*, 121 W.Va. 407, 3 S.E. 2d 612 (1939).

### 4. The *Rodriguez* analysis applies here.

The four *Ram Ditta* factors apply to this case in the same way that they did in *Rodriguez*, the case involving WVU.

### a. Any judgment will affect the state treasury.

As *Rodriguez* explained, funds paid to or held by the University are state funds, regardless of their source, and are paid into the state treasury. *Rodriguez*, 543 F.Supp.2d at 533. (citing *City of Morgantown v. W. Va. Bd. of Regents*, 177 W.Va. 520, 522 (1987)). They can be

withdrawn "only upon a warrant issued by the auditor on the treasurer and by the check of the treasurer." *Rodriguez*, 543 F.Supp.2d at 533. Accordingly, as in *Rodriguez*, any judgment recovered by the University will affect the state treasury.

     **b.**     **The University does not exercise significant autonomy from the state.**

     The University lacks significant autonomy from the state, as demonstrated by any number of facts about its governance and operations. The *Rodriguez* court listed no fewer than nine that apply equally to this case:

     1.     A supermajority of the University's board of governors—nine of its twelve members—is appointed by the governor of West Virginia. W. Va. Code § 18B-2A-1(c)(6). Each board member must take an oath prescribed by the state constitution. W. Va. Code § 18B-2A-1(e)(2). *See Maryland Stadium Authority*, 407 F.3d at 264 (gubernatorial appointment is "a key indicator of state control").

     2.     The governor of West Virginia has the power to remove members of the University's board of governors. W. Va. Code § 18B-2A-1(e)(3).

     3.     The University has no power to tax.

     4.     Moneys may only be withdrawn from University accounts via a check issued by the state treasurer. W. Va. Code § 12-3-1. *See City of Morgantown v. Ducker*, 153 W. Va. 121, 126 (1969).

     5.     Checks may only be issued upon requisition by the University to the state auditor. W. Va. Code § 12-3-1, -5.

     6.     Employees of the University are state employees and are provided with the benefit of the West Virginia Public Employees Grievance Procedure. W. Va. Code § 6C-2-1.

7. The Board of Governors is charged with the preparation of an appropriations request to the West Virginia Higher Education Policy Commission (HEPC), the state's higher education oversight agency. W. Va. Code § 18B-2A-4(f).

8. The schedule of all tuition and fees charged by the University must be certified to the Legislative Auditor. W. Va. Code § 18B-10-1(f).

9. The University must submit copies of its annual audited financial statements to the HEPC. W. Va. Code § 18B-5-9(a)(3). *See Md. Stadium Authority*, 407 F.3d at 264.

*Rodriguez*, 543 F. Supp. 2d at 533-34.

### c. The University is involved in statewide concerns.

*Rodriguez* also found that WVU was involved in statewide concerns, not just local ones. It based this conclusion in part on the importance of education to the general welfare of the state, reasoning that WVU "is engaged in educating the youth of West Virginia, and that such education is a state concern and a traditional governmental function." *Rodriguez*, 543 F. Supp. 2d at 534-35. West Virginia's state code chapter on higher education begins with a statement of this crucial mission: "For the State to realize its considerable potential in the 21st Century, it must have a system for the delivery of post-secondary education which is competitive in the changing national and global environment, is affordable for the state and its citizenry and has the capacity to deliver the programs and services necessary to meet the regional and state needs." W. Va. Code § 18B-1-1(a). *See also Md. Stadium Auth.*, 407 F.3d 255, 265 (4th Cir. 2005) ("[T]he University [of Maryland]'s mission, providing higher education for Maryland's youth, is clearly an area of statewide concern.").

Beyond possessing a mission of statewide import, both WVU and this University are land-grant institutions. As such, they operate extension services to assist the people of West

Virginia in areas including agriculture, community and economic development, and family and consumer sciences. The University's extension service, headquartered on its campus at Institute, has field offices in Kanawha, Cabell, Fayette, Logan, Nicholas, Putnam, Raleigh, and Summers counties. Because of its land-grant mission, the University's geographic reach and involvement exceeds that of most similarly sized institutions. Moreover, the University is the only public university headquartered near Charleston, the state's capital. It educates many students who go on to serve in state government and public interest organizations, heightening its significance in statewide affairs.

