**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

WEST VIRGINIA STATE
UNIVERSITY BOARD OF GOVERNORS
for and on behalf of West Virginia State
University,

       Plaintiff,

v.

THE DOW CHEMICAL COMPANY;
UNION CARBIDE CORPORATION;
BAYER CORPORATION;
BAYER CROPSCIENCE LP;
BAYER CROPSCIENCE HOLDING INC;
RHONE-POULENC INC.;
RHONE-POULENC AG COMPANY;
RHONE-POULENC AG COMPANY, INC.; and
AVENTIS CROPSCIENCE USA LP,

       Defendants.

Case No.: 2:17-cv-03558
Hon. John T. Copenhaver, Jr.

**WEST VIRGINIA STATE UNIVERSITY'S**
**REPLY IN SUPPORT OF MOTION TO REMAND**

**I.     Introduction**

Defendants' notice of removal and their response concerning remand provide no

colorable basis for this court to retain jurisdiction over this case. But defendants' filings are not

just unpersuasive. They contain three claims so objectionable that they deserve special

condemnation.

**A.    Defendants make three especially egregious claims.**

**1.    Defendants claim that the EPA has approved Dow's cleanup proposal—but omit to
mention that the EPA *rejected* that proposal in April 2017.**

Defendants' leading claim is that the Environmental Protection Agency (EPA) has

approved remedial measures under the Resource Conservation and Recovery Act (RCRA) that

include nothing more than an environmental covenant for the University's campus.[1] Defendants assert that the University, merely by demanding that Dow clean up its mess on the University's campus, is challenging an EPA-approved cleanup plan.[2] And they assert that Dow and its personnel are acting under federal officers because they are carrying out an EPA-approved cleanup plan.

But the truth is this: The EPA *rejected* Dow's proposed cleanup plan in April 2017. *See* Exhibit A (April 10, 2017 email from EPA to Dow). The plan rejected was the one that included Dow's proposal regarding the University's property. Defendants withheld this fact from the court while claiming that the EPA has "determined that any contamination beneath the WVSU campus . . . can be effectively addressed without remediation," and that the EPA is "presently in the middle of reviewing the corrective measures proposal that addresses proposed protective measures to be taken both at the Institute facility and the surrounding properties." Not. of Removal 1-2 (ECF 3); Def. Opp. 3, 6 (ECF 24).

Since the EPA has rejected Dow's proposed cleanup plan, there is no EPA-approved plan to which the University's complaint could present a challenge, or that Dow's personnel could be "acting under." Defendants' failure to disclose the true status of the Dow corrective measures proposal, combined with their many unconditional affirmative statements regarding EPA approval, misled the court.

---

[1] This case is brought by the West Virginia State University Board of Governors for an on behalf of West Virginia State University. All references in this memorandum to "the University" refer to West Virginia State University.
[2] Defendants in this case include The Dow Chemical Company and its wholly owned subsidiary Union Carbide Corporation. References to "Dow" refer to these entities collectively.

**2.     Defendants claim that the University was obliged to surrender property rights over half its campus—for free.**

Also objectionable is defendants' position that the University should be stripped of its property rights, without compensation, for the benefit of a $50-billion-a-year chemical company that polluted its campus. Defendants demand that the University accept an environmental covenant that would bar residential construction, limit nonresidential construction, and prevent the use of groundwater on the part of campus that defendants have polluted. Def. Opp. 3. According to Dow itself, the polluted area covers approximately half the University's campus. *See* Exhibit B (map of pollution provided to University by Dow). Yet defendants castigate the University for refusing to surrender land-use rights for half its campus "unless it was paid to do so"—that is, unless it received reasonable compensation for losing its property rights as the result of their pollution. Def Opp. 3. Defendants' extraordinary sense of entitlement shocks the conscience.

