## UNITED STATES FEDERAL DISTRICT COURT
## SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| WEST VIRGINIA STATE UNIVERSITY BOARD OF GOVERNORS for and on behalf of West Virginia State University, <br><br> *Plaintiff*, <br><br> v. <br><br> THE DOW CHEMICAL COMPANY; UNION CARBIDE CORPORATION; BAYER CORPORATION; BAYER CROPSCIENCE LP; BAYER CROPSCIENCE HOLDING INC.; RHONE-POULENC INC.; RHONE-POULENC AG COMPANY; RHONE-POULENC AG COMPANY, INC.; and AVENTIS CROPSCIENCE USA LP, <br><br> *Defendants*. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )      Case. No. 2:17-cv-03558 <br>      Hon. John T. Copenhaver, Jr. |

## MEMORANDUM IN SUPPORT OF
## DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION................................................................................................................1

BACKGROUND ...............................................................................................................2

I.      The Institute Facility Is The Subject of A Decades-Old EPA Cleanup. ......................2

II.     After A Thorough And Comprehensive Investigation, The EPA Concluded
        That There Is No Risk To Human Health. ...................................................................5

III.    Plaintiff Agrees With The EPA's Conclusion That There Is No Risk To
        Human Health. ............................................................................................................6

IV.     Despite Acknowledging That The EPA Has Concluded That There Is No
        Risk, WVSU Filed This Lawsuit Asking The Court To Usurp the Function of
        The EPA and Impose Measures That The EPA Has Concluded Are
        Unwarranted. ..............................................................................................................8

ARGUMENT .....................................................................................................................9

I.      Plaintiff's Claims Are Preempted..............................................................................9

II.     Plaintiff Fails To State Any Legally Cognizable Injury Under West Virginia
        Law. .........................................................................................................................13

        A.      The West Virginia Supreme Court Has Held That Plaintiffs May Not
                Bring Risk-Based Claims For Property Damage..............................................14

        B.      Plaintiff Concedes That There Is No Risk, And Thus Could Not State
                A Claim Even If Risk-Based Claims Were Recognized In West
                Virginia. ......................................................................................................16

III.    Plaintiff Cannot Bring These Claims Because It Does Not Own And Does Not
        Use The Allegedly Contaminated Groundwater..........................................................17

IV.     Plaintiff's Claims Are Time-Barred...........................................................................19

V.      Several Counts of Plaintiff's Complaint Fail For Additional, Independent
        Reasons......................................................................................................................21

VI.     Plaintiff Has No Claim Against The Dow Chemical Company. ...................................27

VII.    To the Extent They Are Not Dismissed In Their Entirety, The Court Should
        Stay Or Dismiss Plaintiff's Claims Pending Completion of the EPA Cleanup. .........28

CONCLUSION ..................................................................................................................33

## INTRODUCTION

This case involves alleged contamination of groundwater beneath property owned by plaintiff West Virginia State University ("WVSU").  Plaintiff concedes that it has known about the contamination for years, that there is no risk to human health, and that the EPA and WVDEP have conducted an extensive investigation and concur in this analysis, agreeing that no remediation is necessary.  Plaintiff's claims are barred for multiple reasons.

*First*, plaintiff's claims are preempted by federal law.  Plaintiff's request that this Court order defendants to undertake various remedial measures (or reimburse plaintiff for undertaking such remedial measures) would interfere with the EPA's ongoing cleanup efforts and is flatly inconsistent with the EPA's determination that no remediation is necessary.

*Second*, the West Virginia Court of Appeals has made clear that plaintiff cannot pursue risk-based claims for alleged property damage, and even if it could, plaintiff concedes that there is no risk currently presented by the contamination at issue here.  Plaintiff has failed to allege any injury cognizable under West Virginia law.

*Third*, plaintiff does not own the groundwater that it alleges is contaminated, and it concedes that it does not even use the groundwater.  It therefore lacks standing to bring these claims.

*Fourth*, to the extent plaintiff had any viable claim (it does not), it would be time-barred.  The contamination at issue here is the subject of a decades-long EPA cleanup in which plaintiff has actively participated.  Indeed, plaintiff concedes that it knew about the contamination when it acquired property adjacent to the Institute Facility in 2013, but this lawsuit was not filed until 2017.  Its claims are therefore barred.

*Fifth*, plaintiff has pleaded several counts that simply fail to state a cause of action.  Plaintiff's claims in Counts I, II, VI, VII and VIII fail for independent reasons.

*Sixth*, plaintiff has no viable claim against The Dow Chemical Company ("Dow"). While plaintiff seeks to hold Dow liable for the acts of its subsidiary, plaintiff has not even attempted to plead any veil-piercing allegations.

For all these reasons, defendants respectfully request that the Court dismiss plaintiff's claims in their entirety pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(b)(1). In the alternative, plaintiff's lawsuit should be stayed in order to allow the EPA to complete its investigation and remediation activities and determine what, if anything, remains of plaintiff's claims after the EPA's activities are completed.

## BACKGROUND

Plaintiff's claims relate to contamination that has been the subject of investigation and remedial activities by the United States Environmental Protection Agency ("EPA") for more than two decades. The EPA has now determined that the contamination poses no risk to human health and thus does not require any remediation. WVSU has repeatedly endorsed these conclusions. Nonetheless, plaintiff has filed this lawsuit asking the Court to order defendants to conduct various remedial activities that the EPA has determined are unwarranted.

## I.  The Institute Facility Is The Subject of A Decades-Old EPA Cleanup.

The Institute Facility is a 433-acre industrial park located in Institute, West Virginia between the Kanawha River to the south, State Route 25 to the north, and WVSU to the east. Today, the Institute facility is owned by Union Carbide Corporation ("UCC"). (Dkt. 3-1, First Am. Compl. ¶ 19.) In the mid-1980s, the EPA initiated efforts to address contamination at the Institute Facility pursuant to the EPA's comprehensive waste management program and regulatory scheme. In August 1984, the EPA published a report documenting environmental pollution from multiple sources located within the Kanawha Valley, stating among other things that it had "detected significant groundwater contamination" at the Institute Facility. (Dkt. 3-17,

*Overview of Environmental Pollution in the Kanawha Valley* (Aug. 1984); *id.* at VII-19 to VII-29 ("Groundwater contamination has been detected at the wastewater treatment plant site.").)[1]

These reports and the subsequent cleanup efforts were the subject of extensive publicity. (*See, e.g., EPA Releases Revised Report on Area Toxins*, The Charleston Daily Mail (Sept. 15, 1987) (discussing EPA report and noting that copies were available for public viewing at several locations, including the University's library), Ex. 1; *Chemical concerns*, Charleston Gazette (Dec. 2, 2004) ("In the early- to mid-1990s," then WVSU President Hazo Carter "wrote a series of strong letters to plant officials."), Ex. 2.)[2]

As part of its efforts to address environmental contamination within the Kanawha Valley, the EPA initiated a Corrective Action in order to identify and remediate solid waste management units ("SWMUs") at the Institute Facility. In December 1990, the EPA issued a revised final permit, effective January 1991, to govern investigation and remediation activities relating to contamination emanating from the Institute Facility. (Dkt. 3-19, USEPA Permit for Corrective Action.) The EPA's Corrective Action permit made clear that "[t]he Permittee must comply

---

[1] The Court may consider these materials from the EPA record and other materials on several grounds. *First*, the Court may take judicial notice of these materials. For example, with respect to the reports and other documentation prepared as part of the EPA cleanup cited herein, the Court may consider them as government records and matters of public record. *See, e.g., Witthohn v. Federal Ins. Co.*, 164 Fed. App'x 395 (4th Cir. 2006) ("[A] court may consider official public records."); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (taking judicial notice of voting statistics in deciding motion to dismiss); *Consol. Salmonid Cases*, 688 F. Supp. 2d 1013, 1016-17 (E.D. Cal. 2010) (taking judicial notice of regulatory documents such as "[a] 1982 Operating Plan for New Melones Reservoir, issued by the Bureau"); *In re Am. Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 2d 1043, 1064 (C.D. Cal. 2012) (taking judicial notice of documents obtained "by making a FOIA request … as matters of public record" in deciding motion to dismiss); *In re MTBE Prods. Liab. Litig.*, 959 F. Supp. 2d 476, 496 (S.D.N.Y. 2013) (taking judicial notice of environmental permits on motion to dismiss); *Davis v. Toyota Motor Sales*, 2015 WL 3456656, at *2-3 (M.D. La. May 29, 2015) (taking judicial notice on motion to dismiss of government webpage). Moreover, several of these reports were publicized along with the complaint on a website maintained by plaintiff's counsel. (*See* http://www.baileyglasser.com/wvsu/.) *Second*, as explained below, courts may consider extrinsic evidence beyond the complaint on a motion to dismiss under Fed. R. Civ. P. 12(b)(1) or under the primary jurisdiction doctrine.

[2] The court may take judicial notice of the press articles cited herein in deciding defendants' motion to dismiss. *See, e.g., U.S. v. Humana, Inc.*, 776 F.3d 805, 811-12 (11th Cir. 2015) (affirming district court, which took judicial notice of, among other things, "five Miami Herald articles"); *Garber v. Legg Mason Inc.*, 347 Fed. Appx. 665, 669 (2d Cir. 2009) (taking judicial notice of newspaper articles on motion to dismiss).

with all terms and conditions of this permit." (*Id.*) It expressly stated that "permit noncompliance" was "grounds for enforcement action" against the owner of the Institute Facility. (*Id.* at 4.) This is consistent with federal law, which provides that, if a permittee violates the requirements in its permit, the EPA may initiate an enforcement action to compel compliance and to collect penalties. *See* 42 U.S.C. § 6928 ("Federal enforcement").

