UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

WEST VIRGINIA STATE UNIVERSITY
BOARD OF GOVERNORS, for and on
behalf of West Virginia State
University,

        Plaintiff,

v.                              Civil Action No. 2:17-cv-3558

THE DOW CHEMICAL COMPANY, and
UNION CARBIDE CORPORATION, and
BAYER CORPORATION, and BAYER CROPSCIENCE
LP, and BAYER CROPSCIENCE HOLDING
INC., and RHONE-POULENC INC., and
RHONE-POULENC AG COMPANY, and
RHONE-POULENC AG COMPANY, INC., and
AVENTIS CROPSCIENCE USA LP,

        Defendants.

## MEMORANDUM OPINION AND ORDER

        Pending is a motion to remand this case to the Circuit Court of Kanawha County filed by plaintiff West Virginia State University Board of Governors, for and on behalf of West Virginia State University ("WVSU" or "the University"), on August 7, 2017.  As will be noted, defendants have filed supplemental submissions that they offer, as impacting the motion to remand, on each July 18, 2018, November 6, 2018, and March 5, 2019.

I.    <u>Factual and Procedural Background</u>

This case arises from the contamination of groundwater beneath land owned by WVSU and adjacent to a 433-acre industrial park in Institute, West Virginia owned or operated by all defendants at times relevant to this action ("the facility"). First Amended Compl. ("Am. Compl.") ¶¶ 15-20; Notice of Removal ("Not. Rem.") ¶¶ 7-8; Pl.'s Mem. Supp. Mot. Remand ("Pl.'s Mem.") at 3.  The facility consists of two distinct areas: a chemical manufacturing plant and wastewater treatment unit. Not. Rem. ¶ 8.

WVSU is a university founded by land-grant and under the authority of the West Virginia State University Board of Governors.  Am. Compl. ¶ 2; W. Va. Code § 18B-2A-1(b).  In or about 1947, Union Carbide Corporation ("UCC") purchased the facility and began manufacturing various hydrocarbon and agricultural products at the chemical plant.  Am. Compl. ¶ 15; Not. Rem. ¶ 9.  At that time, WVSU was separated from the chemical plant by less than a quarter mile, with the West Virginia Rehabilitation Center ("Rehabilitation Center") occupying the land between them.  Am. Compl. ¶ 15.  In or about 2014, WVSU acquired the former Rehabilitation Center land, extending their property to be immediately adjacent to the facility.  <u>Id.</u> ¶ 18.  UCC, now a subsidiary of Dow Chemical

Company, reacquired the facility in 2015.  Id. ¶ 19; Not. Rem.
¶ 9.

Because the facility treats, stores, and disposes of
potentially hazardous wastes, it is subject to Subtitle C of the
Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C.
§§ 6921-6939g, which created "a comprehensive cradle-to-grave
regulatory program for hazardous waste management."[1]  See RCRA
Orientation Manual at I-5, Ex. 8 to Notice of Removal; Notice of
Removal ("Not. Rem.") ¶¶ 1-3; Pl.'s Mem. at 4.

In 1984, the United States Environmental Protection
Agency ("EPA") initiated a corrective permitting action to
identify and remediate onsite Solid Waste Management Units
("SWMUs").  Not. Rem. ¶ 11.  The EPA issued a preliminary RCRA
corrective action permit, also referred to as a RCRA CA Permit,
in 1988 to Rhone-Poulenc — which purchased the facility in 1986.
Id.  In December 1990, the EPA issued a revised final RCRA CA
Permit, which was effective January 1991 to January 2001, and
subsequently extended until the effective date of any new

---

[1] Subtitle C of RCRA focuses on hazardous solid waste
requirements while Subtitle D, 42 U.S.C. §§ 6941-6949a, the
other major program that comprises RCRA, is dedicated to non-
hazardous solid waste.  See EPA RCRA Overview at 1, Ex. 7 to
Not. Rem.; RCRA Orientation Manual at I-2, Ex. 8 to Not. Rem.;
see also Envtl. Def. Fund v. U.S.E.P.A., 852 F.2d 1309, 1310
(D.C. Cir. 1988).

corrective action permit issued by the EPA.  Id.; Permit for

Corrective Action ("RCRA CA Permit"), Ex. 18 to Not. Rem;

Corrective Measures Proposal at 6, Ex. 15 to Not. Rem.[2]

Though the EPA issued the RCRA CA Permit, it delegated

authority to the West Virginia Department of Environmental

Protection ("WVDEP") to separately issue a Hazardous Waste

Management Permit ("Waste Permit") under the state's Hazardous

Waste Management Act.  See 42 U.S.C. § 6926(b); W. Va. Code

§§ 22-18-4, 22-18-8; 40 C.F.R. § 270.51.[3]  The current Waste

Permit was renewed by the WVDEP in 2014, effective until 2024.[4]

See Waste Permit at 3-4, 9-11, Ex. B to Pl.'s Mot Remand.[5]

Inasmuch as the EPA authorized West Virginia's hazardous waste

program to implement corrective action, including corrective

action permitting responsibilities under RCRA sections 3004(u)

and (v), the EPA requested that the WVDEP incorporate the

_____

[2] All references to the Corrective Measures Proposal utilize the
pagination generated by the Electronic Case Filing system.
[3] "In a State with a hazardous waste program authorized under 40
CFR part 271, if a permittee has submitted a timely and complete
application under applicable State law and regulations, the
terms and conditions of an EPA-issued RCRA permit continue in
force beyond the expiration date of the permit, but only until
the effective date of the State's issuance or denial of a State
RCRA permit."  40 C.F.R. § 270.51(d).
[4] The 2014 permit was issued to Bayer CropScience LP.  For
background, Rhone-Poulenc became Aventis CropScience in January
2000, and Aventis CropScience subsequently became Bayer
CropScience in 2002.  See Proposal at 6, Ex. 15 to Not. Rem.
[5] All references to the Waste Permit utilize the pagination
generated by the Electronic Case Filing system.

requirements of the RCRA CA Permit into the renewed 2014 Waste Permit, which WVDEP did.  See Waste Permit at 37, Ex. B to Pl.'s Mot Remand; see also West Virginia: Final Authorization of State Hazardous Waste Management Program Revisions, 78 Fed. Reg. 70,225, 70,229 (Nov. 25, 2013) (to be codified at 40 C.F.R. pt. 271); West Virginia: Final Authorization of State Hazardous Waste Management Program Revision, 68 Fed. Reg. 59,542 (Oct. 16, 2003) (to be codified at 40 C.F.R. pt. 271).

Nonetheless, the EPA remained the lead agency for implementing the RCRA CA Permit, and the WVDEP and EPA agreed in 2011 that the corrective measures for the wastewater treatment unit would be addressed by the RCRA CA permit issued for the main chemical plant.  Corrective Measures Proposal at 6, Ex. 15 to Not. Rem.

Since the EPA issued the RCRA CA Permit, the facility has undergone dozens of investigations, permitting cycles, and remediation activities with the oversight of the EPA and WVDEP. Not. Rem. ¶¶ 11-12, 14; see Corrective Measures Proposal at Table 1-1, Investigation, Permitting, and Remedial Action Timeline, Ex. 15 to Not. Rem., Ex. F to Pl.'s Mem.; W. Va. Code § 22-18-4.  Throughout the relevant period, and continuing today, certain contaminants were released from the facility into the groundwater that has migrated onto WVSU property.  Am.

Compl. ¶¶ 26; Pl.'s Mem. at 4.  These contaminants include 1,4 dioxane, 1,1 dichloroethane, and chloroform which are volatile and semivolatile organic compounds that can migrate upward through soil and vaporize into the air.  Am. Compl. ¶ 21; Pl.'s Mem. at 4.  All three of these contaminants have been classified by the EPA as probable human carcinogens.  Am. Compl. ¶ 23; Pl.'s Mem. at 4.