        **d.**        **State law clearly defines the University as an arm of the state.**

Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains important, and potentially controlling. *Maryland Stadium Auth.*, 407 F.3d at 266. In addressing this factor, a court may consider relevant state statutes, regulations, and constitutional provisions that characterize the entity and the holdings of state courts on the question. *Id.*

Decisions of the state's Supreme Court of Appeals make it abundantly clear that West Virginia deems its public universities to be arms of the state. *See Univ. of W. Va. Bd. of Trustees v. Graf*, 205 W. Va. 118, syl. pt. 1 (1998); *City of Morgantown v. Ducker*, 153 W.Va. 121, syl. pt. 1 (1969); *State ex rel. Bd. of Governors of W. Va. Univ. v. Sims*, 134 W.Va. 428, syl. pt. 2 (1950). Although these decisions pertain to WVU, the University and WVU are organized and governed by the same statutory provisions. *See, e.g.*, W. Va. Code § 18B-2A-1 (establishing and defining powers and duties of boards of governors for WVU and the University, along with other public colleges and universities). Indeed, if there is any difference between the two for purposes of the *Ram Ditta* analysis, it is that the University possesses even less autonomy from the state

than does WVU. *See, e.g.,* W. Va. Code § 18B-2A-3 (exempting WVU and Marshall University from general oversight by HEPC).

> **5.** **Defendants' arguments on this issue lack fail to persuade.**

Defendants assert four reasons that the University is not an arm of the state. None has merit.

*First*, defendants contend that the University is not an arm of the state because it "is a historically African-American university established by the federal government." That claim is incorrect. Defendants misunderstand the nature of land-grant universities. It is true that the University was created as the result of one of the federal Morrill land grant acts. But those acts did not involve the establishment of universities by the federal government. Rather, they provided federal land or funds to states for the purpose of establishing state institutions. The Morrill Land-Grant College Act of 1862 provided the funds that West Virginia used to establish what is now West Virginia University. The Morrill Act of 1890 provided the funds that the state used to establish what is now West Virginia State University. WVU and the University, both land-grant institutions, have been arms of the state since their inception.

*Second*, defendants assert that the University does not purport to bring this action on behalf of the state and is represented by private counsel, not the attorney general or special assistant attorneys general. *Rodriguez* addressed precisely this issue. WVU's counsel of record in *Rodriguez* were private counsel—not the attorney general or special assistants thereto—just as the University's counsel are here. And there, as here, the defendant overlooked West Virginia Code § 18B-2A-4(z), which authorizes university boards of governors to hire outside counsel and provides that a board "may*, but is not required to*, call upon the Attorney General for legal assistance and representation as provided by law." *W. Va. Univ. Bd. of Governors ex rel. W. Va.*

*Univ. v. Rodriguez*, 543 F. Supp. 2d 526, 534 (N.D. W. Va. 2008). The state of West Virginia, therefore, as part of its authority over the University, has authorized it to hire outside counsel. In this case, moreover, the state attorney general's office has, in fact, exercised authority over the case, approving the University's selection of private counsel and monitoring the case from the outset.

*Third*, defendants claim that the University must not be a state entity because state entities cannot seek declaratory judgments, and the University is seeking one here. As an initial matter, this claim seems to arise at the wrong stage of the litigation: If the University is a state entity, and state entities truly cannot seek declaratory judgments, perhaps that could form the basis for a motion to dismiss. But the University's request for a declaratory judgment, even if erroneous, would not make it any less an arm of the state. And in any event, defendants' premise is mistaken. State entities are quite capable of seeking declaratory judgments. *See, e.g.*, *W. Va. Inv. Mgmt. Bd. v. Variable Annuity Life Ins. Co.*, 234 W. Va. 469, 481 (holding state Investment Management Board had standing to seek declaratory judgment in contract dispute). Defendants cite *McGraw v. Caperton*, 191 W. Va. 528, 532 (1994), for the opposite proposition, but that case held only that the state attorney general cannot seek a declaratory judgment. It did not extend its holding to other state agencies, and decisions like that in *Investment Management Board* show that other agencies are not subject to it.