**3.     Defendants claim that historically black colleges and universities enjoy inferior rights to choice of forum compared to other land-grant schools.**

Perhaps most strikingly, defendants argue that the University can be deprived of its choice of a state forum—one that is available to other universities—because it is an historically black university. Both West Virginia University (WVU) and the University were founded as the result of federal land-grant acts to support the establishment of state educational institutions. But defendants contend that federal jurisdiction applies differently to the University than it does to WVU because the act under which the University was created was specifically intended to foster educational opportunity for African-Americans. The claim that some public, state universities enjoy inferior choice of forum because they happen to be historically black is unfathomable— and very likely unconstitutional besides.

3

**B. Defendants fail to offer any colorable reason that this court could retain jurisdiction.**

Beyond these indefensible stances, defendants' claims lack legal merit more broadly.

### 1.   Federal question jurisdiction.

Only a "slim," "small," "special" class of cases warrant federal question jurisdiction absent a federally created cause of action, and no such cause of action exists in this case. *Gunn v. Minton*, 568 U.S. 251, 258 (2013). Defendants fail to seriously address the exceedingly high bar that the Supreme Court has set for them. There are thousands of RCRA cleanup sites around the country.[3] Thirty-five percent of Americans live within three miles of a RCRA cleanup site.[4] The notion that *every* state law cause of action involving contamination from *every* one of these thousands of sites must be heard in federal court is impossible to reconcile with *Grable* and *Gunn.*[5]

Defendants propose two reasons this case cannot be heard in state court despite the Supreme Court's clear direction on the subject. First, they claim that the University's complaint challenges an EPA-approved cleanup plan. Second, they suggest that there is exclusive federal jurisdiction over any case that relates to contamination from an EPA RCRA site—essentially complete federal preemption of such claims. In summary form, here are the problems with those arguments:

a. *No plan*: There is no EPA-approved cleanup plan, despite defendants' misleading claims to the contrary.

---

[3] Environmental Protection Agency, *Population Surrounding 3,720 RCRA Corrective Action Sites*, Sept. 2015, *available at* https://www.epa.gov/sites/production/files/2015-09/documents/webpopulationrcracasites.9.28.15.pdf (attached as Exhibit C).
[4] *Id.*
[5] *Grable & Sons Metal Prods., Inc v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005).

b. *No challenge*: Even if the EPA had approved Dow's proposed plan, nothing in that plan would be precluded by the relief that the University seeks—unlike the two pre-*Grable* district court cases on which defendants' argument rests.

c. *No substantial federal question*: Even if the University's complaint were inconsistent with a RCRA cleanup plan for the Dow site, the inconsistency would at best be peripheral: Dow's plant—not the University's campus—is the RCRA site and the focus of the plan.

d. *No balance*: *Grable* and *Gunn* require the balance between state and federal authority to be preserved. Dragging a state university into federal court over what is at best a peripheral aspect of a RCRA plan would badly upset that balance.

e. *No complete preemption*: RCRA is not a complete preemption statute. On the contrary, it expressly preserves state law causes of action.[6] But if this court were to rule that EPA's longstanding involvement at a chemical plant is enough to remove any case involving the plant to federal court, it would effectively be deeming RCRA completely preemptive.

## 2.      Federal officer jurisdiction.

Controlling Supreme Court precedent also forecloses defendants' federal officer argument. That precedent is *Watson v. Philip Morris Companies*, 551 U.S. 142 (2007). *Watson* expressly held that the fact that a federal regulatory agency directs, supervises, and monitors a company's activities in considerable detail does not bring that company within the scope of the

---

[6] *See* 42 U.S.C. § 6972(f) ("Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief (including relief against the Administrator or a State agency)"). Section 6972 pertains specifically to citizen suits under RCRA, but it would make no sense to include it if RCRA were intended to completely preempt state law causes of action.

federal officer removal statute. *Id.* at 145. Defendants cite *Watson* but somehow neglect to mention that it is controlling authority adverse to their claim. Def. Opp. 22 n.10.

And the existence of a diametrically opposed Supreme Court decision is not defendants' only problem here. Their argument is that Dow and its personnel are acting pursuant to an EPA-approved plan and thus fall within the federal officer statute. But the truth is that there is no such plan.