Pursuant to this permit, the EPA required, among other things, submission "to EPA, for approval, documentation that the subsurface conditions and contaminant plume have been adequately characterized and the proposed corrective measures will adequately remove, contain or treat the released hazardous wastes or hazardous constituents." (Dkt. 3-19, USEPA Permit for Corrective Action (Dec. 18, 1990).) The EPA specified numerous detailed requirements for the work to be performed pursuant to the permit, including that "[a]ll plans, reports, schedules, and other submissions required by" the permit were, "upon approval by the [EPA] Regional administrator, incorporated in this permit" and that "[a]ny noncompliance with such approved studies, schedules, plans, reports, or other submissions shall be deemed noncompliant with this permit." (*Id.* at 27.)

Since the EPA issued the Corrective Action permit, dozens of investigative, permitting and remedial activities have occurred as part of the EPA cleanup. Over the course of several years, the EPA approved a variety of remedial activities to address groundwater contamination. As a result of these remediation activities, in October 2005, the EPA issued a "YE" Environmental Indicator, confirming that any migration of contaminated groundwater is "under Control" at the Institute Facility. (EPA Institute Facility webpage, https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-union-carbide-corporation-institute-operations ("Groundwater under Control: Yes, Controlled"), Ex. 3.)

II.     **After A Thorough And Comprehensive Investigation, The EPA Concluded That There Is No Risk To Human Health.**

As part of its investigation and remediation activities, the EPA approved and supervised a series of studies related to the Institute Facility and surrounding property, including the groundwater beneath WVSU's property.  In conducting these investigations, the "EPA's Corrective Action program works closely with facilities during the investigation and cleanup process."  (EPA website, https://www.epa.gov/hw/learn-about-corrective-action, Ex. 4.)  As discussed further below, WVSU was aware of these investigations, executing an access agreement that allowed researchers to conduct sampling, monitoring and investigative activities on WVSU property.  (*See, e.g.,* Dkt. 3-24, at § 1 (agreement with WVSU granting UCC access to WVSU property "for the sole purpose of conducting soil borings, groundwater sampling, and related investigative efforts").)

Final results from the first study were reported in 2013 (Dkt. 3-29, J. Cibrik, letter to G. Melton (May 30, 2013))—the same year WVSU alleges it acquired property adjoining the Institute Facility (the "Rehabilitation Center" property) (Dkt. 3-1, First Am. Compl. ¶ 18).  The 2013 study reported low levels of various organic compounds in the groundwater beneath the former Rehabilitation Center property adjoining the Institute Facility.  (*See* Dkt. 3-29, J. Cibrik, letter to G. Melton (May 30, 2013).)

The EPA reviewed the results of the study and concluded that there was no risk to human health.  On August 5, 2013, both EPA and WVSU received a technical memorandum reporting the findings from this Phase I study.  (Dkt. 3-31.)  The memorandum concluded that there was no risk to human health from any contamination beneath the WVSU property.  (*Id.* at 7.)  "Based on commercial/industrial land use, no constituents were detected above applicable VISLs at the midpoint of USEPA's risk management range …."  (*Id.* at 2.)  That same memorandum then

recommended at that same time that an environmental covenant be executed that would "prohibit[] the use of groundwater and requir[e] a vapor barrier for new buildings constructed on the property." (*Id.* at 8.)  In April 2014, the EPA approved the technical memorandum, including its finding that there was no risk to human health.  (Dkt. 3-34, W. Wentworth, EPA Approval of East Property Boundary Investigation Report (April 29, 2014).)

On April 18, 2016, the EPA received a second report, containing the results of Phase II-V studies, for its review and approval.  (Dkt. 3-35.)  Among other things, the report concluded that "there is no risk currently associated with the drinking water use pathway" since "the WVSU property is supplied by municipal water and no drinking water wells are present on the property." (*Id.* at 1.)  On July 18, 2016, the EPA approved the results of the Phase II-V studies, stating that "EPA agrees with the conclusions presented in that report."  (Dkt. 3-36, W. Wentworth, letter to J. Cibrik (July 18, 2016).)

On May 30 and 31, 2017, representatives from the EPA convened a meeting with UCC to discuss potential corrective measures.  (*See* Dkt. 3-7, CH2M Meeting Summary re *UCC Institute Facility - Agency/UCC Collaboration Meeting*.)  At the meeting, the EPA reiterated that the reports as to the WVSU property were "approved and endorsed by the USEPA," and the EPA "confirmed [its] agreement with this approval."  (*Id.* at 2.)  Accordingly, the EPA, confirmed that as to WVSU "[n]o further work is necessary to address RCRA corrective action related to the Institute site."  (*Id.*)

## III.   Plaintiff Agrees With The EPA's Conclusion That There Is No Risk To Human Health.

WVSU agrees with the conclusions of the EPA investigation and has repeatedly acknowledged what the EPA and other independent experts have found—that there is no risk to human health from contamination beneath any property owned by the plaintiff here.  Indeed,

plaintiff issued a series of public statements in conjunction with this lawsuit[3] acknowledging that there is "no threat to human health" and that "no one in the campus community" is being "exposed to contamination":

- In an April 27, 2017 press release announcing this lawsuit, for example, the university stated: "The contamination *does not pose a current health risk to anyone* on campus.  Extensive testing has shown that the Dow [sic] contaminants have been introduced through groundwater, which is not used on campus, and pose *no health risk* in any area where people would be exposed to them."  (Dkt. 3-2, 4/27/17 press release at 1 (emphasis added).)

- In an accompanying "fact sheet", the university stated: "Outside experts have concluded that the available evidence indicates there is *no threat to human health* from the Dow [sic] groundwater contaminants.  The United States Environmental Protection Agency and the West Virginia Department of Environmental Protection *have indicated their agreement* with this conclusion."  (Dkt. 3-4, WVSU Fact Sheet at 2-3 (emphasis added).)

- In an April 27, 2017 letter to students and parents announcing the lawsuit, WVSU's President Anthony Jenkins stated: "The federal Environmental Protection Agency (EPA) and the West Virginia Department of Environmental Protection (DEP) have been apprised of the results of campus environmental testing throughout our assessment.  Outside experts have concluded that the available evidence *does not indicate a threat to human health* from these contaminants, and *EPA and DEP agree*."  (Dkt. 3-3, 4/27/17 A. Jenkins, letter to parents and students at 1 (emphasis added).)

- In a letter to students, faculty and staff that same day, President Jenkins reiterated: "Please know *there is no current risk to the health of anyone* on campus."  (Dkt. 3-5, 4/27/17 A. Jenkins, letter to students and faculty at 1 (emphasis added).)  As President Jenkins explained: "Multiple environmental experts have reviewed testing results from various sites on campus and in the ground beneath it.  They all agree, based on all known information, that *no one in the campus community is being exposed to the Dow [sic] contamination.*  The federal Environmental Protection Agency and the state Department of Environmental Protection also have reviewed the test data and *agree that the evidence does not indicate a risk to human health*."  (*Id.* (emphasis added).)

---

[3] The Court may take judicial notice of such public statements.  *See, e.g., In re NAHC, Inc. Securities Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (district court properly took judicial notice of press releases); *Mitchell v. Home*, 377 F. Supp. 2d 361, 367 n.1 (S.D.N.Y. 2005) (court could take judicial notice of press release on motion to dismiss). Plaintiff's counsel republished the statements in conjunction with the complaint on their firm website.  (*See* http://www.baileyglasser.com/wvsu/.)

**IV.    Despite Acknowledging That The EPA Has Concluded That There Is No Risk, WVSU Filed This Lawsuit Asking The Court To Usurp the Function of The EPA and Impose Measures That The EPA Has Concluded Are Unwarranted.**

Even though it has cooperated with the EPA's investigation for years and it agrees with the EPA's conclusion that there is no risk to human health, plaintiff nonetheless has now retained a private law firm and filed the present action seeking a court order imposing a variety of remedial measures to address alleged contamination beneath WVSU property that the EPA has concluded are unwarranted—including potentially shutting down the Institute Facility altogether.

Among other things, plaintiff asks the Court to order defendants to implement and oversee a variety of remedial measures at both university property and the Institute Facility. These remedies include directing defendants to: (1) "Remove the Institute Plant Contaminants from the University's property"; (2) "Install barriers to protect University facilities, including but not limited to buildings and athletic fields, from possible intrusions of the Institute Plant Contaminants"; (3) "Install protective systems in all University buildings sufficient to ensure that, in the event the Institute Plant Contaminants enter the indoor environment in any building, they are removed or rendered harmless"; (4) "Monitor the Institute Plant Contaminants on the University's property to ensure that no person is exposed to the Institute Plant Contaminants"; and (5) "Take all other steps necessary to eliminate any effects of the Institute Plant Contaminants on the University; its students, faculty, and staff; and other persons present on the University's property; and to restore the University and its property to the condition it would have been in absent the Institute Plant Contaminants."  (*Id.* ¶¶ 27, 45.)