     Despite the nature of these chemicals, testing conducted in 2013 concluded that the contaminated groundwater poses no current risk to human health on the WVSU property, though these conclusions were based on the fact that there are no drinking water wells on the WVSU property and no occupied buildings in the area investigated on the WVSU property.  Pl.'s Mem. at 5; Not. Rem. ¶¶ 25-26, 28; Aug. 5, 2013 Ch2M Technical Memorandum at 6-7, Ex. C to Pl.'s Mem.  In 2014, the EPA approved a UCC report summarizing the 2013 investigation of the WVSU property, which included the recommendation of placing an environmental covenant on WVSU property prohibiting the use of groundwater, requiring a vapor barrier for new buildings constructed on the property, and prohibiting "residential reuse" of the property.  See Email from William Wentworth, Ex. 30 to Not. Rem.; Aug. 5, 2013 Ch2M Technical Memorandum at 8, Ex. C to Pl.'s Mem.  The environmental covenant recommendation was also

included in a 2016 report submitted to the EPA summarizing subsequent investigations of the WVSU property and, in July 2016, the EPA stated that it "agree[d] with the conclusions presented in that report" as well.  Not. Rem. ¶¶ 31-32; April 16, 2016 Ch2M Technical Memorandum at 14, Ex. 31 to Not. Rem.; July 18, 2016 Letter from William Wentworth, Ex. 32 to Not. Rem.

The RCRA CA Permit issued by the EPA in 1990 provides that, pursuant to § 3004(u) of RCRA and 40 C.F.R. § 264.101, operators of the facility must take corrective action as necessary to protect human health and the environment for release of hazardous waste or hazardous constituents from any solid waste management unit ("SMWUs") at the facility.  42 U.S.C. § 6924(u); 40 C.F.R. § 264.101(a); RCRA CA Permit at 11, Ex. 18 to Not. Rem; see also Waste Permit at 37-38.  The RCRA CA Permit requires the permittee to follow a corrective action process that starts with conducting an initial Verification Investigation and, if necessary, a RCRA Facility Investigation ("RFI") for suspected releases from specific SMWUs identified in the permit, and a Corrective Measures Study.  RCRA CA Permit at 11, Ex. 18 to Not. Rem.  If the EPA approves the Corrective Measures Study Report and finds that corrective measures are necessary, it will propose a major permit modification,

including the opportunity for a public notice period.  Id. at
11, 27; 42 U.S.C. § 6925(c); 40 C.F.R. § 270.41.

    With respect to the proposed environmental covenant,
although facility owners or operators must take corrective
action "beyond the facility boundary where necessary to protect
human health and the environment," they may only do so with the
consent of the off-site property owner.  42 U.S.C. § 6924(v), 40
C.F.R. § 264.101(c).

    UCC submitted a Corrective Measures Proposal
("Proposal") dated December 2016, addressing the contaminated
groundwater, to the EPA for review and approval.  See Not. Rem.
¶ 34; Letter to Bill Wentworth, dated Jan. 6, 2017, Ex. 15 to
Not. Rem.; Proposal, Ex. 15 to Not. Rem.  The Proposal
recommended that WVSU sign an environmental covenant "that
prohibits the construction of occupied structures over areas of
identified [vapor intrusion] risk, unless a [vapor intrusion]
mitigation is completed, and that restricts groundwater
extraction except for remediation purposes or to support
subsurface construction."  Proposal at 5, 10-11.  The Proposal
made no mention of compensation to WVSU for the impact on its
property.  See id.

    On April 10, 2017, the EPA informed defendants that
the Proposal did not meet the requirements of the facility's

corrective action permit insofar as it only contained some of the necessary elements of a Corrective Measures Study.  Email from Eric Weissbart, Ex. A to Pl.'s Reply.  For instance, the Proposal did not reference an EPA-approved RFI process, include a comprehensive current status of the facility, or include numeric media cleanup standards.  Id.  In May 2017, a meeting was held between representatives of the EPA, WVDEP, and defendants.  See Meeting Summary, prepared June 8, 2017, Ex. 6 to Not. Rem.  At that meeting, the EPA indicated that it "approved and endorsed" the submitted documents pertaining to WVSU and that, with respect to WVSU, "[n]o further work is necessary to address RCRA corrective action related to Institute site."  Id. at 2.  Going forward, the Proposal was referred to as a Corrective Measures Study ("CMS").  Id.

At this time, WVSU has not agreed to abide by the proposed environmental covenant.  Not. Rem. at p. 3.  On April 27, 2017, WVSU brought this action in the Circuit Court of Kanawha County seeking additional remedial measures to address the contamination of its property.  See Compl.  WVSU filed its First Amended Complaint on June 6, 2017, asserting several state and common law causes of actions and seeking declaratory judgment, injunctive relief, and punitive damages.  Am. Compl. ¶¶ 34-108.

9

Defendants timely removed the action to this court on
July 7, 2017, invoking this court's federal question, diversity
jurisdiction, and federal officer jurisdiction pursuant to 28
U.S.C. §§ 1331, 1332, 1441, 1442, and 1446.  Not. Rem. at p. 1.
Defendants assert federal question jurisdiction on grounds that
"plaintiff's claims represent a direct challenge to an ongoing
EPA cleanup," and "largely see[k] to supplant the . . .
cleanup," which, defendants contend, raises a federal issue.
Id. ¶¶ 52-53.  Defendants also argue that there is diversity
jurisdiction, maintaining that WVSU is not an agency or alter
ego of the state of West Virginia.  Id. ¶¶ 66-67.  Finally,
defendants assert federal officer removal because they claim to
be acting under the direction of federal officers who are
supervising the environmental remedial activities.  Id. ¶¶ 58-
59.

Plaintiff filed its motion for remand on August 7,
2017, contesting all three bases of removal and seeking an award
of attorney's fees as authorized by 28 U.S.C. § 1447(c).  WVSU
maintains that their complaint asserts only state law causes of
action that do not raise a federal issue.  Pl.'s Mem. at 1-2,
13.  Additionally, plaintiff states that the EPA's role in
approving any RCRA-compliant corrective action proposal does not
produce federal officer status for the purpose of federal

question removal.  Id. at 19-20.  Finally, WVSU asserts that, as a public university, it is appropriately considered an arm of the state that does not have citizenship for diversity jurisdiction analysis.  Id. at 21.

As this motion was pending, defendants made a supplemental submission on July 18, 2018 informing the court that the EPA issued a Statement of Basis ("SB") on July 13, 2018 describing the information submitted during the Verification Investigation, RFI, and CMS processes, and soliciting public comment on its proposed Final Remedy.  See Suppl. Submission Regarding EPA's Statement of Basis ("Suppl. No. 1"); SB at 3, Ex. A to Suppl. No. 1.  The SB provides that once the WVDEP issues its corrective action permit, referred to as a State CA Permit, the "EPA's Final Remedy will be enforceable under the State CA Permit and EPA will terminate the Federal CA Permit" previously issued by the EPA.  See SB at 3, Ex. A to Suppl. No. 1.

On November 6, 2018, defendants made a second supplemental submission informing the court that the public comment period on the Final Remedy proposed in the SB had concluded and that the EPA issued a Final Decision and Response to Comments ("Final Decision" or "FDRTC") on October 24, 2018. See Suppl. Submission Regarding EPA's Final Decision ("Suppl.

No. 2"). The EPA determined that modifications to the proposed Final Remedy were unnecessary, and the remedy selected in the SB became the Final Decision. FDRTC at 1, Ex. A to Suppl. No. 2.