*Fourth*, defendants contend that "many of the other factors" in the *Ram Ditta* inquiry indicate that the University is not an arm of the state. Under this heading, defendants assert that the litigation will not affect the state treasury because the University's funds are not included in the state's general fund. This claim misunderstands the state treasury. The treasury contains many separate funds, but all are part of the treasury and held by the state. There is no dispute that

the University's funds are, in fact, held in the treasury. *See* W. Va. Code § 18B-10-16; *W. Va. Univ. Bd. of Governors ex rel. W. Va. Univ. v. Rodriguez*, 543 F. Supp. 2d 526, 533 (N.D. W. Va. 2008).

Also under this final point, defendants claim that the University is not an arm of the state because it receives significant federal funding. Needless to say, however, the vast majority of public universities receive significant federal funding, including WVU. And it is not just universities. Other state agencies depend heavily on federal funding as well. The West Virginia Department of Health and Human Resources, for example, receives hundreds of millions of dollars in federal funding every year, yet indisputably remains an arm of the state.

## V.     Conclusion

None of defendants' three bases for removal withstands scrutiny. Their federal question argument fails for a host of reasons. The University's complaint pleads no federally created causes of action and does not *necessarily raise* any federal issue. That is, no federal issue must be resolved for the University to establish any element of its state law claims. Defendants likely will raise federal defenses, but that does not support federal jurisdiction. The University's requested remedies will not interfere with any part of an EPA-approved cleanup plan, or even with the as-yet-unapproved plan Dow has proposed. Nor does the University's complaint challenge the EPA's application of RCRA. And neither Dow nor the EPA can, under RCRA, compel the University to accept an environmental covenant on its property without its consent; without the University's consent, any proposal for an environmental covenant is a nullity.

Even if Dow's RCRA-cleanup plan did raise a necessary federal issue in this case, the issue lacks the substantiality that the Supreme Court's precedents require to found federal question jurisdiction. Dow's RCRA plan overwhelmingly concerns Dow's own plant. The

University's property is peripheral to it. An issue that is tangential to Dow's own RCRA plan cannot possibly create the important federal interest necessary to sustain removal. And depriving the state of a state forum to vindicate its state law claims would upset the congressionally approved balance of state and federal authority.

Defendants' federal officer theory founders, as well. The EPA did not direct defendants to release the Dow contaminants, nor did it direct them to refuse to clean up their mess or compensate the University. Indeed, the EPA has approved no corrective action plan that addresses the University's property at all.

Finally, Defendants' diversity theory lacks any meaningful support at all. Overwhelming authority establishes that state universities generally are arms of the state. Every West Virginia authority of which the University is aware confirms this for public universities in this state. Every prong of the controlling test demonstrates that the University is an arm of the state. And defendants' arguments to the contrary carry no force.

In sum, every applicable legal principle points to state court as the proper home for this case. The University respectfully requests that the court remand it.

Respectfully submitted,

**WEST VIRGINIA STATE
UNIVERSITY BOARD OF GOVERNORS
for and on behalf of West Virginia State
University,**

By Counsel.


  s/ Steven R. Ruby_____
Brian A. Glasser (WVSB #6597)
Samuel A. Hrko (WVSB #7727)
Steven R. Ruby (WVSB #10752)

Sharon F. Iskra (WVSB #6582)
Bailey & Glasser LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 *facsimile*

## CERTIFICATE OF SERVICE

The undersigned counsel for Plaintiff hereby certifies that on this 7th day of August, 2017, the a true an correct copy of the foregoing **Memorandum in Support of Motion to Remand** was electronically filed with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

 s/ Steven R. Ruby         
Steven R. Ruby