### 3.    Diversity jurisdiction

Every court to consider whether West Virginia's public colleges and universities are arms of the state has concluded that they are. Defendants' diversity contention asks this court to reject all those precedents, plus every Fourth Circuit precedent on this subject and nearly every such precedent anywhere, ever. Defendants' attempt to distinguish the University from WVU because it was originally founded for African-American students is ill-considered, to put it generously. Their other arguments are frivolous and similarly fail to distinguish the overwhelming body of precedent on this issue.

### II.    Analysis

### A.    Federal question jurisdiction

### 1.    The EPA has rejected Dow's corrective measures proposal for groundwater contamination.

Defendants' most important argument is that the EPA has approved Dow's plan for the University's campus: An environmental covenant that would stop the University from constructing buildings that it otherwise could construct and from using its groundwater. Defendants fill their notice of removal and opposition to remand with statements like these: the EPA has "determined that any contamination beneath the WVSU campus . . . can be effectively addressed without remediation"; the University's complaint requests relief "flatly inconsistent

with the EPA's regulatory determinations"; and the EPA is "presently in the middle of reviewing the corrective measures proposal that addresses proposed protective measures to be taken both at the Institute facility and the surrounding properties." Not. of Removal 1-2 (ECF 3); Def. Opp. 3, 6 (ECF 24).

Imagine, then, the University's surprise at learning that the EPA in fact rejected Dow's corrective measures proposal in April 2017—and that defendants neglected to mention that fact to the court. After the University filed its motion to remand, it obtained a copy of an April 2017 email from the EPA to Dow. *See* Exhibit A. In the email, the EPA rejects Dow's corrective measures proposal for failing to include fundamental requirements for such a plan. The EPA directed Dow to correct these problems and submit a new plan. The University has no indication that Dow has done so. Strikingly, the email also tells Dow that contaminated groundwater must be restored to drinking water quality.

In other words, contrary to defendants' claims, the EPA has approved no corrective measures for the groundwater contamination at issue here. It has made no determinations about what corrective measures are necessary. Indeed, the EPA does not even have a plan before it for approval. And even when a new plan eventually is submitted, it can only be approved after it is accepted by the EPA and undergoes public comment.[7]

The absence of an approved plan defeats defendants' argument even on its own terms. Defendants rely on two main cases on the issue of federal question jurisdiction. One is *North Penn Water Authority v. BAE Systems*, No. Civ. A. 04-5030, 2005 WL 1279091 (E.D. Pa. May 25, 2005). That case featured an EPA-administered Superfund cleanup plan; the plaintiffs

---

[7] *See* United States Environmental Protection Agency, *Resource Recovery Act Public Participation Manual*, Jan. 11, 2017, at 53, *available at* https://www.epa.gov/sites/production/files/2017-01/documents/final_rcra_ppm.pdf (describing public comment requirements before RCRA remedial action can be approved).

brought their complaint for the specific purpose of challenging that plan. *Id.* at *3. The *North Penn* plaintiff, in fact, had unsuccessfully challenged the Superfund plan while it was up for public comment—and then went to state court to try to have the plan altered. *Id.* In defendant's other main precedent, the plaintiffs were challenging priority-of-payment provisions that were written into the Superfund law itself. In *Lehman Brothers, Inc. v. City of Lodi*, 333 F. Supp. 2d 895, 903, 905-06 (E.D. Cal. 2004), The facts in those cases differ vastly from those here, where there is no cleanup plan at all and no challenge to the RCRA statute.

### 2.  Even if Dow had an approved plan, the University's requested relief would not conflict with it.

Although the court need not entertain speculation about what sort of RCRA cleanup plan the EPA might eventually approve, it nonetheless can conclude that that plan will not conflict with the University's requested relief. The Dow plant may be a RCRA site, but the University's campus is not. No RCRA corrective measures can take place on the University's side of the property line without the University's consent. 42 U.S.C. § 6924(v); 40 C.F.R. § 264.101(c). The University certainly has not consented to any proposal that would allow Dow to avoid cleaning up its mess. So the University's complaint, which seeks remedies only for the contamination on its property—not Dow's—cannot conflict with any legally effective RCRA cleanup plan. Dow's response brief fails to address this fact at all.