In addition, plaintiff asks the Court to "[o]rder[] that Defendants must cease and desist from operating the Institute Facility unless and until they can operate it in a responsible and prudent manner that prevents further contamination of the University's property."  (*Id.* ¶ 36.) Plaintiff requests that the Court step into the shoes of the EPA and oversee—for multiple years if

not decades—these remedial activities and enter an order "[m]aintaining jurisdiction over this matter to ensure that remediation and restoration efforts are performed according to such plans, and are timely and properly executed."  (*Id.*)

## ARGUMENT

### I.     Plaintiff's Claims Are Preempted.

Plaintiff's claims are at odds with the ongoing EPA cleanup and thus are preempted under federal law.  Under the Supremacy Clause (*see* U.S. Const. art. VI, cl. 2), federal law preempts state-law claims where, among other things, they conflict with federal law.  *See Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1412-13 (4th Cir. 1994).  A conflict occurs where either (i) "it is impossible to comply with both" state and federal law or (ii) "the state law stands as an obstacle to the accomplishment and execution of congressional objectives."  *In re W. Va. Asbestos Litig.*, 215 W. Va. 39, 43 (2003).  Applying these principles, courts frequently find that federal environmental statutes, and regulatory actions taken pursuant to them, preempt state-law claims.[4]

**Injunctive and declaratory relief.**  The Fourth Circuit, in particular, has held that EPA actions taken as part of an environmental cleanup pursuant to federal environmental statutes preempt state-law claims for injunctive and declaratory relief.  *Feikema* 16 F.3d 1408 (4th Cir. 1994); *see also U.S. v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1454-57 (6th Cir. 1991) (claims for state law injunctive and declaratory relief preempted by EPA environmental action).

---

[4] *See, e.g.*, *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260 (11th Cir. 2000) (RCRA preempted state statute); *Ensco, Inc. v. Dumas*, 807 F.2d 743 (8th Cir. 1986) (RCRA preempted county ordinance); *Bartlett v. Honeywell Intl., Inc.*, 2017 WL 2223025, at *12 (N.D.N.Y. May 19, 2017) (granting motion to dismiss complaint for both damages and injunctive relief based on conflict preemption with federal environmental action); *Hermes Consol., Inc. v. People*, 849 P.2d 1302 (Wyo. 1993) (federal EPA action under RCRA preempted conflicting state action); *Blue Circle Cement, Inc. v. Bd. of Cty. Commissioners of Cty. of Rogers*, 917 F. Supp. 1514 (N.D. Okla. 1995) (RCRA preempted county ordinance).

In *Feikema*, the court affirmed an order granting defendants' motion to dismiss claims for injunctive relief, holding that the plaintiffs' claims for injunctive relief were preempted because they were at odds with an ongoing environmental cleanup pursuant to the EPA's authority under RCRA. 16 F.3d at 1411-12. The EPA had required the defendant there, among other things, to implement initial remedial measures, submit plans for EPA review and selection, and implement the plan under an EPA-reviewed schedule. *Id.* at 1416. Nonetheless, private plaintiffs sued for injunctive relief under state common law, requesting remedial measures beyond those directed by the EPA. *Id.* at 1411-12. The defendant moved to dismiss the state-law claims, arguing that the plaintiffs' requested injunctive relief would conflict with the ongoing EPA-supervised cleanup. *Id.* at 1411, 1415. The Fourth Circuit agreed, affirming the dismissal of plaintiffs' claims for injunctive relief on the ground that they "would conflict with the remedial measures selected and supervised by the EPA." *Id.* at 1416.

Plaintiff's requested injunctive and declaratory relief here is no different.[5]   As in *Feikema*, the Institute Facility has long been the subject of EPA investigation and remediation. As noted above, investigations at the site began as early as the 1980s. (*See supra* Background § I.)  In 1990, the EPA issued a corrective action permit pursuant to its authority under federal environmental statutes that has governed investigation and remediation activities ever since, both at the Institute Facility and adjoining properties. (*See* Dkt. 3-19 (effective January 1991)); 42 U.S.C. § 6924(u).  As the permit makes clear, it contains the "terms and conditions" that the EPA has "determined necessary to protect human health and the environment" pursuant to its authority under federal law. (*See* Dkt. 3-19, at 3; 40 C.F.R. § 270.32(b)(2).)

---

[5] While the Fourth Circuit in *Feikema* found that the plaintiff's claims for damages were not preempted (16 F.3d at 1418), the court did not hold that damages claims are *never* preempted.  Indeed, as discussed below, the Fourth Circuit later made clear in *Cavallo v. Star Enterprise* that under *Feikema*, claims for damages may also be preempted to the extent they conflict with an EPA cleanup.  100 F.3d 1150, 1156 (4th Cir. 1996).

Under the permit, the Institute Facility is required, among other things, to "submit to EPA, for approval," certain documentation about proposed corrective measures to ensure that the "proposed corrective measures will adequately remove, contain or treat the released hazardous wastes or hazardous constituents." (Dkt. 3-19 at 11.)   As required by the federal permit, defendants have for years submitted proposed remedial measures for EPA review and approval before implementation, and EPA has approved those remedial measures, supervised their implementation and ensured their effectiveness. (*See supra* Background §§ I-II.) Failure to fully comply with this and other terms of the corrective action permit would be a violation of federal law. (*See, e.g.*, Dkt. 3-19 at 4; 42 U.S.C. § 6928 ("Federal enforcement").) Indeed, the permit itself makes clear that "permit noncompliance constitutes a violation of RCRA." (*Id.*)

As discussed above, plaintiff's claims for injunctive and declaratory relief are directly at odds with the EPA's directives, as they seek to impose remedial measures that are different from those the EPA has already approved. *See Town of Acton v. W.R. Grace & Co. Conn., Technologies, Inc.*, 2014 WL 7721850, at *11 (D. Mass. Sept. 22, 2014) ("Enforcement of the proposed [local law] would displace each of these decisions and the general remedial scheme selected here by EPA.'") (internal quotations omitted). Plaintiff's claims are inconsistent with, among other things, both (1) the EPA-approved remedial measures that have been in place at the Institute Facility for years, which the EPA has concluded are effective, issuing a formal determination that any migration of contaminated groundwater is "under control" (EPA Institute Facility webpage, https://www.epa.gov/hwcorrectiveactionsites/hazardous-waste-cleanup-union-carbide-corporation-institute-operations, Ex. 3) and (2) the EPA's determination that there is no risk associated with contamination beneath WVSU property and thus "no further work is

necessary" to remediate contamination with respect to WVSU (Dkt. 3-7, CH2M Meeting Summary ¶ 6(b)).

Indeed, the preemptive effect of federal law is particularly strong here given that plaintiff's claims cover the exact same site and same alleged contamination already covered by the requirements in the EPA's corrective action permit.  *See Feikema*, 16 F.3d at 1416 (finding conflict preemption where "[t]he EPA order addresses the same site and conditions covered by the homeowners' suit").  The injunctive and declaratory relief plaintiff requests would not only dictate remedial measures that are inconsistent with what the EPA has ordered, but it would circumvent the entire approval process established by the EPA permit, putting this Court in the shoes of the EPA and requiring defendants to undertake corrective measures that have not been submitted to, studied by, or approved by the EPA, in violation of federal law.  (*See* Dkt. 3-19, USEPA Permit at 11.)

At bottom, plaintiff asks this Court to impose and administer a regulatory scheme in competition with the EPA.  (*See, e.g.*, Dkt. 3-1, First Am. Compl. ¶ 36 (listing requested declaratory relief, such as "[o]rdering Defendants to conduct periodic post-remediation studies and monitor"), ¶ 45 (requesting injunctive relief).)  Under well-established law, plaintiff's claims for injunctive and declaratory relief are preempted and should be dismissed.  *See Feikema*, 16 F.3d at 1416.  Holding otherwise would "substitute[e] [the Court's] judgment for the authorized judgment of the EPA" and "usurp[] the review role given by statute to the EPA."  *Id.*

**Damages.**  Plaintiff's claims for damages are likewise preempted.  The Fourth Circuit has held that damages claims "conflict with EPA Orders" and are therefore preempted where the allegedly tortious activities "were required, directed, or supervised by the EPA" and "were performed properly."  *Cavallo*, 100 F.3d at 1156.  That is the case here; not only has the EPA

been "supervising" the Institute Facility for the last 30 years, but plaintiff seeks damages based on the alleged inadequacy of remedial measures the EPA "directed" as well as the imposition of new and different remedial measures that the EPA has rejected.

Plaintiff's complaint makes clear that the tortious activities plaintiff alleges "were required, directed, or supervised by the EPA" and were "performed properly." (*Id.*; *see supra* Background § IV.)  As noted above, plaintiff's complaint seeks to impose remedial measures that the EPA has rejected, either by seeking direct injunctive relief at odds with what EPA requires or by claiming damages to reimburse WVSU for conducting such measures on its own.  Thus, for example, plaintiff seeks "all costs which are reasonably necessary to restore the University properties to the condition it would have been in absent the Defendant's contamination."  (Dkt. 3-1, First Am. Compl. ¶ 110.)  "In essence Plaintiffs' claims are based on the theory that the [EPA-approved] remediation plan was inadequate and resulted in their alleged damages."  *See Bartlett*, 2017 WL 2223025, at *11 (citing *Cavallo*, 100 F.3d at 1156).  Plaintiff's claims for damages are therefore preempted under *Cavallo*.

Plaintiff is not permitted "to gain indirectly, through the threat of monetary damages, what [it is] expressly prevented from gaining through an injunction—mandatory clean-up measures that are incompatible with those already approved by the EPA."  *See Feikema*, 16 F.3d at 1419 (Murnaghan, J., concurring); *Bartlett*, 2017 WL 2223025, at *7.  Plaintiff's claims for damages should be dismissed.  *See, e.g., id.* at *11-12 (relying on *Cavallo* to dismiss claims for damages preempted by EPA cleanup).