The EPA's Response to Comments specifically addressed comments from WVSU, stating that "EPA disagrees with the University's comment that the proposed remedy is insufficiently protective with respect to the University. As stated in the SB, from 2013 to 2016, at the direction and oversight of EPA, UCC investigated groundwater along the eastern boundary of the Facility." See FDRTC, Attachment B at 6, Ex. A to Suppl. No. 2. Based on a subsequent Human Health Risk Assessment conducted by UCC, "EPA determined no groundwater constituents pose a current risk to human health at the University property because the University is on public water and groundwater from beneath the University is not a drinking water source. In addition, EPA's Final Remedy restricts groundwater use on the University property thereby eliminating future unacceptable exposures to groundwater." Id. On March 5, 2019, defendants provided a third supplemental submission to inform the court that the WVDEP issued a State CA Permit on February 22, 2019, which incorporated the EPA's Final Remedy. See Suppl. Submission Regarding RCRA CA ("Suppl. No. 3"); State CA Permit, Ex. A to Suppl. No. 3.

## II.  Governing Standard

"Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994) (citations omitted).  Title 28 U.S.C. § 1441(a) governs federal removal jurisdiction, allowing the removal of "any civil action brought in a State court of which" the district court would "have original jurisdiction."  28 U.S.C. § 1441(a).

Federal courts have original jurisdiction over two general types of civil actions: (1) cases "arising under the Constitution, laws, or treaties of the United States" (i.e., "federal question jurisdiction"), 28 U.S.C. § 1331; and (2) cases in which there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000 (i.e., "diversity jurisdiction"), 28 U.S.C. § 1332(a).  Home Depot U. S. A., Inc. v. Jackson, 139 S. Ct. 1743, 1746 (2019). Federal courts also have original jurisdiction over cases brought against federal officers or agencies.  28 U.S.C. § 1442(a)(1).

Federal question jurisdiction applies in "cases in which a well-pleaded complaint establishes either [1] that federal law creates the cause of action or [2] that the

13

plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." Franchise Tax Bd. v. Constr. Laborers Vacation Tr., 463 U.S. 1, 27–28 (1983); Battle v. Seibels Bruce Ins. Co., 288 F.3d 596, 606-07 (4th Cir. 2002). Federal officer removal is appropriate when an action is brought against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).

The burden of establishing removal jurisdiction rests on the removing party. Mulcahey v. Colum. Organic Chem. Co., 29 F.3d 148, 151 (4th Cir. 1994).  "Any doubts concerning the propriety of removal must be resolved in favor of retained state court jurisdiction." Marshall v. Manville Sales, Corp., 6 F.3d 229, 232 (4th Cir. 1993).  However, the usual presumption against retaining jurisdiction does not apply to federal officer removal, as "the right of removal conferred by § 1442(a)(1) is to be broadly construed." Kolibash v. Comm. on Legal Ethics of W. Virginia Bar, 872 F.2d 571, 576 (4th Cir. 1989); see also Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 147 (2007) ("[T]his Court has made clear that [§ 1442(a)(1)] must be 'liberally construed.'") (quoting Colorado v. Symes, 286 U.S.

510, 517 (1932)).  As the parties have relied on § 1442 as one basis for jurisdiction, the court will not presume that federal jurisdiction is inapplicable when considering their arguments as to that provision.

### III. <u>Analysis</u>

Each basis for removal asserted by the defendants will be considered in turn.

#### A. <u>Federal Question Removal</u>

Though defendants acknowledge that plaintiff's complaint does not assert a federal cause of action, they nonetheless state that federal question jurisdiction is appropriate because WVSU's state law claims constitute a "challenge" to an EPA cleanup and thus necessarily raises federal question jurisdiction.

##### i.   <u>Artful Pleading Doctrine</u>

First, defendants rely on an "independent corollary" to the well-pleaded complaint rule known as the artful-pleading doctrine, which provides that "a plaintiff may not defeat removal by omitting to plead necessary federal questions."  <u>See</u> <u>Rivet v. Regions Bank of Louisiana</u>, 522 U.S. 470, 475 (1998) (quoting <u>Franchise Tax Bd.</u>, 463 U.S. at 22).  "Under the artful-

pleading doctrine, a federal court will have jurisdiction if a plaintiff has carefully drafted the complaint so as to avoid naming a federal statute as the basis for the claim, and the claim is in fact based on a federal statute." Mikulski v. Centerior Energy Corp., 501 F.3d 555, 561 (6th Cir. 2007) (citing Franchise Tax Bd., 463 U.S. at 22); see also Federated Dep't Stores v. Moitie, 452 U.S. 394, 397 n.2 (1981)).

Defendants maintain that even though the amended complaint does not include any federal causes of action, it was "artfully pleaded" to avoid federal question jurisdiction. Defendants contend, without specification, that WVSU's complaint "seeks to 'challenge' an environmental cleanup being supervised by the EPA by requesting judicial orders that would dictate remedial actions or interfere with an ongoing cleanup." Not. Rem. ¶ 47; Defs.' Resp. at 9-12.

Conspicuous in its absence, defendants do not cite any federal statutes that govern a purported federal cause of action here. Defendants refer repeatedly to "challenges" to EPA "cleanups" based on a series of cases that specifically related to "challenges" to cleanups under the Comprehensive Environmental Response, Compensation & Liability Act ("CERCLA"), also known as the Superfund statute. See Lehman Bros Inc. v. City of Lodi, 333 F. Supp. 2d 895, 903, 906 (E.D. Cal. 2004)

(finding that plaintiff's "contract-related claims have 'artfully pleaded' a federal question as state law claims, namely whether the Investment Contract constitutes a 'challenge' to CERCLA" where there were cost recovery and contribution claims under CERCLA and the litigation delayed possible CERCLA remediation at the site); <u>N. Penn Water Auth. v. Bae Sys.</u>, No. 04-5030, 2005 U.S. Dist. LEXIS 10210, at *7, *20-28 (E.D. Pa. May 25, 2005) (denying motion to remand because plaintiff's state law claims related to Superfund site constituted a challenge to CERCLA cleanup over which the court had original jurisdiction under CERCLA § 113(b)); <u>See</u> Not. Rem. ¶¶ 47-57.

The facility here is a RCRA site, not a Superfund site.  Unlike the cases they cite in support of removal, defendants do not provide any basis to show that the facility qualifies as a CERCLA cleanup.  Section 113(b) of CERCLA provides that federal district courts "shall have exclusive original jurisdiction over all controversies arising under [CERCLA]."  42 U.S.C. § 9613(b).  Section 113(h) of CERCLA then strips federal courts of this jurisdiction, providing that "[n]o Federal court shall have jurisdiction under Federal law other than under [28 U.S.C. § 1332] (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate . . . to review <u>any challenges</u> to

removal or remedial action selected under [CERCLA § 104],[6] or to review any order issued under [CERCLA § 106],"[7] except in one of five specified exceptions, none of which are relevant here.[8]   42 U.S.C. § 9613(h) (emphasis added); see Hanford Downwinders Coal., Inc. v. Dowdle, 71 F.3d 1469, 1474 (9th Cir. 1995).

However, RCRA explicitly preserved other causes of action, including state law causes of action, stating that "[n]othing in this section shall restrict any right which any

---

[6] CERCLA § 104 authorizes the President to act "to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant."  42 U.S.C. § 9604.
[7] Section 106 of CERCLA, the second section referenced in § 133(h), allows the President to initiate an injunctive abatement action to potentially responsible private parties to clean up their own hazardous messes.  42 U.S.C. § 9606.
[8] The five exceptions are:

   (1) An action under [42 U.S.C. § 9607] to recover response costs or damages or for contribution.
   (2) An action to enforce an order issued under [42 U.S.C. § 9606(a)] or to recover a penalty for violation of such order.
   (3) An action for reimbursement under [42 U.S.C. § 9606(b)(2)].
   (4) An action under [42 U.S.C. § 9659] (relating to citizens suits) alleging that the removal or remedial action taken under [42 U.S.C. § 9604] or secured under [42 U.S.C. § 9606] was in violation of any requirement of this chapter.  Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.
   (5) An action under [42 U.S.C. § 9606] in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613(h)(1)-(5).

person (or class of persons) may have under any statute or common law to seek enforcement of any standard or requirement relating to the management of solid waste or hazardous waste, or to seek any other relief." 42 U.S.C. § 6972(f); see also Feikema v. Texaco, 16 F.3d 1408, 1414-15 (4th Cir. 1994). RCRA imposes the minimum standard of remediation and corrective action with which defendants must comply, see 40 C.F.R. § 264.100, but WVSU is free to seek and obtain additional or alternative relief to the extent it is entitled to that relief under state law.