And in any event, Dow's proposed plan for the University's campus—the covenant against new construction and groundwater use—could be implemented at the same time as the relief the University seeks. Indeed, until campus is cleaned up, restrictions on construction and groundwater use will be necessary. With no inconsistency between Dow's proposal and the measures that the University seeks, there will be no federal question at all.

Even if there were, however, *Grable* and *Gunn* make clear that the mere presence of a federal question embedded in a state law claim usually will not warrant federal question jurisdiction. Three other factors must be present. One, the federal question must be necessarily raised. *Gunn v. Minton*, 568 U.S. 251, 258 (2013). Here, it is not: There is no question of federal law that must be addressed to resolve the University's claims. This case is not like *Gunn*, where a state law claim of malpractice by a patent lawyer necessarily entailed the application of federal patent law. *Id.* at 259. Here, rather, defendants seek to raise the EPA's regulatory authority as a defense. A defendant's effort to raise a federal question as a defense does not make that question "necessarily raised" by the plaintiff's claims.

Two, the federal question must be substantial. *Id.* at 258. Dow's RCRA cleanup proposal primarily concerned Dow's own plant. The University's adjacent property was only a peripheral subject. Even if the University's complaint did conflict in some way with whatever plan eventually is approved, it could not be said that a conflict concerning a site *adjacent* to a RCRA site raises the sort of substantial federal question that could trigger federal jurisdiction.

Three, federal jurisdiction must be consistent with an appropriate balance of federal and state roles. *Id*. There is an especially strong interest in having a state forum to vindicate claims by a state entity.[8] Depriving the state of such a forum in this case would upset the balance mandated by *Grable* and *Gunn*. Notably, neither of the main cases that defendants cite on federal question jurisdiction had a state entity as a plaintiff.

---

[8] *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, n.22 (1983) ("[C]onsiderations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it.").

### 3.  Defendants' other arguments are frivolous.

Defendants' other arguments on this issue are frivolous. They suggest that federal jurisdiction is appropriate because there are statutes on the books that the EPA could use, according to defendants, to regulate the University's property if it wanted to: "CERCLA, the Clean Water Act, and others." Def. Opp. 16. Apparently, defendants believe that federal question jurisdiction is appropriate whenever a federal statute exists that a federal agency *might have* been able to invoke in a particular situation but did not, in fact, seek to invoke. This argument is so feeble that to state it is to refute it.

Defendants also suggest that federal question jurisdiction applies because the University "cooperated with the EPA investigation for years." Def. Opp. 3. This seems to refer to the University's allowing Dow contractors to take groundwater samples on its property to determine how far defendants' pollution extended. But that access was not requested by the EPA. It was requested by Dow. The document that defendants cite as evidence of the University's cooperation with "the EPA investigation" is actually an agreement between Dow and the West Virginia Department of Administration. ECF 3-25. It literally does not mention the EPA—or the University, for that matter. On the contrary, it says that the investigation was being conducted under the supervision of Union Carbide. *Id.* at 1. To claim that this document proves the University's cooperation in an "EPA investigation" is quite a stretch.

The truth is that the University had little or no contact with the EPA regarding this matter until shortly before it filed its complaint. And even if it had, merely cooperating in an EPA investigation would not come close to warranting federal question jurisdiction under *Grable* and *Gunn*.

Defendants also make some curious arguments regarding the applicable precedents. They suggest, obviously wrongly, that the out-of-circuit, pre-*Grable* district court decisions on which they rely should carry more weight here than *Grable* and *Gunn*, the Supreme Court's two key recent decisions on federal question jurisdiction. They also suggest that *Grable* and *Gunn* have no application here because they were not environmental cases. But the principles of federal question jurisdiction are the same no matter what the subject matter of the case. *Grable* and *Gunn* are by no means limited to their particular facts, as this court has recognized.[9] Additionally, defendants assert that *Gunn* does not apply here because it concerns federal question jurisdiction under 28 U.S.C. § 1331 rather than removal under 28 U.S.C. § 1441. This fundamentally misunderstands removal: Defendants seek to remove based on federal question jurisdiction. And federal question jurisdiction is governed by 28 U.S.C. § 1331.