## II.     Plaintiff Fails To State Any Legally Cognizable Injury Under West Virginia Law.

Plaintiff's claims further fail because West Virginia does not recognize risk-based claims for property damage and, even if such claims were viable, plaintiff concedes there is no risk here.

A.     **The West Virginia Supreme Court Has Held That Plaintiffs May Not Bring Risk-Based Claims For Property Damage.**

A legally cognizable injury is a fundamental requirement of standing to bring a claim in court.  In order to establish standing, a plaintiff "must have suffered an 'injury-in-fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical."  *Findley v. State Farm Mut. Auto. Ins. Co.*, 576 S.E.2d 807, 821 (W. Va. 2002).

"[F]ear alone is not a sufficient basis for recovery."  *Carter v. Monsanto Co.*, 575 S.E.2d 342, 347 (W. Va. 2002).  "Mere diminution of the value of the property" is insufficient.  *Martin v. Williams*, 93 S.E.2d 835, 843-44 (W. Va. 1956).  Nor does an alleged need for "property monitoring" support a claim.  *Carter*, 575 S.E.2d at 347.  Rather, plaintiff must allege a concrete, legally cognizable injury and not a mere "risk" of some possible future harm.  Plaintiff's failure to establish standing and plead a legally cognizable injury is a jurisdictional defect that bars plaintiff's claims.[6]

In *Carter v. Monsanto Co.*, for example, the West Virginia Supreme Court of Appeals specifically rejected risk-based claims for property damage.  575 S.E.2d 342 (W. Va. 2002).  There, plaintiff landowner sought to recover the cost of monitoring property that was allegedly at risk from dioxin contamination.  *Id.*  As the Court observed, plaintiff "essentially argue[d] that medical monitoring which was instituted by th[e] Court in *Bower v. Westinghouse Elec. Corp.*,

---

[6] In considering the various aspects of this motion to dismiss that are brought pursuant to Rule 12(b)(1), the Court may consider evidence extrinsic to the complaint.  *See Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765, 769 (4th Cir. 1991) ("In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment."); *Dira v. Deutch*, 149 F.3d 1167 (table), 1998 WL 276236, at *1 (4th Cir. 1998) ("A rule 12(b)(1) motion to dismiss may be supported by a party's assertion that, based on extrinsic evidence outside of the pleadings, the court lacks subject matter jurisdiction.").

206 W. Va. 133, 522 S.E.2d 424 (1999), should be expanded to include property monitoring." *Id.* at 345.

The Court denied plaintiff's request to recognize a risk-based claim for property damage. The Court observed that "[n]either West Virginia common law nor West Virginia statutory law presently supports or recognizes a claim for property monitoring." *Id.* at 346. It declined to recognize a new cause of action, observing that plaintiff's argument "misconstrues nuisance law and would result in a fairly fundamental change in the manner in which nuisance litigation has been historically conducted in our courts." *Id.*

As the Court noted, any other rule would switch the normal burden of proof in a property damage case, which requires the plaintiff to establish each element of its claim, including a cognizable legal injury. Under well-settled West Virginia law, "the burden is on the plaintiff to prove the elements and to first suffer the expenditure of costs incurred to gather and put on the proof." *Id.* "Before one can recover under a tort theory of liability, he or she must prove each of the four elements of a tort: duty, breach, causation, and damages." *Id.*

The Supreme Court's decision in *Carter* bars the risk-based claims that plaintiff seeks to bring here. While plaintiff alleges that contamination has caused a "***risk*** of harm to the University's property" (Dkt. 3-1, First Am. Compl. ¶ 92 (emphasis added)) and that this risk has "caus[ed] alarm, stigma and uncertainty among students, patrons, staff and others as to ***whether*** the condition of the University's property poses a ***health risk***" and "an ***anticipated*** reduction in enrollment, customer base, and financial support of the University" (*id.* ¶ 29 (emphasis added)), the Court in *Carter* held that risk-based claims were insufficient to state a claim as a matter of law. As the Court further observed, "[i]t is well-settled … that under private nuisance, fear alone is not a sufficient basis for recovery." *Carter*, 575 S.E.2d at 347.

**B.    Plaintiff Concedes That There Is No Risk, And Thus Could Not State A Claim Even If Risk-Based Claims Were Recognized In West Virginia.**

The claims that plaintiff brings here, however, would fail even if West Virginia did recognize risk-based claims for property damage.  WVSU has repeatedly stated that "[t]he contamination does ***not*** pose a current health risk to anyone on campus," "available evidence does ***not*** indicate a threat to human health from these contaminants," and "the United States Environmental Protection Agency and the West Virginia Department of Environmental Protection ***agree***."  (Dkt. 3-2, 3-3, 3-4.)  WVSU does not use the groundwater as a source of drinking water for the campus, and the EPA has determined that there is no danger of exposure to any contaminants, and no risk to human health.

Accordingly, it is not surprising that plaintiff does not allege in its complaint that there is any risk to human health associated with the contamination it alleges is present in groundwater beneath its property.  Rather, the complaint alleges only that there is "***uncertainty***" among students, patrons, staff and others "as to ***whether*** the condition of the University's property poses a health risk."  (Dkt. 3-1, First Am. Compl. ¶ 29 (emphasis added).)

Given this repeated acknowledgment that there is no risk, plaintiff could not bring a risk-based claim even if one existed under West Virginia law.  In *Bower v. Westinghouse Elec. Corp.*, the West Virginia Supreme Court required that there be not only an alleged risk to support a claim for medical monitoring in the context of personal injury claims, but also that there be a "***significantly*** increased risk."  522 S.E.2d 424 (W. Va. 1999) (emphasis added).  Accordingly, even if the West Virginia Supreme Court in *Carter* had not rejected the extension of *Bower* to

property-damage claims like those here, plaintiff's claims would still fail because plaintiff cannot

establish that there is any risk, much less satisfy the other requirements in *Bower*.[7]

## III.    Plaintiff Cannot Bring These Claims Because It Does Not Own And Does Not Use The Allegedly Contaminated Groundwater.

Plaintiff's claims independently fail because it does not own the groundwater at issue

here and therefore lacks standing to sue.  In West Virginia, water, including groundwater, is held

by the State of West Virginia for the use and benefit of its citizens.  *See, e.g.,* W. Va. Code § 22-

26-3(a).  Accordingly, plaintiff does not own the groundwater; nor does it use it.  Plaintiff thus

lacks standing to bring any claim based on alleged contamination of groundwater.[8]

**WVSU Does Not Own The Groundwater.**   West Virginia has long adhered to the

"reasonable use" version of the doctrine of riparian rights.   Under the "reasonable use" rule,

property owners do not own the groundwater beneath their properties.   Instead, the State owns

the groundwater, allowing property owners "reasonable use" of those waters.  *See, e.g., Pence v.

Carney*, 52 S.E. 702 (W. Va. 1905); *Drummond v. White Oak Fuel Co.*, 140 S.E. 57, 59–61 (W.

Va. 1927) (observing that West Virginia has adopted the "reasonable use" or "American rule"

under which subsurface waters "[a]re not governed by the rules of law applied to water

courses"); *see also* W. Va. Code § 22-11-2 (declaring that "the water resources of this state with

---

[7] In *Bower*, the West Virginia Supreme Court of Appeals made clear that in order to state a claim for medical monitoring, exposure to a potentially hazardous substance is not enough: among other things, plaintiffs must allege "a significantly increased risk" of contracting a particular disease and that the proposed relief is "reasonably necessary."  *Id.* at 433.  Here, however, plaintiff does not and cannot make such allegations.  Plaintiff does not allege that there is any risk, much less a "significantly increased risk," from any contamination in the groundwater. To the contrary, plaintiff acknowledges that "[t]he contamination does ***not*** pose a current health risk."  (Dkt. 3-2, 4/27/17 press release at 1 (emphasis added).)  Nor can plaintiff allege that the remediation that plaintiff proposes is "reasonably necessary."  To the contrary, as noted above, the EPA has concluded that—given the absence of any human health risk—such remediation is not necessary.  Accordingly, even if the Supreme Court in *Carter* had not repudiated the extension of *Bower* to property damage claims, the allegations here would not support a cause of action.

[8] As noted above, standing is a jurisdictional issue, which in resolving the Court may consider extrinsic evidence under Fed. R. Civ. P. 12(b)(1).  *See supra* note 6.

respect to the quantity thereof be available for reasonable use by all of the citizens of this state").[9]

Pursuant to West Virginia's Water Resources Protection and Management Act, "[t]he waters of the State of West Virginia are claimed as valuable public natural resources **held by the state** for the use and benefit of its citizens." W. Va. Code § 22-26-3(a) (emphasis added). The Act provides that "[t]he state shall manage and protect **its waters** effectively for present and future use and enjoyment and for the protection of the environment." *Id.* (emphasis added).

The State of West Virginia oversees the maintenance and protection of all groundwater pursuant to the Groundwater Protection Act ("Groundwater Act"), W. Va. Code § 22-12-1, *et seq.* The Groundwater Act establishes that: "it is the public policy of the state of West Virginia to maintain and protect the **state's groundwater** so as to support the present and future beneficial uses and further to maintain and protect groundwater at existing quality." W. Va. Code § 22-12-2(b) (emphasis added).