The First Amended Complaint only brings state law claims of declaratory judgment, injunctive relief, and punitive damages and asserts claims for negligence, public nuisance, private nuisance, trespass, strict liability, and unjust enrichment. Am. Compl. ¶¶ 34-108. RCRA grants federal jurisdiction over citizen suits brought for a "violation of any permit, standard, regulation, condition, requirement, prohibition or order which has become effective pursuant to this chapter," or those brought against a person or entity "who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42

U.S.C. § 6972(a)(1).  RCRA prohibits these citizen suits if "the
EPA or the state has already 'commenced and is diligently
prosecuting' a RCRA enforcement action," which is not the case
here.  United States v. State of Colo., 990 F.2d 1565, 1578
(10th Cir. 1993) (quoting 42 U.S.C. § 6972(b)(1)(B)).

　　　More importantly, defendants offer no argument or
support to show that plaintiff challenges CERCLA activities as
defined under § 113(h).  WVSU argues that insofar as defendants
must act according to a RCRA CA Permit, ultimately issued on
February 22, 2019 following the EPA's Final Decision, it only
"constitutes compliance . . . with [RCRA]" rather than a
remedial "cleanup" under CERCLA.  See 40 C.F.R. § 270.4.
Accordingly, the court need not decide whether the state law
claims constitute a "challenge" inasmuch as they do not relate
to a CERCLA cleanup in the first place.

　　ii.  Grable Factors

　　　Even if the "artful pleading" doctrine does not confer
federal question jurisdiction, defendants argue that this case
"necessarily raises" a federal question.  In addition to civil
actions "arising under" federal law where "federal law creates
the cause of action asserted," there remains a "special and
small category" of cases that warrant federal question
jurisdiction even where a plaintiff advances only state law

20

claims.  Gunn v. Minton, 568 U.S. 251, 257–58 (2013).
"[F]ederal jurisdiction over a state law claim will lie if a
federal issue is: (1) necessarily raised, (2) actually disputed,
(3) substantial, and (4) capable of resolution in federal court
without disrupting the federal-state balance approved by
Congress."  Id. at 258 (citing Grable & Sons Metal Prods. v.
Darue Eng'g & Mfg., 545 U.S. 308, 313-314 (2005)).

     The Supreme Court has stated that "conditions of
comity make us reluctant to snatch cases which a State has
brought from the courts of the State, unless some clear rule
demands it."  Franchise Tax Bd., 463 U.S. at 21 n. 22.  Federal
jurisdiction is generally disfavored for cases that involve
substantial questions of state law, and state courts are often
"competent to apply federal law, to the extent it is relevant."
Empire HealthChoice Assur., Inc. v. McVeigh, 547 U.S. 677, 701
(2006); see Bender v. Jordan, 623 F.3d 1128, 1130 (D.C. Cir.
2005); Lontz v. Tharp, 413 F.3d 435, 441 (4th Cir. 2005).
Jurisdiction is "determined from what necessarily appears in the
plaintiff's statement of his own claim in the bill or
declaration."  Taylor v. Anderson, 234 U.S. 74, 75 (1914).

     In determining whether WVSU's First Amended Complaint
"necessarily raises" a federal issue, it is important to assess
the causes of action to determine whether the resolution of any

claim also requires the resolution of any portion of RCRA.  See
Grable 545 U.S. at 314-15.  If there is any legal theory which
allows for the resolution of WVSU's claims through the
application of state law alone, then a federal issue is not
"necessarily raised."  Flying Pigs, LLC v. RRAJ Franchising,
LLC, 757 F.3d 177, 182 (4th Cir. 2014) ("[A] plaintiff's right
to relief for a given claim necessarily depends on a question of
federal law only when every legal theory supporting the claim
requires the resolution of a federal issue.") (quoting Dixon v.
Coburg Dairy, Inc., 369 F.3d 811,816 (4th Cir. 2004) (en banc))
(emphasis in original).  The existence of any available federal
law defenses does not create a federal question.  Caterpillar,
Inc. v. Williams, 482 U.S. 386, 398-99 (1987) ([T]he presence of
a federal question . . . in a defensive argument does not
overcome the paramount polic[y] . . . that the plaintiff may, by
eschewing claims based on federal law, choose to have the cause
heard in state court.").

        Defendants again rely on the contention that
plaintiffs seek to "challeng[e] an ongoing federal environmental
action" to show that the complaint "necessarily raises" several
"substantial" and "disputed" questions.  Defs.' Resp. at 14.  As
the court already finds that the purported "challenge" does not

confer federal jurisdiction in this case, it need not rehash those arguments again.

Still, defendants argue that the requested injunctive relief raises the question of whether the whole case "should be dismissed or dismissed pending completion of the EPA's investigation and remediation activities."  Defs.' Resp. at 14-15.  They maintain that granting the relief sought in the complaint raises "substantial" federal issues inasmuch as the complaint seeks various remedial measures that impact the EPA-approved plan and thereby undermine the consistency of the federal statutory regime.  In addition to a request for an order to remove and remediate the contamination and conduct post-remediation studies and monitoring, defendants point to the request that they "must cease and desist from operating their facility" until they prevent further contaminating of WVSU's property.  Am. Compl. ¶¶ 36, 45.

WVSU's First Amended Complaint does not "necessarily raise" any federal issue.  All of WVSU's claims turn on questions of pure state law, including traditional tort law, questions of duty, breach, causation, and damages.  See also Giles v. Chicago Drum, Inc., 631 F. Supp. 2d 981, 989-90 (N.D. Ill. 2009) (remanding case even where resolution of the conspiracy claim may interpret and apply RCRA terms governing

the lawfulness of defendants' conduct); DeLuca v. Tonawanda Coke Corp., No. 2:10-cv-0859, 2011 U.S. Dist. LEXIS 96110, at *14-16 (W.D.N.Y. Aug. 25, 2011) (remanding case asserting only state law claims despite existence of related RCRA investigation and enforcement).  The RCRA site here is defendants' facility, not WVSU's property, which only related to the corrective action insofar as the EPA recommended, but did not impose, an environmental covenant.

The court must also respect the federal-state balance. See Franchise Tax Bd., 463 U.S. at 22 n.22 ("[C]onsiderations of comity make us reluctant to snatch cases which a State has brought from the courts of that State, unless some clear rule demands it.").  Although the EPA approved the Final Remedy, the corrective action at issue here was ultimately set forth in the 2019 permit issued by WVDEP.  The EPA authorized West Virginia to administer and enforce the corrective action at issue here. See 42 U.S.C. § 6926(b); State CA Permit, Ex. A to Suppl. No. 3. Even if plaintiffs' claims touch on the plans approved in the RCRA CA Permit, WVSU, as an alter ego of the West Virginia, has an interest in having its state law claims heard in state court.

Accordingly, the court does not have federal question jurisdiction over this case pursuant to 28 U.S.C. § 1331.

B. __Diversity__

Defendants assert that complete diversity exists in this matter.  They state that, although WVSU is a public university, it is not an arm, alter ego, or agency of the state of West Virginia, and, therefore, is a citizen of West Virginia. Because all defendants are citizens of other states, they maintain that this court has proper diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).  WVSU contests the characterization of the university as anything other than an agency of the state.