## B.      Federal officer removal

### 1.      The Supreme Court's *Watson* decision rejected precisely the claim that defendants make here.

Defendants' federal officer argument may be dispensed with quickly. Ten years ago, a unanimous Supreme Court rejected precisely the claim that defendants make here. *Watson v. Philip Morris Companies*, 551 U.S. 142 (2007), involved a state law claim alleging deceptive trade practices by a cigarette manufacturer. *Id.* at 146. The *Watson* plaintiff alleged that Philip Morris manipulated testing of its cigarettes to make it look as if they produced less tar and nicotine than they really did—and then used the false results to market the cigarettes as "light." *Id.* Philip Morris removed the case under a federal officer theory, contending that the federal government's detailed supervision of the cigarette testing process meant that the company was

---

[9] *State of West Virginia ex rel. Morrisey, et al. v. McKesson Corp.*, No. 2:16-cv-1772, 2017 WL 357307, at *4-*5 (S.D. W. Va. Jan. 24, 2017) (mem. op. and order).

"acting under" federal officers with respect to the challenged conduct. *Id.* The district court accepted the argument and the Eighth Circuit affirmed. *Id.* at 146-47.

But the Supreme Court reversed. It held that no amount of federal regulation or oversight of a private company is sufficient to bring that company within the federal officer removal statute. *Id.* at 151-53. The Court drew a clear distinction between private actors that are following government orders to comply with the law (*e.g.*, an entity subject to federal environmental regulations) and those that are engaged in helping or assisting the government carry out a government function—mostly government contractors. *Id.* The former—those following government orders to comply with the law—are ineligible for federal officer removal. *Id.* A regulated entity complying with a federal order—even a "highly complex order"—thus may not obtain federal officer removal based on that compliance. *Id.* at 152. A chemical company carrying out a RCRA cleanup plan falls squarely in this category.

A recent Fourth Circuit case that defendants cite provides a helpful illustration of the rule from *Watson*. In *Sawyer v. Foster Wheeler LLC*, 860 F.3d 249 (4th Cir. 2017), the defendant was a federal government contractor that made boilers for naval vessels. *Id.* at 251-52. The Fourth Circuit correctly applied *Watson*, observed that it "distinguished relationships where private entities are merely subject to federal regulation—holding that mere regulation of private entities cannot justify removal under the statute—from the relationships where the private entity contracts with the government to fulfill a government need." *Id.* at 255. Because the boiler manufacturer was a government contractor, it could invoke the federal officer removal statute. *Id.* Because defendants here did not operate the Institute plant as government contractors, they cannot.

### 2.   Defendant's cited precedents either involve government contractors or are overruled by *Watson*.

Defendants cite *California v. H & H Ship Service Co.*, No. 94-10182, 1995 WL 619293 (9th Cir. Oct. 17, 1995) to support their position. The defendant in that case, however, was a contractor hired to assist the Coast Guard with a cleanup project—not a regulated entity complying with a federal order. *Id.* at *1. Defendants also cite *Greene v. Citigroup, Inc., et al.*, No. 99-1030, 2000 WL 647190 (10th Cir. May 19, 2000), in which a private company successfully removed a case involving a Superfund cleanup by contending that it was acting on orders from the EPA. *Greene* is a two-page, unpublished opinion that provides few details about the case. It predates *Watson* by several years and did not examine whether the company at issue was a government contractor or instead the subject of EPA regulation. From the context that the opinion provides, the latter possibility seems more likely. But to the extent *Greene* permitted federal officer removal for a private company based on its compliance with an EPA order, it does not survive *Watson* (and it had no precedential authority in the first place).