Because WVSU does not own the groundwater beneath its property, it cannot bring a claim for its alleged contamination. *See, e.g., Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 734 (Minn. 1997) (holding that "groundwater contamination is damage to public property" and is not damage to the private property owner that owns the land above the groundwater); *Postma v. Cty. of Ottawa*, 2004 WL 1949317, at *14-15 (Mich. Ct. App. Sept. 2, 2004) ("[P]laintiff does not own the groundwater underlying his property but only enjoys a right to its

---

[9] A number of states have adopted this doctrine. *See, e.g., Ivory v. Int'l Bus. Machs. Corp.*, 116 A.D.3d 121, 310 (N.Y. App. Div. 2014) (under reasonable use rule, ground water "does not belong to the owners of real property"); *Reliance Ins. Co. v. Armstrong World Indus., Inc.*, 678 A.2d 1152, 1160–61 (N.J. App. Div. 1996) (groundwater cannot be deemed "property" that is "owned" by anyone; *United States Aviex Co. v. Travelers Ins. Co.*, 336 N.W.2d 838, 843 (Mich. App. 1983) (under "reasonable use" doctrine, owner of land atop groundwater does not "own" the groundwater); *LaSalle Nat'l Trust v. Schaffner*, 818 F. Supp. 1161, 1169–70 (N.D. Ill. 1993) (because groundwater in Illinois is subject to the "reasonable use" doctrine it "is not a matter of legal title," and, therefore, cannot be "owned"); *United States v. Conservation Chem. Co.*, 653 F. Supp. 152, 200 (W.D. Mo. 1986) (under reasonable use doctrine, groundwater was not "owned or controlled" by an insured).

reasonable use. . . . Accordingly, any cause of action for injury to the groundwater underlying plaintiff's property would belong to the state, not plaintiff.") (internal citations omitted); *Abnet v. Coca-Cola Co.*, 786 F. Supp. 2d 1341, 1345-46 (W.D. Mich. 2011) (dismissing plaintiff's claim for trespass because plaintiff lacked proprietary interest in allegedly contaminated groundwater).

      **WVSU does not use the groundwater at issue.**  Even if it owned the groundwater at issue (it does not), WVSU would be unable to bring a claim against defendants because, by its own admission, it does not use the groundwater and thus has not suffered any present, actionable "injury."  As reflected in the EPA record and as discussed above, "the WVSU property is supplied by municipal water and no drinking water wells are present on the property."  (Dkt. 3-35, at 1.)  As WVSU acknowledged in statements it made in conjunction with the filling of this lawsuit, the "contaminants have been introduced through groundwater, which ***is not used on campus*** …."  (Dkt. 3-2, at 1 (emphasis added); *see also* Dkt. 3-3, 3-4.)  Accordingly, even if WVSU owned the groundwater, it would have no basis for a claim.  *See, e.g., Findley*, 576 S.E.2d at 821 (in order to bring a claim, plaintiff "must have suffered an 'injury-in-fact'").

## IV.    Plaintiff's Claims Are Time-Barred.

      Even if plaintiff could state a claim, its claims would be time-barred.  Under the applicable statutes of limitations,[10] plaintiff was required to file this lawsuit—at the latest— within two years of the accrual of such claims.  *See Mullins v. Ethicon, Inc.*, 2017 WL 1345580, at *2 (S.D.W. Va. Jan. 20, 2017).  Plaintiff failed to do so.  As discussed above, the regulatory record demonstrates that plaintiff was on notice of its claims by 2013 at the latest— approximately four years before it filed this lawsuit on April 27, 2017.  (*See supra* Background §

---

[10] Under W. Va. Code § 55-2-12, the limitations period is at most two years for these claims.  *See Vorholt v. One Valley Bank*, 498 S.E.2d 241, 246 (W. Va. 1997) (§ 55-2-12 provides for "general 'catch-all' periods of limitations").

I.)[11]   Indeed, as discussed above, plaintiff concedes it knew about the contamination of groundwater beneath the Rehabilitation Center property when it acquired the property in 2013, and was provided a report that same year containing the results of the EPA-supervised study of the property describing the contamination.

Under West Virginia law, "whether a plaintiff 'knows of' or 'discovered' a cause of action is an objective test" that "focuses upon whether a reasonable prudent person would have known, or by the exercise of reasonable diligence should have known, of the elements of a possible cause of action." *Smith v. Velotta Co.*, 2016 WL 597743, at *4 (W. Va. Feb. 12, 2016) (internal quotations omitted).  Actual knowledge is not required.  Where a plaintiff is "on notice of the possible breach of a duty of care, that plaintiff has an affirmative duty to further and fully investigate the facts surrounding that potential breach." *Rahmi v. Jackson Kelly Attorneys at Law*, 2014 WL 1233740, at *7 (N.D. W. Va. Mar. 25, 2014) (internal quotations omitted) (dismissing claim as time-barred on motion to dismiss).[12]

Plaintiff had actual knowledge of the contamination on the WVSU campus and was actively participating in the EPA cleanup activities to address that contamination by 2013 (at the latest).[13]   (*See* Background §§ II-III.)  Because plaintiff had actual knowledge of its purported

---

[11] As noted, this regulatory record is subject to judicial notice.  *See, e.g., Witthohn*, 164 Fed. App'x 395; *Hall*, 385 F.3d at 424 n.3; *Consol. Salmonid Cases*, 688 F. Supp. 2d at 1016-17; *In re Am. Apparel, Inc. Shareholder Litig.*, 855 F. Supp. 2d 1064; *In re MTBE Prods. Liab. Litig.*, 959 F. Supp. 2d at 496; *Davis*, 2015 WL 3456656, at *2-3.

[12] Accordingly, for example, a plaintiff need not have actual knowledge that groundwater beneath its property is contaminated for property damage claims to accrue: notice that groundwater beneath nearby property is contaminated is sufficient.  *See, e.g., New W. Urban Renewal Co v Viacom, Inc.*, 230 F. Supp. 2d 568, 573 (D.N.J. 2002) ("[T]olling under the discovery rule is not dependent on whether actual sampling results have been taken, but whether there are enough indications of environmental contamination to put the plaintiff on reasonable notice of a need to investigate further."); *Mangini v Aerojet-Gen Corp.*, 230 Cal App 3d 1125, 1152–53 (Cal. Ct. App. 1991) (plaintiff had sufficient notice of its claim where California Department of Justice had "investigated defendant's practices regarding disposal of hazardous waste in the area" despite fact that plaintiffs did not receive report detailing contamination until later date).

[13] Here, plaintiff was on notice of its claims much earlier.  As noted above, the EPA published a report on groundwater contamination at the Institute Facility as early as 1984.  In the subsequent decades, the facility went

claims more than two years before it filed this lawsuit, its claims are time-barred.  *See, e.g., In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 380-81, 388-89 (S.D.N.Y. 2003) (plaintiffs had the requisite notice due to press reports of which court took judicial notice in granting motion to dismiss); *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1196 (10th Cir. 1998) (on motion to dismiss, affirming district court holding that article put plaintiff on inquiry notice); *Vector-Springfield Properties, Ltd. v. Cent. Ill. Light Co., Inc.*, 108 F.3d 806, 809-10 (7th Cir. 1997) (claims accrued for statute of limitations purposes when property owner received information that gas plant on adjacent property had caused environmental contamination); *Fronabarger Concreters, Inc.*, 971 F. Supp. 2d 896, 914 (E.D. Mo. 2013) (plaintiffs had requisite notice for statute of limitations purposes in light of EPA investigations); *Mangini v. Aerojet-General Corp.*, 230 Cal. App. 3d 1125, 1152 (Cal. App. Ct. 1991) (claims time-barred where, *inter alia*, federal regulatory agency "investigated defendant's practices regarding disposal of hazardous waste in the area").

## V.    Several Counts of Plaintiff's Complaint Fail For Additional, Independent Reasons.

Plaintiff's complaint is further deficient because it includes numerous counts that fail to state a claim for additional, independent reasons.

**Count I - Declaratory Judgment.**   As noted above, plaintiff requests wide-ranging declaratory relief seeking to require defendants to take a variety of remedial measures EPA has deemed unnecessary.[14]  Those claims are not only deficient for the reasons stated above, but fail for the following additional reasons.

---

through a permitting process for remediation of groundwater, conducted numerous studies, and took remedial measures to address groundwater contamination, as documented on the EPA's website.  (*See supra* Background §§ I-II.)

[14] Plaintiff's complaint purports to assert this count under the West Virginia Declaratory Judgment Act.  However, the Fourth Circuit has held that where such claims are removed to federal court, the federal Declaratory Judgment Act, 28 U.S.C. § 2201, applies.  *See, e.g., Jones v. Sears Roebuck and Co.*, 301 F. App'x 276, 281 n.12 (4th Cir. 2008) ("Although the State Complaint purported to invoke West Virginia's Declaratory Judgment Act, we apply the federal Declaratory Judgment act in this proceeding."); *Smith v. Scottsdale Ins. Co.*, No. 5:12-CV-86, 2014 U.S.