A state is not a citizen for purposes of diversity jurisdiction, and an action between a state and a citizen of another state does not create federal diversity jurisdiction. __Moor v. County of Alameda__, 411 U.S. 693, 717 (1973); __Postal Telegraph Cable Co. v. Alabama__, 155 U.S. 482, 487 (1894); __Md. Stadium Auth. v. Ellerbe Becket, Inc.__, 407 F.3d 255, 260 (4th Cir. 2005).  "[P]ublic entities and political subdivisions . . . are also not 'citizens of a state' if they are an 'arm or alter ego of the State.'"  __Md. Stadium Auth.__, 407 F.3d at 260 (citing __Moor__, 411 U.S. at 717-18).  Accordingly, if WVSU is an "arm or alter ego" of the State of West Virginia there is no diversity jurisdiction in this case.  See __W. Va. Bd. of Governors ex rel. W. Va. Univ. v. Rodriguez__, 543 F. Supp. 2d 526, 529-30, 535

(N.D.W. Va. 2008) ("hold[ing] that West Virginia University and
its Board of Governors are arms and alter egos of the State of
West Virginia").

"Because the question of whether an entity is an alter
ego of the state is a highly fact-intensive undertaking,
[courts] go into some detail regarding the University's
structure and operations." Md. Stadium Auth., 407 F.3d at 257.
The Fourth Circuit has applied a four factor test when making
this determination: (1) whether judgment will have an effect on
the state treasury; (2) whether the entity exercises a
significant degree of autonomy from the state; (3) whether the
entity is involved in local versus statewide concerns; and
(4) how the entity is treated as a matter of state law. Ram
Ditta v. Md. Nat'l Capital Park & Planning Comm'n, 822 F.2d 456,
457-58 (4th Cir. 1987); Rodriguez 543 F. Supp. 2d at 530.
"[T]he impact of the litigation on the state treasury remains
the most salient factor" for diversity analysis, and the
examination emphasizes "whether any recovery by the entity will
inure to the benefit of the state." Md. Stadium Auth. 407 F.3d
at 262.

Public state universities are "[a]lmost universally"
considered to be alter egos of the state. Md. Stadium Auth.,
407 F.3d at 262-63 (cataloguing decisions). Additionally, the

Board of Governors of West Virginia University ("WVU"), a public
university founded by a federal land-grant act analogous to
WVSU, has been held to be an alter ego of the state of West
Virginia.  Rodriguez, 543 F. Supp. 2d at 535; NIFA Land-Grant
Colleges and Universities, Ex. D to Pl.'s Reply; Joint
Stipulation of Facts ¶¶ 1-3, ECF Nos. 64, 65 ("J. Stip.").
"Despite this overwhelming precedent, 'each state university
must be evaluated in light of its unique characteristics.'"  Md.
Stadium Auth., 407 F.3d at 263 (quoting Univ. of R.I. v. A.W.
Chesterton Co., 2 F.3d 1200, 1204 (1st Cir. 1993)).

        Each of the four Ram Ditta factors will be considered,
as they apply to WVSU.

    i.    Effect on State Treasury

        "Moneys paid to or held by [a] [u]niversity are state
funds."  Rodriguez, 543 F. Supp. 2d at 533; see City of
Morgantown v. Ducker, 168 S.E.2d 298, 301 (W. Va. 1969) ("Moneys
received and administered by the board of governors are public
moneys."); State ex rel. Board of Governors of West Virginia
University v. Sims, 59 S.E.2d 705 (W. Va. 1950).  As in West
Virginia University Board of Governors ex rel. West Virginia
University v. Rodriguez, if WVSU successfully collects damages
for the contamination of its property these funds will be paid
into the state treasury and may only be withdrawn from the

treasury "upon warrant issued by the auditor on the treasurer
and by the check of the treasurer upon such warrant as provided
by [W. Va. Code § 12-3-1]."  543 F. Supp. 2d at 533 (N.D.W. Va.
2008) (quoting Ducker, 168 S.E.2d at 301); see also W. Va. Code
§§ 12-2-2, 18B-10-16; Am. Compl. ¶ 110.  Even though WVSU seeks
injunctive relief in addition to monetary damages, this does not
eliminate the potential impact on the state treasury as a result
of this action.

  ii.  Autonomy from the State

     Even where a board of governors has "great latitude in
the day to day operations of [a] [u]niversity," the board and
university may still be significantly tied to the state, such
that it cannot be said to be autonomous.  Rodriguez, 543 F.
Supp. 2d. at 533.  The court in Rodriguez analyzed twelve
factors about the governance and operations of the board of
governors of WVU, several of which apply equally to WVSU.  See
id. at 533-34; see also Md. Stadium Auth. 407 F.3d at 264.

     First, nine of the twelve members of WVSU's board of
governors are appointed by the governor of West Virginia.  W.
Va. Code § 18B-2A-1(c)(6); see Md. Stadium Auth., 407 F.3d at
264 (cataloging cases and finding that gubernatorial appointment
is a "key indicator of state control").  All members must take

an oath of office prescribed by the Constitution of West Virginia.  W. Va. Code § 18B-2A-1(e)(2).

Second, the nine governor-appointed members may be removed by the governor "only in the manner prescribed by law for the removal of the state elective officers."  W. Va. Code § 18B-2A-1(e)(3).

Third, WVSU lacks the power to tax.  J. Stip. ¶ 13; see Rodriguez, 543 F. Supp. 2d. at 534.

Fourth, money from WVSU accounts may only be withdrawn via a check issued by the state treasurer.  W. Va. Code § 12-3-1; see Ducker, 168 S.E.2d at 301.

Fifth, checks may only be issued upon requisition by WVSU to the state auditor.  W. Va. Code § 12-3-5; see id. § 12-3-1.

Sixth, WVSU employees are considered state employees who are given the benefit of the West Virginia Public Employees Grievance Procedure.  See id. § 6C-2-1 et seq.

Seventh, the board of governors has the duty to prepare an appropriations request to the West Virginia Higher Education Policy Commission ("HEPC"), the state's oversight

29

agency for higher education.  Id. §§ 18B-2A-4(f), 18B-1B-1, 18B-1B-4(28).

Eighth, the board of governors must prepare a schedule of all tuition and fees, file this schedule with the HEPC, and certify the schedule to the Legislative Auditor.  Id. § 18B-10-1(e).

Finally, WVSU must submit copies of its annual audited financial statements to the HEPC.  Id. § 18B-5-9(a)(3).

Defendants assert that WVSU's representation by private counsel, rather than the state attorney general or special assistants to the attorney general, indicates its autonomy from the state.  The Supreme Court of Appeals of West Virginia has stated that "in all instances when an executive branch or related State entity is represented by counsel before a tribunal, the Attorney General shall appear upon the pleadings as an attorney of record; however, this requirement does not bar other counsel from also appearing and acting in a legal capacity for the State entity."  State ex rel. McGraw v. Burton, 569 S.E.2d 99, 117 (W. Va. 2002).  In contrast with this proclamation, the board of governors has the power and duty to, [n]otwithstanding any other provision of [the West Virginia Code] to the contrary, acquire legal services that are necessary . . . . [T]he governing board may, but is not required to, call

upon the Attorney General for legal assistance and representation as provided by law."  W. Va. Code § 18B-2A-4(z) (emphasis added).

In <u>Rodriguez</u>, WVU was represented solely by private counsel.  There, as here, the court relied upon West Virginia Code § 18B-2A-4(z) to discount the defendant's assertion that WVU was not an arm of the state because the action did not involve the attorney general.  <u>Rodriguez</u>, 543 F. Supp. 2d at 534.  Even if the use of only private counsel indicates a lack of autonomy, it is but one consideration to that end, and is not dispositive of the issue.  <u>See</u> <u>Md. Stadium Auth.</u>, 407 F.3d at 264-65 (considering representation by the attorney general as one factor in its analysis).

Because of the numerous conditions of oversight and control executed on WVSU by the state of West Virginia, it cannot be considered autonomous from the state.