### 3.   There is no EPA-approved RCRA cleanup plan that Dow could be carrying out.

Besides the fact that the Supreme Court has rejected defendants' argument, there is also a factual problem. Defendants' contention rests on the premise that Dow and its personnel are acting pursuant to an EPA-approved cleanup plan. The truth is that there is no EPA-approved plan: The EPA in fact has rejected Dow's proposal. Even if *Watson* had never been decided, therefore, defendants could not accurately claim to be carrying out an EPA cleanup plan.

### 4.   The University's complaint arises from the defendants' pollution, not from any cleanup.

Additionally, the University's complaint does not arise from any cleanup activity by defendants. Rather, it arises from their pollution of the University's campus. Federal officer

removal is available only if the acts performed under federal direction are the same acts that give rise to the claim. *Virden v. Altria Group, Inc.*, 304 F. Supp. 2d 832, 844 (N.D. W. Va. 2004). The two environmental cases on which defendants rely on this issue—*H & H Ship Service Co.* and *Greene*—both arose from acts performed during a cleanup—not from the original pollution.[10] In that way, as well, they are altogether different from this case.

### C.    Diversity jurisdiction

In their diversity jurisdiction contention, defendants ask the court to reject the conclusion of every other court that has considered whether public universities in West Virginia are arms of the state—not to mention an unbroken line of Fourth Circuit precedents, along with overwhelming authority from around the country. These include a recent decision from the Northern District of West Virginia that is squarely on point. *W. Va. Univ. Bd. of Governors ex rel. W. Va. Univ. v. Rodriguez*, 543 F. Supp. 2d 526 (N.D. W. Va. 2008). Defendants offer no colorable reason that the court should consider such a radical tack.

### 1.    A state university that is historically black is still a state university.

Most strikingly, defendants try to distinguish the University from WVU because the University was originally founded for African-American students and WVU was not. Def. Opp. 24. Both schools were founded as state institutions with financial support from federal land-grant acts. WVU was founded as a result of the 1862 Land-Grant Act, and the University was founded as a result of the 1890 Land-Grant Act.[11] Both acts provided grants of federal land to states to help fund the establishment of educational institutions. Both resulted from Congress' conclusion

---

[10] *H & H Ship Serv. Co.*, 1995 WL 619293, at *1 (allegation was that defendant violated California Fish and Game Code during cleanup of phosphoric acid spill); *Greene*, 2000 WL 647190, at *1 (allegation was that defendant violated "Rocky Mountain Low Level Radioactive Waste Compact . . . by implementing a remedy for clean-up of the Unit 8 Denver Radium site").

[11] United States Department of Agriculture, *NIFA Land-Grant Colleges and Universities*, available at https://nifa.usda.gov/sites/default/files/resource/lgu_map_6_25_2014_0.pdf (attached as Exhibit D).

that more federal support was needed for education in the states. The only difference was that the 1890 Act focused specifically focused on African-American institutions. Defendants assert that this focus somehow ties 1890 Act schools to the federal government more closely than 1862 Act schools. That argument is specious, and defendants should not have made it.

### 2. Receiving federal funds does not deprive an agency of its status as a state entity.

Defendants also argue that the University is not an arm of the state because it continues to receive federal funding, including federal funding dedicated to historically black colleges and universities (HBCUs). This argument, too, is frivolous. Virtually every public college and university—and almost every other state agency—receives substantial sums of federal funding. In West Virginia, state government agencies are expected to receive more than $5 billion in federal funding in fiscal year 2017, with funds going to nearly every state agency, college, and university.[12] West Virginia's Department of Health and Human Resources alone receives about $3 billion a year in federal Medicaid funding.[13] There can be no serious claim that an agency ceases to be an arm of the state because it receives federal funds.

All land-grant institutions, in particular, are eligible for federal funding from the United States Department of Agriculture to support their land-grant missions. This includes both the University and WVU.[14] Defendants' attempt to distinguish the two institutions based on access to dedicated federal funds lacks any foundation.