*First*, a declaratory judgment action is not a proper tool to determine claims like the ones at issue here.  A district court may entertain a declaratory action only "when it will clarify the legal relationships at issue and will afford relief from uncertainty and insecurity arising from the proceedings."  *Dann Marine Towing v. St. Paul Fire & Marine Ins.*, 2002 WL 34455167, at *3 (D.S.C. April 23, 2002).  Here, there are no "legal relationships" between plaintiff and defendants that must be "clarified" and thus no basis for declaratory relief.  *See id.*  A declaratory action is not appropriate, for example, to "merely determine whether [a party] is liable in tort for its prior actions."  *Tucker Materials, Inc. v. Safesound Acoustics, Inc.*, 971 F. Supp. 2d 537, 552 (W.D.N.C. 2013) (granting motion to dismiss because "a declaratory judgment would not prevent avoidable injuries and would not serve to clarify the uncertain legal rights of the parties" but rather would "merely determine whether Plaintiff was liable in tort for its prior actions"); *see also Dann*, 2002 WL 34455167, at *3 ("plaintiff cannot proceed under the Declaratory Judgment act with a simple negligence claim").

*Second*, plaintiff's request for a declaration that defendants must "fully indemnify" plaintiff for unspecified potential or future claims "by third parties" (Dkt. 3-1, First Am. Compl. ¶¶ 36(a)-(b)) should be dismissed as a matter of law because plaintiff lacks standing to bring such claims.  *See, e.g., Little Hocking Water Ass'n v. E.I. du Pont de Nemours & Co.*, 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015) (dismissing declaratory judgment action for indemnity on ground that future litigation was merely "hypothetical").  To be justiciable, a controversy "must be such that it can be presently litigated and decided."  *Id.* at 987.  It cannot be "hypothetical, conjectural, conditional or based upon the possibility of a factual situation that may never

---

Dist. LEXIS 7617, at *7-8 (N.D. W. Va. Jan. 22, 2014) ("[T]his Court notes that although the plaintiffs purport to invoke the West Virginia Declaratory Judgment Act in Count II of their complaint, this court must apply the federal declaratory judgment act after removal, as it is a procedural matter.").

develop." *Id.*  In this case, plaintiff does not allege it has been sued, or threatened with suit, by any third party.  Nor is there likely ever to be any such suit given that plaintiff concedes that there is not even any risk to anyone from the contamination at issue here, much less actionable harm.  Plaintiff's claim for declaratory judgment should be dismissed.

*Third*, plaintiff's complaint is devoid of any facts demonstrating that there is a "substantial controversy … of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.  *See Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Indeed, plaintiff has been fully aware of the contamination beneath its property for years, and there is no risk posed by the contamination: there is certainly no "immediacy" here. (*See* Dkt. 3-1, First Am. Compl. ¶ 26; Dkt. 3-30, East Property Boundary Investigation.)

**Count II - Injunctive Relief.**  Plaintiff has not met its burden to plead allegations demonstrating that it is entitled to the "drastic and extraordinary remedy" of injunctive relief that plaintiff seeks.  *See Monsanto Co. v. Geerton Seed Farms*, 561 U.S. 139, 165 (2010).  Plaintiff's complaint fails to set forth any well-pleaded facts that would plausibly entitle it to such relief.

*First*, plaintiff fails to adequately plead irreparable harm.  The complaint makes clear there is no, and there will not be any, harm, much less irreparable harm.  To the contrary, plaintiff alleges that the contamination has been present beneath its property for years (Dkt. 3-1, First Am. Compl. ¶ 26), and plaintiff repeatedly has acknowledged that there is not even any risk of injury associated with the contamination, much less harm, much less irreparable harm.  (*See supra* Background §§ II-III.)  The complaint fails on this ground alone.  *See, e.g., Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Dwyer v. Range Resources-Appalachia, LLC*, 2014 WL 1648272, at *4 (N.D. W. Va. Apr. 24, 2014) (dismissing claim for permanent injunction under Rule 12(b)(6) for lack of "irreparable injury"); *Standiford v.*

*Rodriguez-Hernandez*, 2010 WL 3670721, at *4 (N.D. W. Va. Sept. 15, 2010) (dismissing claim for preliminary injunction where "the plaintiff's complaint includes no facts in support of the argument that the plaintiff is likely to be irreparably harmed absent preliminary injunctive relief").

*Second*, plaintiff does not adequately allege that its remedies at law are insufficient. *See CMG Holdings Grp. v. Wagner*, 2016 WL 4688865, at *10 (S.D.N.Y. Sept. 7, 2016) (dismissing request for injunctive relief for failure to adequately plead that "remedies at law are insufficient to compensate a plaintiff for its injuries"). Plaintiff simply *asserts* without any explanation or well-pleaded facts that "remedies at law and monetary damages are inadequate to fully compensate the University." (Dkt. 3-1, First Am. Compl. ¶ 40.) Plaintiff never alleges why that is the case.

**Count VI - Trespass.** Plaintiff's claim for trespass fails because there is no tangible invasion of its property. "Under West Virginia law, to constitute a trespass, the defendant's conduct must result in an actual, nonconsensual invasion of the plaintiff's property, which interferes with the plaintiff's possession and use of the property." *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011). "[O]nly tangible, rather than intangible, invasions [are] deemed to constitute an actual interference with property." *Rhodes v. E.I. DuPont de Nemours & Co.*, 657 F. Supp. 2d 751, 771 (S.D.W. Va. 2009). Thus, the Supreme Court of Appeals of West Virginia has held that "chemical deposits upon [land] from fumes, gases, and dust" do not effect a trespass. *Bartlett v. Grasselli Chem. Co.*, 115 S.E. 451, 455 (W. Va. 1922).

In *Rhodes*, for example, the court dismissed a claim for trespass against a chemical manufacturer alleging that its release of perfluoroctanoic acid had contaminated drinking water.

657 F. Supp. at 756.   In holding that plaintiffs could not state a claim for trespass, the court explained that "West Virginia [adheres] to the traditional rule requiring a trespass to involve an invasion of property by tangible objects." *Id.* at 772.   Relying on the Supreme Court of Appeals' decision in *Barlett*, the court held that "the intrusion of particles through a municipal drinking water supply" could not constitute a trespass because such chemical intrusions were not tangible. *Id.*   Here, as in *Rhodes* and *Bartlett*, plaintiff's claim for trespass should be dismissed because it arises out of an alleged intangible intrusion of chemicals.   (*See* Dkt. 3-1, First Am. Compl. ¶ 21.)

**Count VII - Strict Liability.**   Plaintiff's claim for strict liability fails because defendants were not engaged in an "abnormally dangerous activity."   *See Crum v. Equity Inns, Inc.*, 224 W. Va. 246, 257 (2009) (West Virginia follows the Second Restatement of Torts, requiring an "abnormally dangerous activity").   Whether an activity qualifies as "abnormally dangerous" is a question of law for the Court.   *See e.g.*, *id.* at 257-59 (affirming dismissal on grounds that alleged activity was not abnormally dangerous as a matter of law); Rest. (2d) of Torts § 520 cmt. l (1977) (stating that "[w]hether the activity is an abnormally dangerous one is to be determined by the court").

Courts have repeatedly held that where, as here, an activity is regulated, strict liability is inappropriate because the existence of the regulatory scheme presupposes that the activity can be conducted in a manner such that it is not "abnormally dangerous."[15]   The same is true here where

---

[15] *See, e.g.*, *G.J. Leasing Co., Inc.*, 854 F. Supp. 539, 568 (S.D. Ill. 1994) (holding that activity was not abnormally dangerous where "[a] detailed regulatory scheme" governed the activity), *aff'd G.J. Leasing, Inc. v. Union Elec. Co.*, 54 F.3d 379, 386-87 (7th Cir. 1995); *New Meadows Holding Co. v. Wash. Water Power Co.*, 102 Wash. 2d 495, 500-02 (Wash. 1984) (no strict liability because "[g]as companies are subject to strict federal and state safety regulations" and thus "the high degree of risk involved in the transmission of natural gas through underground lines can be eliminated by the use of reasonable care and legislative safeguards"); *June v. Laris*, 205 A.D.2d 166, 169 (N.Y. Sup. Ct. App. Div. 1994) (dismissing strict liability claim where insecticide formula at issue had "been Federally approved since 1966"); *Edwards v. Post Trans. Co.*, 279 Cal. App. 3d 980, 986-87 (holding that because "sulfuric acid is governmental classified as a hazardous material" and "its transporters must be specially classified or registered," "such regulation" therefore "eliminate[s] the special risk" such that strict liability will not be imposed); *Lovick v. Nigro*, 1997 WL 112806, at *5 (Conn. Sup. Ct. Feb. 24, 1997) ("Our legislature has already addressed the

the activities at the Institute Facility are subject to regulation by the EPA.  (*See supra* Background § I.)  In addition to the extensive regulatory scheme that would apply to any such facility under federal law, the Institute Facility has been under the direct supervision of the EPA both pursuant to a Corrective Action permit governing the specific contamination at issue here and pursuant to an ongoing comprehensive cleanup.  (*See id.*)  Indeed, as noted above, far from creating the high degree of risk that would be associated with an "abnormally dangerous activity," plaintiff has repeatedly conceded that the level of contamination it alleges has been released from the Institute Facility poses *no risk* to the public.  (*See, e.g.*, *id.* § III (as acknowledged by WVSU, there is "no threat to human health" and "contamination does not pose a current health risk to anyone on campus").)

In addition, plaintiff nowhere pleads any facts with respect to any specific "activities" that it contends are abnormally dangerous.  (*See generally* Dkt. 3-1, First Am. Compl.)  Rather, plaintiff's allegations rest on the false premise that *any* activities anyone performs with respect to "dangerous chemicals" qualify as abnormally dangerous.  (*See, e.g.*, *id.* ¶ 91.)    But such allegations regarding allegedly abnormally dangerous *materials* are insufficient; plaintiff must adequately allege abnormally dangerous *activities*.  *See G.J. Leasing*, 854 F. Supp. at 568 ("[S]trict liability attaches only to abnormally dangerous activities, not substances."); *Splendorio v. Bilray Demolition Co., Inc.*, 682 A.2d 461, 465-66 (R.I. 1996) ("Absolute liability attaches only to ultrahazardous or abnormally dangerous *activities* and not to ultrahazardous or abnormally dangerous *materials*.").