### iii. <u>Local Versus Statewide Concerns</u>

"Higher education is an area of quintessential state concern and a traditional state governmental function."  <u>Md. Stadium Auth.</u>, 407 F.3d at 265.  The legislature recognized the importance of educating young adults when it stated that "public higher education . . . benefit[s] the citizens of the State of

West Virginia," and "post-secondary education is vital to the future of West Virginia."  W. Va. Code § 18B-1-1a(a), (c). Furthermore, as a land-grant institution and to "aid in diffusing among the people . . . useful and practical information," 7 U.S.C. § 341, WVSU operates extension services related to agriculture, community and economic development, and family and consumer sciences at field offices in Fayette, Kanawha, Logan, Nicholas, Putnam, Raleigh, and Summers counties. J. Stip. ¶¶ 10, 14.

As a public university and land-grant institution, WVSU is clearly involved in statewide concerns.  See Md. Stadium Auth., 407 F.3d at 265 ("[T]he University [of Maryland's] mission, providing higher education for Maryland's youth, is clearly an area of statewide concern."); Rodriguez, 54 F. Supp. 2d at 535 (finding WVU to be involved in statewide concerns based, in part, on its mission of education).

    iv.   Treatment Under State Law

"Although the question of whether an entity is an alter ego of the state is a question of federal, not state, law, the manner in which state law addresses the entity remains 'important, and potentially controlling.'"  Md. Stadium Auth., 407 F.3d at 265 (quoting Hall v. Med. Coll. of Ohio at Toledo, 742 F.2d 299, 304 (6th Cir. 1984)).  In making this

determination, "a court may consider both the relevant state statutes, regulations, and constitutional provisions which characterize the entity, and the holdings of state courts on the question." Harter v. Vernon, 101 F.3d 334, 342 (4th Cir. 1996).

Public universities in West Virginia are treated as alter egos of the state. Time and again, the Supreme Court of Appeals of West Virginia has held WVU to be an arm of the state. Univ. of W. Va. Bd. of Trustees ex rel. W. Va. Univ. v. Graf, 516 S.E.2d 741, 745 (W. Va. 1998); Ducker, 168 S.E.2d at 304; Sims, 59 S.E.2d at 709. While these cases involve WVU rather than WVSU, both universities are land-grant institutions defined as "state institutions of higher education" under the West Virginia Code. W. Va. Code § 18B-1-2(27). Both the board of governors of WVU and the board of governors of WVSU are regulated under article two-a, chapter eighteen-b of the West Virginia Code. See W. Va. Code § 18B-2A-1 et seq. Both universities were founded as a result of federal land-grant acts, with WVU as a result of the First Morrill Act, and WVSU being founded as a result of the Second Morrill Act. J. Stip. ¶¶ 1-3, 7; see 7 U.S.C. §§ 301 et seq, 321 et seq.

Defendants argue that WVU and WVSU are not analogous because they resulted from two different land-grant acts, some thirty years apart. The Second Morrill Act provided land-grants

33

for what have become some of the Historically Black Colleges or Universities, and, in some instances, separate federal funds are available to these grantees than those who were founded under the First Morrill Act. J. Stip. ¶¶ 4, 8; see 7 U.S.C. § 323; 34 C.F.R. § 608.2; Ex. 14 to Defs.' Resp. This slight difference does not overcome the many similarities between WVU and WVSU for the purposes of determining their treatment under state law; furthermore, to the extent that defendants assert that these funding differences make WVSU autonomous from the state, this also is not dispositive of that issue.

WVSU is properly considered an arm of the state under the Ram Ditta factors that control in this Circuit. As such, it has no citizenship and the removal of this case cannot be justified on grounds of diversity pursuant to 28 U.S.C. § 1332(a)(1).

C. Federal Officer Removal

As previously noted, defendants' notice of removal asserted that one basis for removal was that of federal officer removal pursuant to 28 U.S.C. § 1442(a)(1). Defendants state, "this court has jurisdiction because defendants are acting under the direction of officials at the EPA who are federal officers" supervising the remedial cleanup activities. Not. Rem. at p.

23.   In pertinent part, § 1442(a)(1) allows for removal where a civil action is raised against:

> (1) The United States or any agency thereof or <u>any officer (or any person acting under that officer) of the United States or of any agency thereof</u>, in an official or individual capacity, <u>for or relating to any act under color of such office</u> or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1) (emphasis added).

To qualify for federal officer removal under § 1442(a)(1), a private defendant must establish: "(1) that it 'act[ed] under' a federal officer, (2) that it has 'a colorable federal defense,' and (3) that the charged conduct was carried out for on [sic, or] in relation to the asserted official authority."  <u>Sawyer v. Foster Wheeler LLC</u>, 860 F.3d 249, 254 (4th Cir. 2017) (citations omitted).

i.   <u>"Acting Under" a Federal Officer</u>

First, WVSU asserts that defendants are merely "private actors that are following government orders to comply with the law," but that this does not mean that they meet the requisite "acting under" standard.  Pl.'s Reply at 12.  WVSU further contends that federal officer removal is improper on the third factor because the EPA "did not, of course, direct defendants to release the [contaminants] into the University's

groundwater.  It was the release of the contaminants that gives rise to this civil action."  Pl.'s Mem. at 19-20.

Regarding the first element, the phrase "acting under" is "broad" and to be "liberally construed," but even "broad language is not limitless.  And a liberal construction nonetheless can find limits."  <u>Watson v. Philip Morris Cos.</u>, 551 U.S. 142, 147 (2007).  Insofar as a private entity is involved, the phrase "acting under" typically involves "a relationship where the government exerts some 'subjection, guidance, or control.'"  <u>Sawyer</u>, 860 F.3d at 255 (quoting <u>Watson</u>, 551 U.S. at 151).  The private entity must be engaging in "an effort to <u>assist</u>, or to help <u>carry out</u>, the duties or tasks of the federal superior."  <u>Watson</u>, 551 U.S. at 152 (emphasis in original).

In <u>Watson v. Philip Morris Cos.</u>, the Supreme Court rejected cigarette manufacturer Philip Morris' argument that federal officer removal was proper on the basis of heavy regulation by the Federal Trade Commission for the testing and labeling of cigarettes, finding that "a highly regulated firm cannot find a statutory basis for removal in the fact of regulation alone," for "the help or assistance necessary to bring a private person within the scope of the statute does <u>not</u> include simply <u>complying</u> with the law."  <u>Id.</u> at 152-53 (emphasis in original).  This is true "even if the regulation is highly

detailed and even if the private firm's activities are highly supervised and monitored." Id. at 153.

Watson noted cases where federal officer removal applied to government contractors, "at least when the relationship between the contractor and the Government is an unusually close one involving detailed regulation, monitoring, or supervision." Watson, 551 U.S. at 153 (citing Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387 (5th Cir. 1998)). Indeed, "courts have unhesitatingly treated the 'acting under' requirement as satisfied where a contractor seeks to remove a case involving injuries arising from equipment that it manufactured for the government." Sawyer, 860 F.3d at 255 (emphasis in the original) (citing Hurley v. CBS Corp., 648 F. App'x 299, 303 (4th Cir. 2016) and Papp v. Fore-Kast Sales Co., 842 F.3d 805, 812 (3d Cir. 2016)). Yet, Watson took care to distinguish "relationships where private entities are merely subject to federal regulation" — such as Philip Morris — "from the relationships where the private entity contracts with the government to fulfill a government need." Sawyer, 860 F.3d at 255 (citing Watson, 551 U.S. at 153-54).

Defendants state that their "investigation and remediation activities are being conducted under the ongoing direction and supervision of federal officers at the EPA."  Not.

37

Rem. ¶ 61; FDRTC, Attachment B at 6, Ex. A to Suppl. No. 2 ("As stated in the SB, from 2013 to 2016, at the direction and oversight of EPA, UCC investigated groundwater along the eastern boundary of the Facility . . . ."). Relying on two cases decided prior to Watson, defendants claim this supervision adequately satisfies the standard of federal officer removal. Not. Rem. ¶¶ 59-61.