---

[12] West Virginia Department of Revenue, *West Virginia Consolidated Report of Federal Funds, FY 2017*, Nov. 2015, at 1-3, *available at* http://www.budget.wv.gov/reportsandcharts/federalfunds/Documents/FedFunds2017.pdf (attached as Exhibit E).
[13] West Virginia Department of Health and Human Resources, *State Fiscal Year 2015 Annual Report*, at 3, *available at* http://www.dhhr.wv.gov/bms/BMSPUB/Documents/BMS%20Annual%20Report%202015%20Final%20 approved%20version.pdf (attached as Exhibit F).
[14] United States Department of Agriculture, National Institute of Food and Agriculture, *Land-Grant Colleges and Universities*, *available at* https://nifa.usda.gov/land-grant-colleges-and-universities (attached as Exhibit G).

### 3.   This case will affect the state treasury.

Defendants next contend that this case will not affect the state treasury, first because the University seeks injunctive relief in addition to money damages, and second because money recovered by the University in this action would not benefit the state. On the first of these points, defendants assert that the University's complaint is primarily for injunctive relief and suggest that the demand for damages is somehow peripheral. This mischaracterizes the complaint. The University's demand for damages is just as central to the complaint as the request for an injunction. The University has suffered and will suffer grave monetary harm from defendants' pollution.

As to their second point, defendants offer no explanation why the recovery of funds to clean up pollution on state property and combat damage to the reputation of a state institution would not benefit the state. That claim is illogical. The University's funds, moreover, are held in the state treasury just as WVU's are. *See* W. Va. Code § 18B-10-16; *W. Va. Univ. Bd. of Governors ex rel. W. Va. Univ. v. Rodriguez*, 543 F. Supp. 2d 526, 533 (N.D. W. Va. 2008). Defendants offer no distinction between this case and *Rodriguez* case on this point.

### 4.   Defendants' other arguments offer no distinction between this case and the precedents.

Defendants' remaining arguments on this issue similarly fail to distinguish this case from the overwhelming weight of precedent. Defendants contend that the University cannot be a state agency because it is represented by private counsel. The *Rodriguez* court rejected this claim, noting that the state legislature has expressly authorized public universities to hire their own counsel. *Rodriguez*, 543 F. Supp. 2d at 534. Defendants offer no response to this.

Defendants also claim that the University cannot be a state entity because it gave notice to the state Department of Environmental Protection (DEP) of a possible statutory claim against

16

defendants. Defendants theorize that if the University were truly an arm of the state, the DEP's normal enforcement powers would not apply to it. On this point, as well, defendants are misinformed. State agencies are subject to DEP environmental oversight just as private entities are. Consider, for example, a 2015 DEP consent order that fined the state's Division of Natural Resources more than $90,000 for Clean Water Act violations. *See* Exhibit H at 5.

Defendants further claim that the University cannot be a state entity because it has the capacity to sue and be sued, own property, and acquire legal services. The same facts were true of WVU in the *Rodriguez* case. Defendants propose no distinction that would separate this case from that one on these points.

Defendants also dismiss as irrelevant many of the factors that other courts have considered—even factors that the Fourth Circuit requires to be considered—in deciding what constitutes an arm of the state. Def. Opp. 29. Surprisingly, defendants claim that the presence or absence of state funding is irrelevant to identifying an arm of the state. *Id.* This argument is nonsensical. Elsewhere, defendants claim that a 5% state budget cut to the University somehow indicates it is not an arm of the state; the University's dependence on state funding in fact illustrate the opposite. Defendants also assert that it the University's involvement in statewide concerns is irrelevant. But such involvement is one of the four factors that the Fourth Circuit says must be considered in this analysis. *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456, 457-58 (4th Cir. 1987). And if the University's absence of taxing power and its sharing accounts with the state are irrelevant, as defendants contend, that fact will come as news to the court in *Rodriguez*. *Rodriguez*, 543 F. Supp. 2d at 534.