**Count VIII - Unjust Enrichment.**  Plaintiff's unjust enrichment claim fails because plaintiff cannot establish that it conferred a benefit upon any of the defendants.  *Veolia ES*

---

policy question regarding lead-based paint hazards by establishing a statutory and regulatory scheme for inspection and abatement that does not impose strict liability.").

*Special Servs., Inc. v. Techsol Chem. Co.*, 2007 WL 4255280, at \*9 (S.D.W. Va. Nov. 30, 2007) (listing, among three elements of unjust enrichment, "a benefit conferred upon the plaintiff"). Courts commonly dismiss claims where the plaintiff did not confer any benefit upon the defendants.[16]

Here, plaintiff alleges that defendants have been unjustly enriched through the "unauthorized" use of plaintiff's property for the "disposal" of alleged contaminants and that defendants have "benefited and continued to benefit…by failing to reasonably abate, remove, and remedy this contamination."  (*See, e.g.,* Dkt. 3-1, First Am. Compl. ¶¶ 99-101.)  But allegations that contaminants have allegedly seeped into the groundwater beneath plaintiff's property do not qualify, both because the groundwater is not plaintiff's property and because plaintiff has pled no benefit to defendants.  To the contrary, defendants have had to engage in a variety of investigations of the groundwater flowing beneath plaintiff's property.    This claim should be dismissed.

## VI.    Plaintiff Has No Claim Against The Dow Chemical Company.

Plaintiff has no viable claim against Dow.  While plaintiff names Dow as a defendant, it does not allege how this entity, which never owned or operated the Institute Facility, could be held liable in this case.  Rather, it simply asserts that Dow is the parent of UCC, another corporate defendant.  (*See* Dkt. 3-1, First Am. Compl. ¶ 19.)

Under black-letter law, "deeply ingrained in our economic and legal systems," a parent corporation "is not liable for the acts of its subsidiaries."  *See Susko v. Cox Enterprises, Inc.*,

---

[16] *See, e.g.*, *HSBC Bank USA v. Resh*, 2016 WL 525829, at \*7-\*8 (S.D.W. Va. Feb. 8, 2016) (dismissing unjust enrichment claim where no "benefit conferred" on the plaintiff); *Waters v. Eletrolux Home Prods., Inc.*, 154 F. Supp. 3d 340, 351 (N.D. W. Va. 2015) (granting motion to dismiss where "plaintiffs cannot establish that they conferred a benefit on [defendant] that it unjustly retained"); *Devil's Advocate, LLC v. Zurich Am. Ins. Co.*, 666 Fed. Appx. 256, 261 (4th Cir. 2016) (affirming district court's dismissal of unjust enrichment claim for lack of plausible allegations that plaintiff conferred "actual benefits" on defendants).

2008 WL 4279673, at *8 (N.D. W. Va. Sept. 16, 2008) (quoting *United States v. Bestfoods*, 524 U.S. 51, 61 (1998)).  "[A] court cannot ignore separate corporate structures and imply liability, simply because one corporation controls another or the two such corporations share officers." *Id.* Nor can plaintiffs "seek[] to impose liability on [parent corporations] simply because these are the alleged parent corporations of [another defendant]." *Id.*  "This type of liability, however, is forbidden."  *Id.*  In short, "a parent corporation cannot be held liable for the acts of its subsidiary."  *Id.* (dismissing all claims against two parent corporations).

Despite this well-settled law, WVSU seeks to hold Dow liable for the acts of its subsidiary, UCC, without even attempting to plead any basis for piercing the corporate veil.  All claims against Dow should be dismissed.  *See, e.g.*, *O'Bryan v. Synthes, Inc.*, 2014 WL 297835, at *6 (S.D.W. Va. Jan. 27, 2014) (dismissing claim against parent corporation absent "factual allegations in the complaint to buttress, explain or otherwise support piercing the corporate veil in this instance").[17]

## VII.   To the Extent They Are Not Dismissed In Their Entirety, The Court Should Stay Or Dismiss Plaintiff's Claims Pending Completion of the EPA Cleanup.

Finally, defendants request that, to the extent plaintiff's claims are not dismissed with prejudice, they be stayed or dismissed without prejudice pending the conclusion of the EPA's

---

[17] Some courts have looked to the law of the state of incorporation of the subsidiary in determining whether the corporate veil may be pierced, which in this case would be New York (Dkt. 3-1, First Am. Compl. ¶ 4).  *See, e.g.*, *Mountain Link Assocs., Inc. v. Chesapeake Energy Corp.*, 2014 WL 4851993, at *6 (S.D. W. Va. Sept. 29, 2014) (While "[t]he Court has not found any cases on the applicable rule in West Virginia," "[i]n other jurisdictions, some courts have applied the internal affairs doctrine to impose the law of the state of incorporation upon piercing claims[.]").  However, WVSU has not stated a claim for veil-piercing under New York law either.  *See Am. Fuel Corp. v. Utah Energy Devel. Co., Inc.*, 122 F.2d 130, 134 (2d Cir. 1997) (New York law requires both "that the owner exercised complete domination over the corporation with respect to the transaction at issue" and "that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil").  Thus, regardless of which state's law applies, WVSU cannot hold Dow liable on a veil-piercing theory.  *Mountain Link Assocs., Inc.*, 2014 WL 4851993, at *7 ("But the Court need not undertake an extensive general choice-of-law analysis, because the law is not outcome determinative.  Both the Oklahoma and West Virginia law of veil-piercing point to the same result.").

ongoing investigation and remediation activities.  Such a stay or dismissal without prejudice would be appropriate in this case for multiple reasons.

**Primary jurisdiction doctrine.**  Courts frequently stay or dismiss litigation relating to ongoing environmental cleanup activities under the doctrine of primary jurisdiction.  *See Stevens v. Boston Scientific Corp.*, 152 F. Supp. 3d 527, 531 (S.D.W. Va. 2016) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)) (staying private civil action pursuant to doctrine of primary jurisdiction).[18]  The doctrine applies "where a claim can originally be addressed in a court but would be better addressed first by an administrative body."  *Id.* at 533.

In applying the doctrine, courts frequently consider, among other things: (1) "whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise"; (2) "whether the question at issue is particularly within the agency's discretion"; (3) "whether there exists a substantial danger of inconsistent rulings"; and (4) "whether a prior application to the agency has been made."  *See U.S. ex rel. Lambert v. Elliott Contracting, Inc.*, 2015 WL 1097381, at *9 (S.D.W. Va. Mar. 11, 2015) (granting stay); *Ellis v. Tribune Tele. Co.*, 443 F.3d 71, 82-83, 92 (2d Cir. 2006) (reversing because "[t]he district court erred in failing to recognize the FCC's primary jurisdiction in this matter").

All four factors weigh heavily in favor of the application of the doctrine here.  *First*, the technical and policy-based questions raised by plaintiff's claims are squarely within the EPA's

---

[18] *See also, e.g.*, *Jones v. Halliburton Energy Servs., Inc.*, 2016 WL 1212133, at *3 (W.D. Okla. Mar. 25, 2016) ("[T]he Court finds that it should abstain from exercising jurisdiction" in order to allow regulators to "continue the investigation, supervision, and remediation of the Site without the prospect of conflicting directives from this Court as to how the contamination should be remedied."); *Collins v. Olin Corp.*, 418 F. Supp. 2d 34, 45 (D. Conn. 2006) (applying primary jurisdiction doctrine in light of action by state regulatory agency); *Davies v. Natl. Cooperative Refinery Assoc.*, 963 F. Supp. 990, 999 (D. Kan. 1990) (applying primary jurisdiction doctrine "in order to permit the [state environmental agency] to continue its investigation, supervision, and remediation of the site without the prospect of conflicting directives from this court as to how the contamination should be remedied").

field of expertise.  (*See supra* Background §§ I-II.)  Based on such considerations, courts have repeatedly invoked the doctrine where there is an ongoing EPA cleanup.  *See, e.g.*, *Collins*, 318 F. Supp. 2d at 45; *Davies*, 963 F. Supp. 997.  "Deciding what remedy is appropriate for varying levels of contamination, and overseeing that remedial effort, is a matter more properly within the technical expertise and experience of the [state regulatory agency]."  *Collins*, 318 F. Supp. 2d at 45.  Indeed, "[t]here can be no question" that a complaint "raises issues that are within the special expertise" of the EPA where the "primary issues under that claim concern the extent of the threat posed by the hazardous waste, whether immediate remediation is required to protect health or the environment, and what type of remedy is best suited to the site."  *Davies*, 963 F. Supp. at 997.

*Second*, the issues raised by plaintiff's complaint are within the EPA's discretion.  The purpose of the EPA is to "permit[] coordinated and effective government action to assure the protection of the environment by abating and controlling pollution on a systematic basis."  40 C.F.R. § 1.3.  Under federal law, the EPA has broad authority to "develop regulations, guidance and policies that ensure the safe management and cleanup of solid and hazardous waste."  (*See* Dkt. 3-8, EPA RCRA Overview; *e.g.*, 40 C.F.R. §§ 261-262.)  As part of its mandate under federal statutes, the EPA issues corrective action permits like the one here to govern the investigation and remediation of releases of hazardous wastes or constituents from sites like the Institute Facility.  (*See generally* Dkt. 3-19, USEPA Permit;[19] 42 U.S.C. § 6924(u).)  The EPA has been exercising its discretion under such a permit with respect to the Institute Facility for years.  (*See supra* Background § I.)