In California v. H & H Ship Serv. Co., the Ninth Circuit Court of Appeals found that federal officer removal was warranted for a private defendant that was hired to assist in conducting a CERCLA cleanup that was "supervised" and "approved" by the United States Coast Guard. 68 F.3d 481 (table), 1995 U.S. App. LEXIS 30986, at *3-4 (9th Cir. Oct. 17, 1995). Unlike the present case, the private defendant in H & H did not cause the hazardous spill itself, but rather was hired after the fact to contain it based on the Coast Guard's instructions. Id. Greene v. Citigroup, Inc., which does not state whether the private defendant was responsible for the contamination itself, held that the defendant "implementing a remedy for clean-up . . . which the [EPA] had ordered pursuant to [CERCLA]" properly removed the case when the plaintiff sought injunctive and declaratory relief challenging the defendant's cleanup of the radioactive waste site. No. 99-1030, 2000 U.S. App. LEXIS

11350, at *2-3 (10th Cir. May 19, 2000).  As explained above, WVSU is not challenging an EPA-ordered cleanup nor has the EPA taken any enforcement action related to the facility.

Unlike the above two cases cited by defendants, a New Jersey district court has taken up the issue of a private defendant conducting a remedial CERCLA cleanup both before and after the Watson decision.  See Morgan v. Ford Motor Co., No. 3:06-cv-1080, 2007 U.S. Dist. LEXIS 52944 (D.N.J. July 23, 2007).  The action was initially brought in state court by current and former residents of the area near a contaminated landfill site who alleged that Ford Motor Company and Ford International Services, Inc. (collectively "Ford defendants") "failed to investigate and remediate the true extent and magnitude of contamination."  Id. at *16-17.

The Ford defendants removed the action to federal court under the federal officer removal statute, claiming that their remediation activities at the landfill "were governed by consent orders entered into with the EPA pursuant to CERCLA . . . and [they] were therefore acting under the direction of a federal officer."  Id. at *17.  Although the District of New Jersey initially denied the motion to remand, the court found it necessary to reexamine its subject matter jurisdiction over the action following the Watson decision.  Id. at *17-18.  Upon

reconsideration, the court determined that even though the Ford defendants' remediation "conduct was governed by a series of administrative consent orders, and [they were] doing exactly what the [EPA] told [them] to do," they did not qualify for federal officer removal because they were not "acting under" a federal officer. Id. at *18-20. The court acknowledged that "the precise issue before the Supreme Court in Watson concerned compliance with a federal regulation, and not compliance with a [CERCLA] consent order, [but] nonetheless [found] Watson controlling" because "the fact that the federal government is directing, supervising and monitoring a company's activities does not necessarily allow the company to remove a case to federal court." Id. at *19.

As in Morgan, the language and reasoning of Watson forecloses federal jurisdiction in this case. The defendants in this action are merely operating within the highly regulated industry related to hazardous wastes. RCRA requires that "each person owning or operating an existing facility or planning to construct a new facility for the treatment, storage, or disposal of hazardous waste . . . have a permit." 42 U.S.C. § 6925; see also W. Va. Code § 22-18-8. A RCRA permit provides "conditions necessary to achieve compliance with [RCRA] and regulations"

including "conditions . . . necessary to protect human health and the environment."  40 C.F.R. § 270.32(b)(1)-(2).

Again, defendants' arguments rely on cases that concerned CERCLA cleanups rather than corrective action permits under RCRA.  See H & H Ship Serv. Co. 1995 U.S. App. LEXIS 30986 at *3; Greene 2000 U.S. App. LEXIS 11350 at *2-3.  Though the statutes and associated regulatory schemes share some similarities, there are notable differences between them, particularly with regard to the selection of remedial actions and the role of the federal government.

CERCLA authorizes the President to act "to remove or arrange for the removal of, and provide for remedial action relating to such hazardous substance, pollutant, or contaminant."  42 U.S.C. § 9604.  This duty of the President is delegated to federal agencies.  40 C.F.R. § 300.100.  The lead federal agency is responsible for conducting removal and remedial evaluations on a site with a possible CERCLA contamination, for conducting removal of the contaminants, and for selecting appropriate remedial actions.  See 40 C.F.R. §§ 300.410, 300.415, 300.420, 300.430.  The federal authority may allow the owner or operator of a contaminated facility or any other potentially responsible party to conduct a remedial investigation or take part in removal, but this is at the

41

discretion of the federal agency.  See 42 U.S.C. §§ 9604(a)(1),
9622; 40 C.F.R. § 300.415(a)(2).

RCRA, by comparison, places the responsibility for
investigation, reporting, and remediation on the owner or
operator of the facility or site itself.  A facility takes
actions in compliance with RCRA, first by applying for a permit,
and then by complying with the regulations and terms governing
that permit.  See 40 C.F.R. § 270.4 ("Compliance with a RCRA
permit . . . constitutes compliance . . . with [RCRA]."); 40
C.F.R. § 270.32(b).  In accordance with the applicable
regulations, defendants' permit specifically requires that
"[t]he Permittee will submit a [Proposal] to address the need
for corrective action" at the facility.  Id. at 41.  The
Proposal should "develop and evaluate the corrective action
alternative(s), provide information on the effectiveness of
interim measures implemented at the Facility, and recommend
corrective measure(s) to be taken at the Facility for approval
by WVDEP."  Id.  "If the [WVDEP] Project Manager and/or EPA
determines . . . that corrective measures for releases of
hazardous waste or hazardous constituents are necessary to
protect human health or the environment" the Permittee will be
advised of such determination in writing.  Id. at 41-42.  As
required by their RCRA permit, defendants submitted their

Proposal to be approved by the WVDEP and the EPA.  After receiving final approval, defendants are now required to take actions that have been accepted as meeting minimum RCRA standards.

While CERCLA focuses on the prompt removal and remediation of contaminants by the federal government for the public health, RCRA seeks to achieve its goals by "assuring that hazardous waste management practices are conducted in a manner which protects human health and the environment," and "requiring that hazardous waste be properly managed in the first instance thereby reducing the need for corrective action at a future date."  42 U.S.C. § 6902(a)(4)-(5).  Facility operators or owners seeking a permit under RCRA are themselves responsible for instituting corrective action.  See 42 U.S.C. § 6924(u); 40 C.F.R. § 264.101(a).

Another objective of RCRA is "establishing a viable Federal-State partnership to carry out the purposes" of the statute and to "give a high priority to assisting and cooperating with States in obtaining full authorization of State programs under" Subtitle C, which relates to hazardous solid waste management.  42 U.S.C. § 6902(a)(7).  As such, the federal government has a more significant role and greater discretion in controlling a CERCLA cleanup when compared to a RCRA corrective

action.  Defendants' proffered cases are distinguishable inasmuch as they relate to CERCLA cleanup actions rather than RCRA corrective actions.

The oversight and supervision conducted by the EPA at the facility here is indicative only of defendants' compliance with highly detailed statutes and regulations applicable to all members of the industry related to hazardous waste. Successfully invoking federal officer removal requires more, namely, "that a private entity must be assisting the federal government in carrying out the government's own tasks."  Mays v. City of Flint, Mich., 871 F.3d 437, 444 (6th Cir. 2017) (citing Watson, 551 U.S. at 152).

While defendants' conduct may be "highly supervised and monitored," mere compliance with the law does not amount to "acting under" a federal officer for the purposes of 28 U.S.C. § 1442(a)(1).  Defendants have not established that their investigations taken under the RCRA corrective action process and the remediations approved by the EPA amount to "an effort to assist, or to help carry out, the duties or tasks of the federal superior."  Watson, 551 U.S. at 152.

ii.   "Colorable Federal Defense"

       With respect to the second factor, defendants assert
that they have a "colorable federal defense" that WVSU's claims
are preempted by federal law and that their actions were taken
in compliance with EPA directives.  See Feikema, 16 F.3d at 1416
("We hold that when the EPA, acting within valid statutory
authority of the RCRA and not arbitrarily, enters into a consent
order, that order will also preempt conflicting state
regulation, including a federal court order based on state
common law."); Not. Rem. ¶ 63.  Plaintiffs do not address
whether these arguments amount to colorable federal defenses.