17

**5.      Defendants offer no response at all to the most important
indicia that the University is an arm of the state.**

Defendants have no response at all to some of the most significant facts establishing the
University as an arm of the state. They do not respond to the facts that the University's
employees are employees of the state, that West Virginia's governor appoints most of the
University's board of governors, that the state Higher Education Policy Commission oversees the
University, and that state code unequivocally declares the University to be a state entity. These
facts, even standing alone, provide a more than ample basis to reject defendants' position.

**III.      Nothing about this case warrants discovery on the question of remand.**

Contrary to defendants' contention, no discovery is needed for the court to rule on the
pending remand motion. The University's memorandum in support of its remand motion
included copious statutory citations that demonstrate it is part and parcel of the State of West
Virginia. Pl. Mem. at 25-26 (ECF 11). And as noted in the previous section, the uncontested
facts about the University's status as a state entity are, standing alone, sufficient to reject
defendants' position out of hand. Defendants suggest, somewhat curiously, that the court should
order discovery because defendants filed 700 pages of exhibits and the University filed less. If
the court is by some chance inclined to use exhibit volume as the litmus test for whether to order
discovery, the University has met it, with several hundred pages' worth of support included with
its motion and this reply.

**IV.      Defendants should bear the University's costs
and attorneys' fees in connection with removal.**

This is the rare case in which removal is so obviously unsupported that the removing
party should bear its opponents' costs and attorneys' fees. *See* 28 U.S.C. § 1447(c). Consider
defendants' three claims. *First*, they assert federal question jurisdiction. But they rely primarily

18

on the misleading claim that the EPA approved a cleanup plan with which the University's complaint conflicts. Defendants withheld from the court the fact that the EPA rejected Dow's corrective measures proposal in April, before this case was filed. Because there is no EPA-approved plan, there can be no challenge to it. And even setting aside the misleading statements about EPA approval, defendants fail to seriously address the extremely high bar that *Grable* and *Gunn* establish for federal question jurisdiction over purely state law claims.

*Second*, defendants assert that federal officer removal applies. But the Supreme Court's *Watson* decision rejected precisely the claim that defendants make here. *Watson v. Philip Morris Companies*, 551 U.S. 142 (2007). *Watson* expressly held that a private company that complies with federal orders does not thereby become eligible for federal officer removal. *Id.* at 152-53. Rather, the company must be assisting the government in carrying out a government function, in the manner of a government contractor. *Id.* Defendants cited *Watson* but failed to disclose it as controlling adverse authority. Def. Opp. 22 n.10. Their federal officer argument, moreover, depends on their misleading claims that Dow is carrying out an EPA-approved cleanup plan.

*Third*, defendants contend that diversity jurisdiction applies because the University is not an arm of the state. This runs counter to every known precedent on West Virginia and Fourth Circuit higher education institutions. Although defendants are correct that the inquiry is fact-specific, they offer no facts that could found a good-faith distinction between this case and those precedents. Their leading claim—that land-grant schools founded to educate African-American students are subject to a different standard than other land-grant schools—is wrongheaded and ill-considered, at best.

The federal removal statutes include a fee-shifting provision for a reason: to discourage defendants from filing baseless, abusive removal notices like the one in this case. The University

should not have had to spend time and money seeking to return this case to state court, where it belongs. If the statute's purpose is to be fulfilled, the court should require defendants to bear the University's costs and attorneys' fees.

Respectfully submitted,

**WEST VIRGINIA STATE
UNIVERSITY BOARD OF GOVERNORS
for and on behalf of West Virginia State
University,**

By Counsel.


 /s Steven R. Ruby
Brian A. Glasser (WVSB #6597)
Samuel A. Hrko (WVSB #7727)
Steven R. Ruby (WVSB #10752)
Sharon F. Iskra (WVSB #6582)
Bailey & Glasser LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 *facsimile*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel for Plaintiff hereby certifies that on this 28th day of August, 2017, a true an correct copy of the foregoing **West Virginia State University's Reply in Support of Motion to Remand** was electronically filed with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

/s Steven R. Ruby
Steven R. Ruby