---

[19] On a motion to dismiss or stay an action under the primary jurisdiction doctrine, courts may consider extrinsic evidence beyond the allegations in the complaint.  *See U.S. ex rel. Taylor v. Gabelli*, 345 F. Supp. 2d 340, 351 n.49 (S.D.N.Y. 2004); *MBR Constr. Servs., Inc. v. Liberty Mut. Ins. Co.*, 2016 WL 3190650, at *3 (D. Md. June 6, 2016) (no restriction on court's consideration of documents outside of the pleadings on motion to stay).

*Third*, plaintiff's lawsuit raises a substantial danger of inconsistent rulings were this Court to decline to defer to the EPA's jurisdiction.  In particular, "[a] potential for conflicting orders would exist if this court were to determine an investigatory and remediation plan independently of the [EPA]."  *See Davies*, 963 F. Supp. at 998.  As explained above (*see supra* Argument § I), plaintiff's requested relief is in direct conflict with the EPA's directives to date and would frustrate the EPA's chosen process of investigating, considering and studying proposed remedial measures before their implementation.  Likewise, plaintiff's request that this Court exercise concurrent jurisdiction over the cleanup (Dkt. 3-1, First Am. Compl. at ¶ 36(f)) would undoubtedly lead to conflicting obligations.

*Fourth*, the EPA has been directing and supervising the cleanup of the site for years.  In particular, EPA investigation and remediation activities with respect to the groundwater beneath the Institute Facility have been ongoing since at least the 1990s, and investigation and testing beneath the WVSU campus has been ongoing since at least 2013.  (*See supra* Background §§ I-II.)  The EPA's longstanding involvement further supports a stay or dismissal without prejudice here.  *See Sierra Club v. Chesapeake Oper., LLC*, 2017 WL 1287546, at *9 (W.D. Okla. Apr. 4, 2017) (stay warranted where "issues involved in this case [were] clearly before" the agency).  Indeed, where, as here, "the issue is already before the agency," "[i]t is axiomatic that the advisability of invoking primary jurisdiction is greatest."  *Jones*, 2016 WL 1212133, at *2 (internal quotations omitted).

*Finally*, the advantages of applying the doctrine far outweigh any potential costs.  *Elliott Contracting, Inc.*, 2015 WL 1097381, at *10 (internal quotations omitted).  The regulatory agencies are best-suited to oversee the remediation of the allegedly contaminated groundwater, and any judicial interference would only serve to impede their efforts.  Further, deference to the

regulatory agencies will mean that "both parties will have the benefit of the agency's special expertise on this issue." *Id.* at *10.

**Discretionary stay.** A stay or dismissal without prejudice is likewise warranted under this Court's inherent authority to control its docket, further judicial efficiency, and avoid deciding issues that may be rendered moot. A federal district court may exercise its discretion to stay a case "as part of its inherent power to control its own docket." *See Elite Constr. Team, Inc. v. Wal-Mart Stores, Inc.*, 2015 WL 925927, at *3 (D. Md. Mar. 2, 2015) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). In weighing a motion for discretionary stay, courts consider: (1) "the interests of judicial economy"; (2) "hardship and equity to the moving party if the action is not stayed"; and (3) "potential prejudice to the non-moving party." *Id.*

A stay here would be in the interests of judicial economy, and there would be little if any potential prejudice to WVSU, because the EPA-supervised investigation and remediation may very well moot all (or some) of WVSU's claims, rendering this litigation unnecessary. *See Doe v. Browner*, 902 F. Supp. 1240, 1250 (D. Nev. 1995) (plaintiffs' claims moot where "relief to which Plaintiffs may have been entitled in the citizen suit has been effectively eliminated by the actions of the EPA and the Air Force subsequent to the commencement of this litigation"); *Davis Bros., Inc. v. Thornton Oil Co.*, 12 F. Supp. 2d 1333, 1338 (M.D. Ga. 1998) ("[T]he proposed remedy of injunctive relief is moot because Conoco has already agreed to remediate the site and pay for any costs associated with the cleanup, and the state is overseeing the cleanup more effectively than the court ever could.").

Nor would there be any prejudice to WVSU from a stay or dismissal pending completion of the EPA cleanup. As noted above, the university concedes that there is no risk to human health. *See supra* Background § III. Accordingly, the most efficient way for both the Court and

the parties to resolve this litigation is to allow the EPA cleanup to run its course and then determine what, if any, dispute remains.  In contrast, moving forward with this case now would only result in needless expenditure of resources by the Court and the parties, arguing over dueling remediation schemes that may be rendered irrelevant by subsequent EPA actions.

## CONCLUSION

Defendants respectfully request that the Court dismiss plaintiff's complaint in its entirety.

Dated:  September 4, 2017

/s/Patricia M. Bello
R. Scott Masterson (WV Bar #10730)
Matthew A. Nelson (WV Bar #9421)
Patricia M. Bello (WV Bar #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLC
222 Capitol Street, Fifth Floor
Charleston, West Virginia 25301
(304) 553-0166
Scott.masterson@lewisbrisbois.com
Matt.nelson@lewisbrisbois.com
Patricia.bello@lewisbrisbois.com
Counsel for Union Carbide Corporation


/s/Floyd E. Boone, Jr.
Floyd E. Boone Jr. (WV Bar #8784)
Thomas A. Heywood (WV Bar #1703)
Roger G. Hanshaw (WV Bar #11968)
Bowles Rice, LLP
600 Quarrier Street
Charleston, WV 25301
(304)347-1733
fboone@bowlesrice.com
theywood@bowlesrice.com
rhanshaw@bowlesrice.com
Counsel for Union Carbide Corporation


/s/ Joseph M. Price
Joseph M. Price (WV Bar #2981)
Stephen F. Gandee (WV Bar #5204)
Robinson & McElwee, PLLC
700 Virginia Street, East, Suite 400
Charleston, West Virginia 25301
jmp@ramlaw.com
sfg@ramlaw.com
Counsel for Bayer Corporation, Bayer
CropScience LP, Bayer CropScience Holding,
Inc., Rhone-Poulenc, Inc., Rhone-Poulenc AG
Company, Rhone-Poulenc AG Company, Inc.
and Aventis Corporation USA LP

/s/ David R. Pogue
Michael W. Carey (WV Bar #635)
David R. Pogue (WV Bar #10806)
Carey, Scott, Douglas & Kessler, PLLC
901 Chase Tower
707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
(304) 345-1234
mwcarey@csdlawfirm.com
drpogue@csdlawfirm.com


and

Douglas J. Kurtenbach, P.C. (*pro hac vice*)
Douglas G. Smith, P.C. (*pro hac vice*)
Scott A. McMillin, P.C. (*pro hac vice*)
Kirkland & Ellis
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
douglas.kurtenbach@kirkland.com
douglas.smith@kirkland.com
scott.mcmillin@kirkland.com

*Counsel for The Dow Chemical Company*

UNITED STATES FEDERAL DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA

| | |
|---|---|
| WEST VIRGINIA STATE UNIVERSITY BOARD OF GOVERNORS for and on behalf of West Virginia State University, )<br><br>*Plaintiff*, )<br><br>v. )<br><br>THE DOW CHEMICAL COMPANY; UNION CARBIDE CORPORATION; BAYER CORPORATION; BAYER CROPSCIENCE LP; BAYER CROPSCIENCE HOLDING INC.; RHONE-POULENC INC.; RHONE-POULENC AG COMPANY; RHONE-POULENC AG COMPANY, INC.; and AVENTIS CROPSCIENCE USA LP, )<br><br>*Defendants*. ) | Case. No.  2:17-CV-03558 |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 4th day of September, 2017, the foregoing

"**MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

**PLAINTIFF'S COMPLAINT**" was electronically filed with the Clerk of the Court using the

CM/ECF system, which will send a Notice of Electronic Filing to, and constitutes service on:

Brian A. Glasser, Esquire
Samuel A. Hrko, Esquire
Steven R. Ruby, Esquire
Sharon F. Iskra, Esquire
Bailey & Glasser LLP
209 Capitol Street
Charleston, WV  25301
*Counsel for Plaintiff*

4826-4018-2350.1

Michael W. Carey, Esquire
David R. Pogue, Esquire
Carey, Scott, Douglas & Kessler, PLLC
P.O. Box 913
Charleston, WV 25323
*Counsel for The Dow Chemical Company*

Joseph M. Price, Esquire
Stephen F. Gandee, Esquire
Robinson & McElwee PLLC
700 Virginia Street, East, Suite 400
Charleston, West Virginia 25301
*Counsel for Bayer Corporation, Bayer CropScience LP,
BayerCropScience Holding, Inc., Rhone-Poulenc, Inc., Rhone-
Poulenc AG Company, Rhone-Poulenc AG Company, Inc. and
Aventis Corporation USA, LP*

/s/ Patricia M. Bello
Patricia M. Bello (WV Bar #11500)
LEWIS BRISBOIS BISGAARD & SMITH LLP
222 Capitol Street, Fifth Floor
Charleston, West Virginia 25301
(304) 553-0166
Patricia.bello@lewisbrisbois.com

4826-4018-2350.1