       Defendants only need to raise a "colorable" federal
defense, which "does not require the defendant to 'win his case
before he can have it removed' nor even establish that the
defense is 'clearly sustainable.'"  Ripley v. Foster Wheeler
LLC, 841 F.3d 207, 210 (4th Cir. 2016) (quoting Willingham v.
Morgan, 395 U.S. 402, 407 (1969)); Magnin v. Teledyne Cont'l
Motors, 91 F.3d 1424, 1429 (11th Cir. 1996) (finding defendant's
assertion that he "complied with all his federal law
obligations" adequate to show colorable federal defense).
Defendants' preemption argument also constitutes a colorable
federal defense for removal purposes.  See Cobb v. GC Servs.,
LP, No. CV 3:16-3764, 2016 WL 7155765, at *3 (S.D.W. Va. Dec. 7,

45

2016).  Accordingly, the court finds that defendants satisfy
this factor.

### iii. Act for or Relating to Official Authority

Prior to the 2011 amendment of 28 U.S.C. § 1442(a)(1),
an entity seeking federal officer removal had to show that the
suit was "for a[n] act under color of office," which was
interpreted to require "a causal connection between the charged
conduct and asserted official authority."  Sawyer 860 F.3d at
258 (quoting Jefferson County v. Acker, 527 U.S. 423, 431
(1999)).  However, in 2011, the statute was augmented by the
addition of the phrase "or relating to," so that the action, to
be removable, may be "for or relating to any act under color of
[federal] office."  28 U.S.C. § 1442(a)(1); see Sawyer 860 F.3d
at 258.  "This new language broadened the universe of acts that
enable federal removal such that there need only be a connection
or association between the act in question and the federal
office."  Id. (internal citation and quotation marks omitted)
(emphasis in original).  This standard does not require
"specific government direction" or a strict causal connection
between the charged conduct and a person acting under a federal
officer.  Id.

In Sawyer v. Foster Wheeler LLC, the Fourth Circuit
determined that the government contractor defendant adequately

46

demonstrated a "connection or association" between its failure
to warn employees of the dangers of asbestos exposure and the
"intense direction and control" asserted by the United States
Navy that prohibited it from "affix[ing] any type of warning or
caution statement to a piece of equipment intended for
installation onto a Navy vessel, beyond those required by the
Navy." , 860 F.3d 249, 253 (4th Cir. 2017). The court found
that "the Navy dictated the content of warnings on [defendant's]
boilers, and [defendant] complied with the Navy's requirements.
That relationship was sufficient to connect the plaintiffs'
claims, which [were based on] warnings that were not specified
by the Navy, to the warnings that the Navy specified and with
which [defendant] complied." Id. at 258. Thus, the plaintiff's
claims undoubtably "'relat[ed] to' all warnings, given or not,
that the Navy determined in its discretion." Id.

        Still, a defendant must "plausibly assert that the
acts for which they have been sued were carried out 'for or
relating to' the alleged federal authority." Mayor & City
Council of Baltimore v. BP P.L.C., 388 F. Supp. 3d 538, 569 (D.
Md. 2019), as amended (June 20, 2019), aff'd, 952 F.3d 452 (4th
Cir. 2020). Ryan v. Dow Chem. Co., 781 F. Supp. 934, 950
(E.D.N.Y. 1992) (finding that defendants could not remove under
§ 1442(a)(1) because "[a]lthough the defendants later produced

and delivered [the product] under the control of federal
officers, these subsequent acts are distinct from the earlier
acts of product and manufacturing design being sued upon.").

In <u>Mayor & City Council of Baltimore v. BP P.L.C.</u>, the
Fourth Circuit distinguished <u>Sawyer</u> in holding that the
defendant fossil fuel companies did not satisfy the causation
prong of § 1442.  952 F.3d 452, 467-68 (4th Cir. 2020).  The
court affirmed that while the plaintiff mayor and city sued the
defendants "for their contribution to climate change by
producing, promoting, selling, and concealing the dangers of
fossil fuel products," defendants "failed to show that a federal
officer 'controlled their total production and sales of fossil
fuels,' or 'directed them to conceal the hazards of fossil fuels
or prohibited them from providing warnings to consumers.'"  <u>Id.</u>
at 467 (quoting 388 F. Supp. 3d at 568-69).

Defendants portray the acts that led WVSU to file this
action not as the contamination itself, but as the failure to
take corrective remediation actions, stating, "plaintiff alleges
that the defendants have not properly cleaned up contamination
allegedly emanating from the Institute Facility."  Not. Rem.
¶ 62.  Characterizing the claims as the lack of remediation,
defendants assert that the "claims have a causal nexus to the
remediation work that defendants have performed and are

continuing to perform under the ongoing and continuing
supervision of the EPA." Id. However, defendants acknowledge
that "[t]his dispute concerns contamination from a chemical
plant in Institute, West Virginia that plaintiff alleges has
seeped into groundwater underneath adjoining property
purportedly owned by [WVSU]." Id. at p. 2.

Unlike Sawyer, where "the Navy was aware of the
dangers of asbestos" and nonetheless "required the use of
asbestos in boilers for which it contracted with" the defendant
manufacturer, the EPA did not require or direct defendants to
take the actions that are at the heart of this suit. 860 F.3d
at 258. The event sued upon here is the contamination of WVSU's
property, not the subsequent EPA plan related to defendants'
facility administered and enforced under the State CA Permit
ultimately issued in 2019. WVSU's First Amended Complaint
states that defendants "contaminated the groundwater under
[WVSU] with three likely carcinogens, yet [defendants] refus[e]
to clean up the pollution and pay for the harm [they have]
caused the University . . . . The University brings this action
to compel Dow and others who operated the plant to clean up
their mess and pay for the damage they have done." Am. Compl. ¶
1. It goes on to assert that "[a]cts and omissions by the
[d]efendants have directly and proximately caused . . .

dangerous chemicals to enter the groundwater under the
University's property . . . . These acts and omissions include
but are not limited to the [d]efendants' failure to take
measures adequate to prevent the [contaminants'] escape into the
groundwater, resulting in the migration of said chemicals to
[WVSU] property." Id. ¶ 20.

Under the broadened standard of the amended federal
officer removal statute, defendants have not plausibly asserted
a "connection or association" between the charged acts and their
compliance with RCRA under the supervision of the EPA.  Inasmuch
as defendants have failed to demonstrate that they "acted under"
a federal officer or show a causal connection between the
charged conduct and asserted official authority, the court does
not have federal officer jurisdiction over this action.

IV.   Attorney's Fees and Costs

WVSU requests an award of costs and fees incurred as a
result of removal as authorized by 28 U.S.C. § 1447(c), which
states in pertinent part: "An order remanding the case may
require payment of just costs and any actual expenses, including
attorney's fees, incurred as a result of the removal."
"[C]ourts may award attorney's fees under § 1447(c) only where
the removing party lacked an objectively reasonable basis for
seeking removal.  Conversely, when an objectively reasonable

basis exists, fees should be denied."   Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005).  Despite plaintiff's contentions otherwise, the court finds that the defendants were objectively reasonable in their removal of this action.

V.   Conclusion

For the foregoing reasons, it is ORDERED that the plaintiff's motion to remand be, and it hereby is, granted and this case is remanded to the Circuit Court of Kanawha County, West Virginia.  It is further ORDERED that plaintiff's motion be, and it hereby is, denied as to the request for fees and costs associated with this remand.

The Clerk is requested to transmit this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: June 1, 2020

John T. Copenhaver, Jr.
Senior United States District Judge